**UNITED STATES of America**

v.

**Gary Lee SAMPSON**

**Cr. No. 01–10384–MLW.**

United States District Court,
D. Massachusetts.

Aug. 26, 2004.

David A. Ruhnke, Ruhnke & Barrett, Montclair, NJ, Robert L. Sheketoff, Boston, MA, for Judge Mark L. Wolf, Defendants.

Frank M. Gaziano, United States Attorney's Office, George W. Vien, United States Attorney's Office, John A. Wortmann, Jr., United States Attorney's Office, for USA, Plaintiff.

*MEMORANDUM AND ORDER CONCERNING TRIAL RULINGS*

WOLF, District Judge.

TABLE OF CONTENTS

I. INTRODUCTION ............................................... 173

II. FACTUAL BACKGROUND AND PROCEDURAL HISTORY ............... 174

III. THE FEDERAL DEATH PENALTY ACT .............................. 175

IV. PROCEDURAL PROTECTIONS AFFORDED BY 18 U.S.C. § 3432 ......... 176

V. EVIDENTIARY RULINGS RELATING TO PHOTOGRAPHS .............. 177
 A. GENERAL STANDARDS ...................................... 177
 B. APPLICATION OF STANDARDS TO GOVERNMENT'S
 PROFFERED EVIDENCE ..................................... 178

VI. EVIDENTIARY RULINGS RELATING TO BLOODY CLOTHING .......... 184

VII. VICTIM IMPACT EVIDENCE .................................... 186
 A. GENERAL STANDARDS ...................................... 186
 B. APPLICATION OF STANDARDS TO THIS CASE ................... 187

VIII. EVIDENCE RELATING TO OTHER CAPITAL PROSECUTIONS ......... 193

IX. THE COURT'S AUTHORITY TO REVIEW THE SUFFICIENCY OF
 THE GOVERNMENT'S EVIDENCE ................................ 198

X. ESPECIALLY HEINOUS, CRUEL OR DEPRAVED MANNER OF
 COMMITTING THE OFFENSE ...................................202
 A. SERIOUS PHYSICAL ABUSE.......................................204
 B. TORTURE .........................................................206
 C. SUFFICIENCY OF THE EVIDENCE AS TO SERIOUS
 PHYSICAL ABUSE .........................................207
 D. SUFFICIENCY OF THE EVIDENCE AS TO TORTURE .............208

XI. SUBSTANTIAL PLANNING AND PREMEDITATION ...................209
 A. DEFINITION ......................................................209
 B. SUFFICIENCY OF THE EVIDENCE................................211

XII. VULNERABLE VICTIM ...............................................212
 A. DEFINITION ......................................................213
 B. SUFFICIENCY OF THE EVIDENCE................................214

XIII. OBSTRUCTION OF JUSTICE .........................................215
 A. DEFINITION ......................................................215
 B. SUFFICIENCY OF THE EVIDENCE................................216

XIV. FUTURE DANGEROUSNESS ...........................................217
 A. JURY INSTRUCTIONS ............................................223
 B. EVIDENTIARY RULINGS RELATING TO GOVERNMENT'S
 PROFFER .....................................................224
 C. SUFFICIENCY OF THE EVIDENCE................................225
 D. EVIDENTIARY RULINGS RELATING TO DR. MARK
 CUNNINGHAM ................................................226

XV. MITIGATING FACTORS AS QUESTIONS OF LAW OR FACT .............228

XVI. JURY INSTRUCTIONS RELATING TO MITIGATING FACTORS .........232
 A. STATUTORY MITIGATING FACTORS RELATING TO MENTAL
 CONDITION ..................................................232
 B. NON–STATUTORY MITIGATING FACTORS RELATING TO
 MENTAL CONDITION .........................................233
 C. OTHER MITIGATING FACTORS ...................................234

XVII. INSTRUCTIONS RELATING TO THE WEIGHING PROCESS .............234

XVIII. INSTRUCTIONS RELATING TO FAILURE OF THE JURY TO
 REACH A UNANIMOUS VERDICT ....................................240

XIX. ISSUES RELATING TO FEDERAL RULE OF CRIMINAL
 PROCEDURE 12.2 ..................................................241
 A. SUFFICIENCY OF SAMPSON'S RULE 12.2 NOTICE .................241
 B. CONTENT OF SAMPSON'S RULE 12.2 NOTICE ....................242
 C. DESIGNATION OF FIRE–WALLED ASSISTANT UNITED
 STATES ATTORNEYS .........................................243
 D. ADVANCE NOTICE TO THE DEFENDANT OF GOVERNMENT
 TESTING .....................................................245
 E. TAPE–RECORDING OF GOVERNMENT'S TESTING .................246

XX. ORDER ................................................................248

## I. INTRODUCTION

On January 29, 2004, pursuant to the jury's verdict, this court sentenced the defendant, Gary Sampson, to be executed on each of two counts of carjacking resulting in death in violation of 18 U.S.C. § 2119(3).

*See* 300 F.Supp.2d 275 (D.Mass.2004). This death sentence is the first imposed in the District of Massachusetts or any other district within the First Circuit since Congress and the President reinstituted a federal death penalty in 1988. Consequently, as this case was being tried, the court found that there were few binding precedents interpreting and applying the Federal Death Penalty Act, 18 U.S.C. §§ 3591–3598 (the "FDPA").

This Memorandum and Order summarizes and explains some of the decisions the court made during the pretrial proceedings and the trial. These include: (1) a clarification of the procedural protections concerning jury selection afforded the defendant in a capital case under 18 U.S.C. § 3432; (2) evidentiary rulings applying the standard set forth in 18 U.S.C. § 3593(c); (3) a discussion of the court's power to strike an aggravating factor because the government failed to introduce sufficient evidence to prove the factor beyond a reasonable doubt; (4) explanations of rulings and jury instructions relating to aggravating factors; (5) explanations of rulings and jury instructions relating to mitigating factors; (6) explanations of general FDPA jury instructions; and (7) explanations of rulings relating to the provisions of Federal Rule of Criminal Procedure 12.2 that address issues relating to a capital defendant's mental condition.

The court is issuing a separate Memorandum and Order concerning its oral decisions on Sampson's post-trial motions.

The court is issuing this Memorandum and Order to memorialize some of its decisions and for the instructive value they may have in view of the limited body of capital case law in the First Circuit. It is not, however, intended to be a substitute for the oral rulings issued from the bench as reflected in the transcripts of the proceedings.[1] Unlike the transcripts, the Memorandum and Order does not include all of the rulings made at trial or all of the reasoning articulated by the court at the time the rulings were made. Instead, the Memorandum and Order focuses on those aspects of the court's rulings that are most likely to be at issue in future FDPA cases. To the extent, if any, that there appears to be an inconsistency between the summaries in the Memorandum and the court's oral explanations for its decisions, the oral explanations should generally be regarded as more accurate and complete.

## II. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

After committing a series of bank robberies in North Carolina in May, June and July 2001, Sampson fled to the Boston area. On July 23, 2001, Sampson called the Boston office of the Federal Bureau of Investigation (the "FBI") in an attempt to turn himself in. However, his call was disconnected and, although he waited to be arrested, the FBI failed to arrive and arrest him. *See United States v. Anderson,* 229 F.Supp.2d 17, 19 (D.Mass.2002); *United States v. Anderson,* 260 F.Supp.2d 310, 312 (D.Mass.2003).

On July 24, 2001, Phillip McCloskey, a 69–year old retiree, picked up Sampson, who was hitchhiking. Sampson subsequently murdered McCloskey with a knife and attempted to steal his automobile.

On July 27, 2001, Sampson was hitchhiking again. He was picked up by Jonathan Rizzo, a college student. Sampson murdered Rizzo by tying him to a tree and then stabbing him to death. Sampson then stole Rizzo's automobile.

---

1. Some portions of the Memorandum and Order are based on the transcripts of the court's oral decisions.

On July 30, 2001, Sampson encountered Robert Whitney in New Hampshire. Sampson murdered Whitney by tying him to a chair and strangling him to death. Sampson then stole Whitney's automobile.

On July 31, 2001, William Gregory picked up Sampson, who was hitchhiking in Vermont. Sampson pulled a knife and ordered Gregory to drive down a dirt road. Gregory, however, jumped out of his automobile, which Sampson drove away. Gregory reported that his car had been stolen. Shortly thereafter, Sampson called 911 to surrender.

Sampson was arrested by the Vermont State Police and quickly confessed his crimes, including the murders of McCloskey, Rizzo, and Whitney. He gave an additional tape-recorded confession to two Massachusetts State Police troopers who traveled to Vermont to question Sampson. On August 1, 2001, Sampson was brought back to Massachusetts, where he gave another tape-recorded confession to troopers of the Massachusetts State Police.

Later that month, Sampson was charged by the Commonwealth of Massachusetts for the murders of McCloskey and Rizzo. On October 24, 2001, Sampson was also indicted in this federal case. The Massachusetts charges against Sampson were dismissed in deference to this federal prosecution. Sampson offered to plead guilty and accept a federal sentence of life in prison without the possibility of parole. The Department of Justice did not accept this offer. Rather, on November 19, 2002, the Attorney General filed a Notice of Intent to seek the death penalty in this case.

Sampson filed several pretrial motions challenging the constitutionality of various provisions of the FDPA. In *United States v. Sampson*, 245 F.Supp.2d 327 (D.Mass. 2003) (*Sampson I*) and *United States v. Sampson*, 275 F.Supp.2d 49 (D.Mass.2003) (*Sampson II*), the court rejected these challenges.

On December 23, 2003, Sampson pled guilty to both charges. Accordingly, the court impaneled a jury to determine the penalty. *See* 18 U.S.C. § 3592(b)(2)(A); *United States v. Sampson*, 297 F.Supp.2d 340 (D.Mass.2003). Jury selection began on September 18, 2003 and was completed on October 27, 2003. On December 23, 2003, the jury returned its verdicts requiring that the death penalty be imposed on both counts. *See* 18 U.S.C. § 3594.

## III. THE FEDERAL DEATH PENAL-TY ACT

The unique structure of the FDPA has been discussed at length in several published opinions. As this court wrote in August 2003:

> If the government decides to seek the death penalty, the FDPA bifurcates the trial into two phases, a guilt phase and a penalty phase. The penalty phase occurs only if the defendant is found guilty of a capital offense. In the context of this case, the government must prove during the guilt phase, beyond a reasonable doubt, that the defendant committed at least one carjacking or attempted carjacking resulting in death within the meaning of 18 U.S.C. § 2119(3). If the government proves either of the two capital charges, a penalty phase of the jury trial will be required.

There are two distinct issues before the jury during the penalty phase. The first is whether the defendant is eligible for the death penalty. If so, the second is whether the death penalty is justified.

In order to establish eligibility for a death sentence for a homicide, the government must prove, beyond a reasonable doubt, that: the defendant was at least 18 years old at the time of the offense, 18 U.S.C. § 3591(a); he acted with one of the four mental states set

forth in 18 U.S.C. § 3591(a)(2); and at least one of the sixteen statutory aggravating factors set forth in 18 U.S.C. § 3592(c) exists. If the government fails to establish eligibility, a death sentence cannot be imposed.

If the jury finds that the defendant is eligible for the death penalty, it must decide whether a sentence of death is justified. In reaching this decision, the jury must weigh any aggravating factors against any mitigating factors. In order to recommend that the defendant be sentenced to death, the jury must unanimously conclude that "all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death, or, in the absence of a mitigating factor, [ ] the aggravating factor or factors alone are sufficient to justify a sentence of death." 18 U.S.C. § 3593(e). The jury can also recommend a sentence of life imprisonment or, in some cases, some lesser punishment. A jury's "recommendation" of a sentence of death or life imprisonment is binding on the court. 18 U.S.C. § 3594. Aggravating factors may include statutory aggravating factors and non-statutory aggravating factors identified by the government in its notice of intent to seek the death penalty. *See* 18 U.S.C. § 3593; § XII.A, *infra.* Mitigating factors may include any "relevant circumstance that could cause [a jury] to decline to impose the [death] penalty." *McCleskey v. Kemp,* 481 U.S. 279, 305–06, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987).

Different standards govern the proof of aggravating factors and mitigating factors. "The burden of establishing the existence of any aggravating factor is on the government, and is not satisfied unless the existence of such a factor is established beyond a reasonable doubt. The burden of establishing the existence

of any mitigating factor is on the defendant, and is not satisfied unless the existence of such a factor is established by a preponderance of the information." 18 U.S.C. § 3593(c). A jury must unanimously agree that an aggravating factor has been proven in order to consider it in deciding if the death penalty is justified. 18 U.S.C. § 3593(d). However, any juror who finds that the defendant has established a mitigating factor may take it into account in considering whether a death sentence is justified even if no other juror finds that that mitigating factor has been proven. *Id.*

The FDPA refers to "information" rather than "evidence" because the penalty phase of a capital case is not governed by the Federal Rules of Evidence. *See* 18 U.S.C. § 3593(c). Rather, any relevant information may be presented to the jury unless "its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." *Id.*

*Sampson II,* 275 F.Supp.2d at 61–62.

## IV. PROCEDURAL PROTECTIONS AFFORDED BY 18 U.S.C. § 3432

18 U.S.C. § 3432 provides procedural protections for defendants in capital cases beyond those afforded defendants in non-capital cases. The statute requires that a defendant in a capital case "shall at least three entire days before commencement of trial be furnished with a copy of the indictment and a list of the veniremen, and of the witnesses to be produced on the trial for proving the indictment, stating the place of abode of each venireman and witness." The statute further provides that the lists of veniremen and witnesses "need not be furnished if the court finds by a preponderance of the evidence that providing the list may jeopardize the life or safety of any person."

There is some debate as to whether "place of abode" means "township of resi-

dence" as opposed to street address. *Compare United States v. Frank,* 11 F.Supp.2d 322, 326 n. 6 (S.D.N.Y.1998) (noting that some courts have interpreted "place of abode" to mean township, but that the government in *Frank* agreed to disclose addresses) *with United States v. Insurgents,* 2 U.S.(2 Dall.) 335, 1 L.Ed. 404, 26 F. Cas. 499 (C.C.D.Pa.1795) (No. 15,443) (Patterson, J.) (rejecting list that specified only state or county rather than township). The court has found no cases, however, that suggest that the government's initial witness list, which identified law enforcement witnesses by agency rather than home address, satisfied the statute. "Place of abode" does not mean a business address. Accordingly, the court ordered that the government submit a new witness list that included the home address of every witness it intended to call in its case-in-chief. In order to accommodate the government's legitimate concerns about making the home addresses of law enforcement officers part of the public record of this case, the court allowed the government to file a witness list with addresses subject to an August 21, 2003 Protective Order and a separate list with the addresses redacted for the public record.

The court concluded that street addresses rather than townships were required because a township may be inadequate to identify a person with a common name. *Cf. United States v. Hurley (In re Globe Newspaper Co.),* 920 F.2d 88, 93 n. 6 (1st Cir.1990) ("In the case of many familiar names, an address as well as the name is necessary to identify the individual [juror].").

## V. EVIDENTIARY RULINGS RELATING TO PHOTOGRAPHS

### A. GENERAL STANDARDS

█ 18 U.S.C. § 3593(c) provides, in pertinent part, that:

Information is admissible [in the penalty phase of an FDPA prosecution] regardless of its admissibility under the rules governing admission of evidence at criminal trials except that information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury.

This standard is similar to that set forth in Federal Rule of Evidence 403, which provides that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." The FDPA standard is more restrictive. It permits exclusion if probative value is outweighed by the danger of prejudice, while the Rule 403 standard allows exclusion only if the probative value is *substantially* outweighed by the danger of prejudice. However, the FDPA eliminates considerations of undue delay, waste of time and needless presentation of cumulative evidence from the court's calculus.

In this case, the government proffered a large number of photographs of the victims, taken both at the time their bodies were discovered by the police and at the time of their autopsies. Sampson objected to many of these photographs, arguing that they were unnecessary, cumulative, and unfairly prejudicial. The defendant also argued that the pictures' probative value was diminished as they reflected a physical condition different from that at the time of the offense: the bodies had begun to decompose and showed the effects of insect activity.

Although this issue arises frequently during trial under the Rule 403 standard, appellate courts have generally been reluctant to overturn determinations by district

courts that photographs, even particularly "gruesome" photographs, are not unfairly prejudicial and therefore are admissible. The matter is one that has largely remained within the discretion of the trial court. The First Circuit has said that determinations under Federal Rule of Evidence 403 will be overturned only in "extraordinarily compelling circumstances." *United States v. Rodriguez–Estrada,* 877 F.2d 153, 155–56 (1st Cir.1989).

Appellate courts have generally held that when the photographs are probative of a relevant fact, even if not necessarily a disputed one, admission of gruesome photographs under Rule 403 is not reversible error. As the Tenth Circuit has said, "[g]ruesomeness alone does not make photographs inadmissible." *United States v. Naranjo,* 710 F.2d 1465, 1468 (10th Cir. 1983); *see, e.g., United States v. Ortiz,* 315 F.3d 873, 897 (8th Cir.2002) (in capital case, admission of graphic photos of bloody corpse not abuse of discretion, as they corroborated testimony regarding victim's murder and established that it was heinous and depraved); *United States v. Rezaq,* 134 F.3d 1121, 1138 (D.C.Cir.1998) (autopsy photographs relevant to determination of "force and violence" in hijacking case and corroboration of government theory regarding systematic executions); *United States v. Cruz–Kuilan,* 75 F.3d 59, 61 (1st Cir.1996) (lacerations on victim's head corroborated government theory regarding stray bullets); *United States v. Treas–Wilson,* 3 F.3d 1406, 1410 (10th Cir.1993) (autopsy and crime scene photographs, though graphic, were relevant to determination of defendant's intent or state of mind); *United States v. De Parias,* 805 F.2d 1447, 1453–54 (11th Cir.1986) (photograph of badly decomposed body of kidnaping victim admissible to show identity and cause of death), *overruled on other grounds by, United States v. Kaplan,* 171 F.3d 1351 (11th Cir.1999); *United States v. Holmes,* 632 F.2d 167, 169 (1st Cir.1980) (color photograph of victim helpful in illustrating medical examiner's testimony regarding sequence of wounds); *United States v. McRae,* 593 F.2d 700, 707 (5th Cir.1979) (photograph showing victim's head wounds had bearing on defense of accident); *cf. Ferrier v. Duckworth,* 902 F.2d 545, 548–49 (7th Cir.1990) (habeas court criticized state court for admitting photographs of the victim's splattered blood, in color and enlarged to twelve square feet, when the killing was not denied, as the defendant argued intoxication or insanity; court stated that "[t]he only conceivable reason for placing them in evidence was to inflame the jury"); *Rezaq,* 134 F.3d at 1138 (close-up photo of section of victim's skull, with skin removed, carried risk of significant prejudice; court stated that "photographs of gore may inappropriately dispose a jury to exact retribution").

## B. APPLICATION OF STANDARDS TO GOVERNMENT'S PROFFERED EVIDENCE

Over the course of several hearings in October and November 2003, the court considered the defendant's objections to the government's proposed photographic exhibits of the victims' bodies. The court made rulings on these objections on October 31, 2003, November 3, 2003, November 4, 2003, November 5, 2003, November 6, 2003, November 10, 2003, and November 12, 2003.

Analysis of the photographs in the current case took into account its distinctive features. Sampson, having pled guilty to the charged offenses, did not contest that he had committed the murders of McCloskey, Rizzo and Whitney. Further, as the photographs were to be presented first at the penalty phase and not, as in most capital trials, originally at the guilt phase, they were relevant only insofar as they

related to a gateway mental state or an aggravating or mitigating factor.

The photographs, and the injuries depicted in them, were relevant to proving the gateway mental states. Even though Sampson had pled guilty, the jury was required to make a finding regarding intent before it could begin considered the aggravating or mitigating factors. 18 U.S.C. § 3591(a)(2) states that a defendant can only be considered for a sentence of death:

> if the defendant, *as determined beyond a reasonable doubt at the hearing under section 3593-*
>
> (A) intentionally killed the victim;
>
> (B) intentionally inflicted serious bodily injury that resulted in the death of the victim;
>
> (C) intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and the victim died as a direct result of the act; or
>
> (D) intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and the victim died as a direct result of the act.

*Id.* (emphasis added). Thus, a finding of intent must be made during the penalty phase; a guilty plea, just like a conviction after trial, does not extinguish this requirement.

Intent can be difficult to prove, as it often cannot be shown directly. The jury frequently can only make inferences, informed by the evidence, as to what a defendant was thinking at any given time. Even a defendant's statements regarding his intent are not necessarily conclusive, as they may be the product of deceit, forgetfulness, or mental illness. Therefore, although the jury could have drawn on the information given by Sampson in his confessions, any additional information regarding the nature of the wounds inflicted by him could have been important circumstantial evidence of his intent to cause death. While medical diagrams would have informed the jury about the size and location of the wounds, the photographs might have allowed the jury to obtain a better understanding of what occurred and how Sampson attacked his victims.[2] By having more information about the encounter and the actions of the defendant, the jurors might be better able to make inferences about his state of mind. *See United States v. Allen,* 247 F.3d 741, 793 (8th Cir.2001) (photographs of victims probative of intent, as showing the extent of the damage caused by the defendant), *vacated on other grounds,* 536 U.S. 953, 122 S.Ct. 2653, 153 L.Ed.2d 830 (2002).

However, because the gateway factors were not seriously in dispute, there was a real danger that the admission of extensive graphic and shocking evidence that was relevant only to those gateway factors would be unfair to the defendant. If this had been the only relevance, it would have been clear that the photographs should, in large part, have been excluded. However, the photographs were also relevant to at least one alleged aggravating factor that

---

**2.** It was significant that at least one of the medical examiners, Dr. William Zane, indicated that he could use diagrams which would more clearly identify the wounds in question. Indeed, when questioned about the photographs, he repeatedly referred to his notes and diagrams in the course of his voir dire testimony in order to understand what the photographs depicted.

was significantly in dispute, namely, that "the offenses were committed in an especially heinous, cruel, or depraved manner in that they involved torture or serious physical abuse to the victims." *See* 18 U.S.C. § 3592(c)(6). As discussed in Part X, *infra,* a finding of especially heinous, cruel, or depraved under either the torture or the serious physical abuse prong would require a finding not merely of the damage done to the victims' bodies or mental anguish inflicted, but also a finding of the defendant's intent. For a finding of especially serious physical abuse, the jury would have to find that the defendant had the intent to inflict physical abuse to the victims' bodies beyond that necessary to kill the victims. For a finding of torture, the jury would have to find that the defendant inflicted physical or mental abuse to a conscious victim for one of three specific purposes: either to punish, to extract information or a confession, or for sadistic pleasure.

Again, there are relatively few kinds of evidence that could be helpful in determining whether the requisite intent existed. The words of a defendant, as recorded in a confession, may be helpful but not determinative: both the prosecution and the defense argued at various points that Sampson's statements were inaccurate in many of their details. In determining whether the defendant had the necessary intent to meet the especially heinous, cruel, or depraved factor, the jury would have been aided by any evidence that would have enabled it to visualize the encounter between the defendant and his victims, to visualize the state the victims were in at the time the defendant left, and, therefore, to understand better the defendant's likely intention.

One consideration under the FDPA that is not present in the usual criminal trial is the necessity of giving weight to a factor if the jury reaches the point where it must decide "whether all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death, or, in the absence of a mitigating factor, whether the aggravating factor or factors alone are sufficient to justify a sentence of death." 18 U.S.C. § 3593(e). During a criminal trial to determine guilt, once a fact is established beyond a reasonable doubt, additional proof regarding that fact may be unnecessary and cumulative. However, under the FDPA, the existence of a fact or factor is not all that the jury must consider. It must also consider the *weight* to be given to that factor. In this context, even if medical diagrams and oral testimony would have been sufficient to establish that the offense was committed in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse, photographs had the potential to be valuable for the jury in determining how much weight to give that factor.[3]

Sampson made two particular objections to the photographic evidence. First, he argued that the photographs were unfairly prejudicial because of their gruesome nature. He argued that any probative value they possessed paled in comparison to their inherently prejudicial nature, which would serve to inflame the jury. *See, e.g., Spears v. Mullin,* 343 F.3d 1215, 1228 (10th Cir.2003) ("[E]ven if the photographs were minimally relevant to the heinous, atrocious, or cruel aggravator, the photographs' prejudicial effect outweighed their probative value."). Second, Sampson argued that the photographs did not accurately represent the victims' bodies at the time he left them. These objections were analyzed together under the 18 U.S.C.

---

**3.** The same analysis does not apply to the gateway findings of intent, which are not part of the final weighing process under 18 U.S.C. § 3593(e).

§ 3593(c) framework, which instructs the court to compare the probative value of a piece of evidence with the danger of unfair prejudice, confusion, and misleading of the jury.

Both objections go to the danger of unfair prejudice; the second objection also goes to the limited probative value of the photographs. To the extent the photographs depicted a situation significantly different from that at the time the defendant left the crime scene, they were less helpful in drawing inferences about his actions and state of mind at that time. *But see United States v. Sarracino*, 340 F.3d 1148, 1169 (10th Cir.2003) (rejecting a challenge that the body of the victim had changed between the time of the crime and the time of the photograph, the court wrote, "The bloodied head and face of the victim gives an *indication*, although admittedly an imperfect one, of how the victim must have appeared to the defendants at the end of the fight. Without these photos, the prosecution would have been handicapped in its ability to convey the nature and extent of the beating to the jurors.").

The most significant post-mortem changes were to the size and shape of the wounds, which might have expanded as the skin loosened over time, and the presence of insects on the body, the activities of which also caused considerable skin discoloration. The government argued that the defendant could not fairly complain about the decomposition of his victims' bodies when he contributed to the level of decomposition by concealing the bodies from the authorities. While it is possible that in some cases the fact that the defendant concealed the body of the victim and pur-

posefully left it to decompose could be an aggravating factor, that factor was not alleged in this case and, therefore, could not be considered by the jury. *See* 18 U.S.C. § 3593(a). The decomposition of the body was not relevant to the especially heinous, cruel, or depraved aggravating factor requiring serious physical abuse or torture at the time of the murder. Moreover, when faced with photographs showing the effects of decay, decomposition, and insects, the jury might well have been led to consider the murders to have been worse or the defendant more deserving of the death penalty. This danger could not have been cured entirely by a limiting instruction.[4]

As the Supreme Court of Kentucky phrased the issue, in a case where the body of the victim had been stored for months in a freezer:

> The general rule is that relevant pictures are not rendered inadmissible simply because they are gruesome and the crime is heinous. This general rule loses considerable force when the condition of the body has been materially altered by mutilation, autopsy, decomposition or other extraneous causes, not related to commission of the crime, so that the pictures tend to arouse passion and appall the viewer.

*Clark v. Commonwealth*, 833 S.W.2d 793, 794 (Ky.1991) (citations omitted).

Similarly, Justice Thurgood Marshall wrote, in dissenting to a denial of certiorari of a capital case from Oklahoma where photographs of a victim's body which had been retrieved from a river one month after a murder were introduced at the penalty phase:

---

4. However, the Sixth Circuit has held in an unpublished opinion that a particular defendant had not been prejudiced in a case where "the actual presentation of the evidence at trial was accomplished in such a manner as to inform the jury that the disfigurement of

the victim's body was due in part to the autopsy procedures, and in part to decomposition and to rodent mutilation." *United States v. Amey*, 70 F.3d 1273, 1995 WL 696680, at *4 (6th Cir. Nov.20, 1995) (unpublished).

[T]he petitioner argues convincingly that the photographic evidence created an impermissible risk that his death sentence was based on considerations that are "totally irrelevant to the sentencing process," because it focused the jury's attention on the postmortem decomposition of the victim's body rather than on "the character of the [defendant] and the circumstances of the crime."

*Mann v. Oklahoma,* 488 U.S. 877, 877, 109 S.Ct. 193, 102 L.Ed.2d 163 (1988) (Marshall, J., dissenting from denial of cert.) (citations omitted).

In addition to some photographs in which insects were visible on the bodies of the victims, there were a number of photographs in which portions of the victims' bodies were colored dark red or brown. This caused an additional risk of confusion or of misleading of the jury. To the untrained eye, this discoloration appeared to be the product of blood loss. However, the voir dire testimony of the medical examiner, Dr. William Zane, established that the discoloration was caused by an entirely different, but equally unpleasant process: the decay caused by the enzymes that are produced by insect larvae as they travel across the corpse, eating away the outer layers of skin. Introduction of these photographs would either have served to mislead the jury concerning the amount of blood that had been lost or have required a detailed and particularly disturbing explanation of the processes of decomposition, an explanation that would likely have aroused the passions of the jurors. The defendant would have been forced to choose between two unfair alternatives: either allow the jury to believe that more blood was lost or be forced to bring out the details of the insect activity. Again, however reprehensible anyone might find the fact that victims' bodies decomposed as a result of being abandoned by the defendant is wooded areas, the government did not allege that fact as an aggravating factor in this case and the jury could not properly have considered it as one. *See* 18 U.S.C. § 3593(a).

A similar situation was considered by the Supreme Court of Arizona in *State v. Spreitz,* 190 Ariz. 129, 945 P.2d 1260, 1271–73 (1997). There, in a capital case, a number of autopsy photographs were admitted. The court described the photographs as follows:

> The photographs depict the corpse as it appeared after decomposing in the desert for three days in temperatures exceeding 100 F. The corpse is severely discolored, and in all of the photographs insects are shown partly covering the body. This insect activity is vividly apparent in the close ups.

*Id.* at 1271. The Supreme Court of Arizona, in deciding that admission of the photographs was error, noted that the medical examiner was able to testify clearly about the wounds to the victim's body, and that the photographs provided "little or no additional aid in that regard." *Id.* at 1273. The court held that the "danger of unfair prejudicial effect on the jury substantially outweighed the photographs' probative value." *Id.*[5]

Also, in *Tobler v. State,* 688 P.2d 350 (Okla.Crim.App.1984), the Court of Criminal Appeals of Oklahoma reversed a capital conviction, in part based on the admission of photographs depicting the "gruesome work of nature" on victims' bodies, including decomposition and maggot activity.[6] *Id.* at 355. The court not-

**5.** Although the Arizona Supreme Court found the admission of the photographs to be error, it declined to reverse the conviction as it found the error to be harmless in light of the defendant's uncoerced confession. *Id.* at 1273, 1995 WL 696680, at *4.

**6.** The court also identified the testimony of the officers regarding the condition of the

ed that "[i]t is difficult to ascertain any probative value of the evidence," given that the defendant had admitted to the killings, stipulated to the information in the photographs, and the medical examiner testified as to the cause of death. *Id.* at 355–56. The photographs "provided nothing in the way of new evidence, and had the potential, if not certain, effect of unduly prejudicing" the defendant. *Id.* at 356.

In analyzing the admission of the photographs, this court was cognizant not only of the balancing test for information established by 18 U.S.C. § 3593(c), but also of the due process concerns in the case generally. A defendant's due process rights have been violated when, in view of the totality of the circumstances, he has not received a fundamentally fair trial. *See, e.g., Spears,* 343 F.3d at 1225–26. Such a violation could arise out of a single action or piece of evidence. It could also arise from the cumulative effect of a number of pieces of evidence in combination. In the present case, the photographs might individually have been admissible, but might have amounted to a denial of due process when considered together. Similarly, the photographs themselves might not have caused a due process violation, but could, in combination with other types of evidence that involve the danger of unfair prejudice, have contributed to a due process violation. Therefore, the court was required to consider the other evidence in this case, including the type and amount of victim impact evidence, when deciding which photographs to admit. *See, e.g., United States v. Rivera,* 900 F.2d 1462, 1477 (10th Cir.1990) ("Courts have also found fundamental unfairness when error is considered in conjunction with other prejudicial circumstances within the trial, even though such other circumstances may not individually rise to the level of error.").

bodies when discovered as unduly prejudicial.

In light of these concerns, the court admitted only a small subset of the proffered photographs. The photographs admitted were those that most closely depicted the condition of the victims at the time they were left by the defendant. They primarily showed detailed views of individual wounds rather than pictures of the general condition or blood loss of the victim's bodies. Redacted from the photographs that were admitted were particularly gruesome portions of the images, including those depicting discoloration of the victim's body and insect activity.

■ Finally, one photograph was admitted after the portion of it which showed a crucifix was redacted. This photograph was of Whitney, tied to a chair in the bathroom where Sampson killed him. A crucifix hung on the wall next to the bathroom. The crucifix had little or no probative value. It did not relate to Whitney's character since he was killed in someone else's house. Further, the juxtaposition of the crucifix with Whitney's strangled and bound body could have been seen as providing religious overtones to the murder. Inclusion of the crucifix would have run the risk of affecting one or more jurors in an unpredictable, but unfairly prejudicial way. *See Taylor v. State,* 640 So.2d 1127, 1135 (Fla.Dist.Ct.App.1994) (videotape of victim's home that included panning shots of a crucifix on the wall "invite[d] an emotional response"); *cf. Commonwealth v. Chambers,* 528 Pa. 558, 599 A.2d 630, 644 (1991) (establishing a *per se* rule against religious invocations in prosecutorial closing arguments in capital cases). As the inclusion of the crucifix would have provided no relevant information, redaction was appropriate to avoid the risk of unfair prejudice.

## VI. EVIDENTIARY RULINGS RELATING TO BLOODY CLOTHING

■ On November 6, 2003, November 10, 2003, November 12, 2003, November 13, 2003, December 3, 2003, December 16, 2003 and December 17, 2003, the court considered the introduction of the shirts that McCloskey and Rizzo were wearing when Sampson killed them. These shirts had been cut off the victim's bodies by police investigators and preserved. They were mounted in plexiglass that allowed both the front and the back of the shirt to be viewed. In addition to the cuts made by the police, the shirts were ripped in numerous places that corresponded with the stab wounds inflicted on McCloskey and Rizzo. They also were heavily stained with blood. The shirt of one of the victims had several folds in which insects had laid a large number of eggs.

The shirts were relevant in the same way that many of the gruesome photographs were germane. They could have been used by the jury in considering whether the offenses were committed in an especially heinous, cruel, or depraved manner in that it involved serious physical abuse.[7] The shirts could have vivified the victims' struggles for the jury in a way that might not have been accomplished merely by oral testimony and medical diagrams. By having a more vivid picture of the struggle, the jury might have been better able to make inferences about the defendant's intent, an element necessary for establishing serious physical abuse. In the same way, the shirts might also have assisted the jury in giving weight to the heinous, cruel, or depraved aggravator, if the jury had found that factor to have been proven.

The court recognized that the shirts were not the best evidence of the specific size and number of wounds inflicted on the victims. The rips in the shirts might have been larger than the actual stab wounds. Likewise, if a shirt were doubled over at the time of the attack, a single knife thrust could have made two or more rips in the shirt. These dangers, however, could have been reduced or eliminated by testimony elicited on direct or cross-examination regarding the manner in which a knife attack causes holes in a garment.

In the context of this case, the court ruled that the shirts were inadmissible under the 18 U.S.C. § 3593(c) standard and the due process clause.[8] Courts have often admitted the bloody clothing of the victim in homicide prosecutions. *See, e.g.,* Annotation, "Admissibility, in Homicide Prosecution, of Deceased's Clothing Worn at Time of Killing," 68 A.L.R.2d 903, § 2[a], 1959 WL 12853 (1959) ("In homicide prosecutions, the general rule is that the clothing worn by the victim at the time of the killing is admissible in evidence, even where its introduction may be prejudicial to the accused, if it tends to shed light upon a material inquiry in the case."). However, in the context of this capital

---

7. They would also have been relevant to whether the offenses were committed in a heinous, cruel, or depraved manner in that it involved torture. However, when the court ruled on the admissibility of the shirts on December 17, 2003, the court had already determined that there was not, even with the shirts, sufficient evidence to prove torture, so this factor was not submitted to the jury.

8. On November 13, 2003, the court ruled preliminarily that the shirts would be admissible, reserving its final decision to the conclusion of the evidence. Therefore, foundational and explanatory testimony was given about the shirts. However, the shirts themselves were not shown to the jury. If the court had made a final ruling that the shirts were admissible, they could have been used by the prosecution in its closing argument, and would have been available to the jury during deliberations.

case, there were unique considerations that indicated that exclusion was appropriate.

While the shirts were, as described above, relevant to material issues in this case, it is likely that the jury would not have considered them solely on those issues. During the trial, the prosecution produced evidence, especially through the confessions of the defendant, that was more directly probative of the intent element of serious physical abuse. Rather than as circumstantial evidence of intent, the jury would likely have regarded the shirts as powerful and immediate symbols of the victims and the brutality of their murders. *See, e.g., Frazier v. Mitchell,* 188 F.Supp.2d 798, 826 (N.D.Ohio 2001) (with bloody clothing before the jury, prosecutor stated in closing that the victim "is not here. We have bloody clothing to represent her"; the court viewed this as "unprofessional, improper and excessive"). The presence of the shirts in the jury room during deliberations could have exerted an intense emotional force unconnected to their legitimate probative value. The display of the shirts during closing argument could have induced the jury to respond in a purely emotional way.[9]

Further, use of the shirts would have presented the danger of introducing inappropriate victim impact information. At several times during the course of the case, members of the victim's families seated in the gallery were, understandably, visibly and audibly upset by the testimony and other evidence. The court attempted to ensure that the jurors considered only the victim impact evidence that was offered from the witness stand and were not influenced by reactions they observed in the gallery.[10] At one point, when McCloskey's bloody shirt was displayed in open court, but not in the presence of the jury, there were audible gasps from the gallery. In this context, the court feared the repetition of the events described in *State v. Steele,* 120 Ariz. 462, 586 P.2d 1274, 1277–78 (1978). In that case, during the display of a murder victim's clothing, his widow become so overwrought that she rushed from the courtroom, creating a disturbance which was noticed by all the jurors. The defendant objected, saying that the prosecution was "in effect, 'waving the bloody shirt.'" On appeal, the Supreme Court of

9. Display of the clothing of the dead is an age-old strategy for inciting a desire for revenge. In Shakespeare's *The Tragedy of Julius Caesar,* act 3, scene 2, Marc Antony displayed the toga of the murdered Caesar during his funeral oration as a means of encouraging the crowd to violence. Antony described each rip in the toga:

> If you have tears, prepare to shed them now. You all do know this mantle. I remember The first time ever Caesar put it on; 'Twas on a summer's evening, in his tent, That day he overcame the Nervii. Look, in this place ran Cassius' dagger through; See what a rent the envious Casca made; Through this the well-beloved Brutus stabb'd; And as he pluck'd his cursed steel away, Mark how the blood of Caesar follow'd it, As rushing out of doors, to be resolved If Brutus so unkindly knock'd, or no; For Brutus, as you know, was Caesar's

angel. Judge, O you gods, how dearly Caesar loved him! This was the most unkindest cut of all;

The crowd responded as desired:
> FIRST CITIZEN. O most bloody sight!
> SECOND CITIZEN. We will be revenged.
> ALL. Revenge! About! Seek! Burn! Fire! Kill! Slay! Let not a traitor live!

*Id. See also United States v. Rezaq,* 134 F.3d 1121, 1138 (D.C.Cir.1998) ("'Blood will have blood'"; excessive depictions of "gore may inappropriately dispose a jury to exact retribution") (quoting William Shakespeare, *The Tragedy of Macbeth,* act 3, scene 4).

10. At several points in the trial, the victims' families agreed to watch portions of the trial from another courtroom, using a one-way video-conference, so that the jury would not observe their foreseeable, anguished reactions to the evidence.

Arizona agreed, saying that the shirts had been introduced "only to arouse and inflame the emotions of the jury." *Id.*

For these reasons, the court ruled that the bloody shirts of McCloskey and Rizzo were not admissible.

## VII. VICTIM IMPACT EVIDENCE

### A. GENERAL STANDARDS

In *Payne v. Tennessee,* 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), the Supreme Court reversed its prior decisions and held that the Eighth Amendment does not erect a *per se* bar to the introduction of victim impact evidence. Under *Payne,* the prosecution may offer at capital sentencing "a quick glimpse of the life which a defendant chose to extinguish." *Id.* at 822, 111 S.Ct. 2597 (quoting *Mills v. Maryland,* 486 U.S. 367, 397, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988)). Additionally, victim impact evidence may illustrate "the loss to the victim's family and to society which has resulted from the defendant's homicide." *Id.* Thus, the prosecution also may offer evidence of the impact of the victim's loss on others. *Id.* at 836, 111 S.Ct. 2597. (Souter, J., concurring) In essence, in holding that the Constitution erects no *per se* bar to victim impact evidence, the Supreme Court concluded that "[v]ictim impact evidence is simply another form or method of informing the sentencing authority about the specific harm caused by the crime in question." *Id.* at 825, 111 S.Ct. 2597. Victim impact evidence is admissible under the constitution unless it "is so unduly prejudicial that it renders the trial fundamentally unfair" in violation of a defendant's right to due process. *Id.* at 825, 111 S.Ct. 2597; *see also Jones v. United States,* 527 U.S. 373, 401–02, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999).

The Supreme Court, however, also recognized the risk that victim impact evidence could be unduly inflammatory and expressed the expectation that trial courts would exclude such testimony. *Payne,* 501 U.S. at 831, 111 S.Ct. 2597 (O'Connor, J., concurring) ("The possibility that this evidence may in some cases be unduly inflammatory does not justify a prophylactic, constitutionally based rule that this evidence may never be admitted. Trial courts routinely exclude evidence that is unduly inflammatory; where inflammatory evidence is improperly admitted, appellate courts carefully review the record to determine whether the error was prejudicial."); *id.* at 836, 111 S.Ct. 2597 (Souter, J., concurring) ("[I]n each case there is a traditional guard against the inflammatory risk, in the trial judge's authority and responsibility to control the proceedings consistently with due process, on which ground defendants may object and, if necessary, appeal."). Exercising this authority is essential in a capital case for, as the Supreme Court has cautioned, "[i]t is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion." *Gardner v. Florida,* 430 U.S. 349, 358, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977).

Victim impact evidence may be considered by the jury in federal capital cases, as a non-statutory aggravating factor, if the jury unanimously finds that the prosecution has proven at least one statutory aggravating factor. *See* 18 U.S.C. § 3593(a),(e). The FDPA explicitly permits the government to present evidence "concerning the effect of the offense on the victim and the victim's family." 18 U.S.C. § 3593(a). Such evidence "may include oral testimony, a victim impact statement that identifies the victim of the offense and the extent and scope of the injury and loss suffered by the victim and the victim's family, and any other relevant information." *Id.* Under the FDPA, the prosecution must provide the defendant with notice of its intent to use victim im-

pact evidence, unless its evidence is introduced merely to rebut mitigating evidence offered by the defendant. *See* 18 U.S.C. § 3593(a)-(b); *see also United States v. Allen*, 247 F.3d 741, 778–81 (8th Cir.2001) (holding that FDPA allows victim impact evidence and that the notice and unanimity requirements of the FDPA are adequate procedural safeguards), *vacated on other grounds*, 536 U.S. 953, 122 S.Ct. 2653, 153 L.Ed.2d 830 (2002).

In this case, the court recognized that there are two checks on potentially unfairly prejudicial victim impact evidence, and indeed on all evidence at trial. The first check is the trial court's statutory responsibility, *see* 18 U.S.C. § 3593(c), to decide if the probative value of a particular piece of evidence is outweighed by the danger of unfair prejudice, in the form of inflaming the jury's passions and thus promoting the "risk [of] a verdict impermissibly based on passion, not deliberation." *Payne*, 501 U.S. at 836, 111 S.Ct. 2597 (Souter, J., concurring).

The second check is the responsibility of the court to secure the defendant's right to due process by viewing the proffered evidence in the context of all the other evidence in the case and deciding if its admission would contribute to or detract from a trial that is fundamentally fair and allows jurors to base their decisions on reason and reliable evidence rather than passion. *Id.*

While *Payne* reversed *Booth v. Maryland*, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), in which the Court had held that the admission of victim impact testimony was always unconstitutional at capital sentencing, it specifically did not reverse its prior holdings on other issues. The Court explained:

> Our holding today is limited to the holdings of *Booth v. Maryland*, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), and *South Carolina v. Gathers*, 490 U.S.

805, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989), that evidence and argument relating to the victim and the impact of the victim's death on the victim's family are inadmissible at a capital sentencing hearing. *Booth* also held that the admission of a victim's family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence violates the Eighth Amendment. No evidence of the latter sort was presented at the trial in this case.

*Payne*, 501 U.S. at 830 n. 2, 111 S.Ct. 2597. Therefore, certain types of testimony by a victim's survivors continue to be prohibited.

▮ First, victim impact witnesses may not characterize or give their opinions on the crime. Second, they may not characterize or give opinions on the defendant. Third, they may not express an opinion on the appropriate sentence. *See Booth*, 482 U.S. at 508, 107 S.Ct. 2529. Other courts have echoed these findings, holding that victim impact testimony may not present an opinion on what the appropriate sentence might be or consist of statements constituting a "mere emotional plea" unrelated to the impact of the crime on the victims or their families. *See Hain v. Gibson*, 287 F.3d 1224, 1237–38 (10th Cir. 2002); *Robison v. Maynard*, 943 F.2d 1216 (10th Cir.1991).

### B. APPLICATION OF STANDARDS TO THIS CASE

▮ On August 15, 2003, the court ordered the parties to file memoranda addressing the permissible scope of victim impact testimony, and what measures it should consider in order to ensure that the jury was not exposed to testimony that should have been excluded. On September 2, 2003, the government filed its Memorandum regarding Admissibility and Scope of Victim Impact Testimony as to

Gary Lee Sampson. The defendant filed his response on September 5, 2003. On October 27, 2003, at the court's request, the government filed a proffer regarding its expected victim-impact testimony, stating its intention to call a total of nine victim impact witnesses and outlining the information that it intended to elicit from the witnesses at trial.

Sampson filed his response on October 28, 2003 which he supplemented on October 29, 2003. Sampson asked that the government be limited to two witnesses per family, and further that any victim impact evidence relating to the Whitney murder, for which Sampson was not being tried in this court,[11] be excluded altogether. Sampson also called on the court to impose procedural safeguards to guard against possible prejudice, asking specifically that the court impose the procedures set out in United States v. O'Driscoll, 203 F.Supp.2d 334, 340–41 (M.D.Pa.2002) and United States v. Glover, 43 F.Supp.2d 1217, 1234–36 (D.Kan.1999). In each of those two cases, the government was required to submit a written statement describing the proposed testimony of each victim impact witness. O'Driscoll, 203 F.Supp.2d at 341 (citing Glover, 43 F.Supp.2d at 1235–36). Each of the courts also adopted instructions to be given victim impact witnesses, concerning control of their emotions during the time of their testimony. Id.

The government initially proposed a total of nine victim impact witnesses: three from the McCloskey family, four from the Rizzo family, and two from the Whitney family.

On October 30, 2003, the court first addressed the issues presented by the McCloskey and Rizzo witnesses. The government's proposed witnesses were three of Philip McCloskey's adult children, as well as the parents and two younger brothers of Jonathan Rizzo. The government informed the court that it would introduce those witnesses' victim impact testimony in a question-and-answer format. As indicated earlier, Sampson argued that no more than two members of each of the McCloskey and Rizzo families should be allowed to testify, to prevent unfair prejudice and the risk that passion and sympathy would overwhelm reason.

In many federal and state cases, however, trial courts have allowed several family members and others to testify at capital sentencing. The trial at issue in United States v. Allen, 247 F.3d 741, 779 (8th Cir.2001), vacated on other grounds, 536 U.S. 953, 122 S.Ct. 2653, 153 L.Ed.2d 830 (2002), involved eleven victim impact witnesses and 80 pages of transcript. The Tenth Circuit in United States v. Chanthadara, 230 F.3d 1237 (10th Cir.2000), found that allowing three family members, the victim's widow and their two children, to testify as victim impact witnesses did not violate the defendant's due process rights. In United States v. Bernard, 299 F.3d 467, 478 (5th Cir.2002), the Fifth Circuit found no error in the court's allowing the reading of five victim impact statements, four from the victims' parents and one by a friend and former coworker of the two victims; and in United States v. Barnette, 211 F.3d 803, 818 (4th Cir.2000), the Fourth Circuit found no error when the trial court permitted seven family members to testify as victim impact witnesses regarding the deaths of two people. In State v. Scales, 655 So.2d 1326, 1335–36 (La.1995), several family members testified, each briefly, and that was not found to be reversible error. State v. Taylor, 669 So.2d 364, 370–71 (La.1996) allowed three witnesses related to the victim, where their testimony took up only ten pages out of a 793–page tran-

11. The Whitney murder was, however, an aggravating factor presented to the jury.

script and where the defense presented twenty mitigation witnesses.

This court found that three to four family members per victim in this case was not too many *per se.* Each family member of a murdered victim suffers a unique harm. Consequently, each witness' testimony provides distinct information that the jury can use in deciding what weight to give this aggravating factor.

Ultimately, however, the prosecution introduced victim impact evidence through the testimony of only six witnesses: three of McCloskey's adult children, followed by Rizzo's father, mother and one of his younger brothers. The testimony was conducted in question-and-answer format in order to control the subject matter covered and to provide the defendant with an opportunity to make objections. In total, the victim impact testimony comprised about two hours of more than two weeks of prosecution evidence, comprising only sixty-three pages of a very lengthy trial transcript.

Just before the first victim impact witness testified, the court instructed the jury as follows:

Ladies and gentlemen, the next set of witnesses are going to be members of the victims' families. They're going to give testimony that in the law is called victim impact testimony. And with the agreement of counsel, I'm going to explain to you now and, I expect, repeat at the end of the case the specific and limited purpose for which victim impact evidence can be considered by you.

To understand this, you need to be reminded of the architecture of the Federal Death Penalty Act. You may recall that in the process of jury selection and on the first day that you came to hear evidence, I told you that there are various stages in the Federal Death Penalty Act which establishes a process that you have to follow in this case in deciding the appropriate sentence.

At the first stage, you decide whether the defendant is eligible to be executed, whether the death penalty is an option.

In the second stage—if you reach that stage—if the government proves that the death penalty is an option, you have to decide which if any of the alleged aggravating factors have been proven beyond a reasonable doubt, actually, the non-statutory aggravating factors.

And then you would have to consider, if the death penalty is an option, whether any of the possible mitigating factors have been proven by a preponderance of the evidence. And then, if the death penalty is an option, you have to weigh the proven aggravating factors against any possible mitigating factors and decide if the aggravating factors are sufficient to make the death penalty the appropriate penalty in this case rather than life in prison without possibility of release, which is the only other option.

... the first thing you'll have to consider when you go back to deliberate is whether the government has proven beyond a reasonable doubt certain facts that are necessary to establish that the defendant is eligible for the death penalty.

\* \* \* \* \* \*

And this will require that the government prove at least one of several alleged states of mind at the time the crime was committed. And I'll explain it to you, and they'll be spelled out on the verdict form.

And you'll also have to decide whether the government has proven beyond a reasonable doubt at least one aggravating factor that's established by the Federal Death Penalty statute. For example, in this case there are several, but—for example, it's alleged that each of the crimes was committed after substantial planning and premeditation.

So, if the government doesn't prove that the defendant is eligible for the death penalty, your deliberations will be complete, and you won't in your deliberations have considered the victim impact evidence.

If the government does prove . . . that the death penalty is an option for Mr. Sampson in this case for either or both of the crimes with which he's charged and pled guilty, then you'll go to the second stage. You'll have to decide whether the government has proven any of what are called non-statutory aggravating factors beyond a reasonable doubt.

The impact of the crime on each of the victims, Philip McCloskey and Jonathan Rizzo and each of their families, is a non-statutory aggravating factor for each of the crimes concerning them. And several members of each of the victims' families are going to testify today with regard to this.

I want to tell you what the Supreme Court has explained about victim impact evidence. The evidence is intended to inform you that each victim was a unique human being, just as you'll later hear through the evidence in this case that the defendant, Gary Sampson, is a unique human being. And I expect that the testimony that you're going to start hearing soon will be emotional. In fact, [the Deputy Clerk] has some [Kleenex] and, if we discern that anybody wants it or needs it, he'll give it to you . . .

However, the victim impact evidence is being admitted for a limited purpose. That means you can consider it for a particular purpose, but not for other purposes.

You may not consider the victim impact evidence, that is, the evidence from the victims' families, on the issue of whether the defendant is eligible for the death penalty. You'll have to address certain other factual questions before

you can properly consider victim impact evidence, and the victim impact evidence can't influence your judgment on those earlier issues.

So, for example, you can't consider what the victims' families say on whether the defendant had the state of mind required when he committed the crime to make him eligible for the death penalty. And they won't be testifying about that. And you can't consider the evidence from the victims' families on whether some statutory aggravating factor has been proven.

You can consider the victims' families testimony only if the defendant is proven to be eligible for the death penalty by other evidence in the case, and then you can consider that testimony from the victims' families only on the issue of victim impact and not with regard to whether other non-statutory aggravating factors have been proven.

If you find that the defendant is eligible for the death penalty with regard to the crime of carjacking resulting in the murder of Philip McCloskey, you may consider the content of the victim impact evidence, evidence from his family members, regarding whether the government has proven that non-statutory aggravating factor of victim impact. And if that's proven, you can consider that factor in deciding whether the death penalty is justified for that crime. And the same is true with regard to the carjacking resulting in the murder of Jonathan Rizzo.

You may not, however, permit the victims' families' testimony to overwhelm your ability to follow the law. For example, you must obey the legal requirement that you not consider the testimony from the victims' families on the factual issues that will determine whether the death penalty is an option

for one or both of the crimes and [if] victim impact is proven, you must still decide based solely on the other evidence if the other alleged aggravating factors are proven beyond a reasonable doubt and whether any mitigating factors are proven by a preponderance of the evidence.

If the death penalty is an option in your deliberations, you must consider and weigh all of the proven aggravating factors and mitigating factors and not just consider victim impact in deciding if the death penalty is the appropriate penalty or whether the defendant should be sentenced, instead, to life without possibility of release.

In essence, the law requires that you decide whether the death penalty is justified in this case based on a reasoned judgment made according to the process that the law establishes and that I describe. You may not base the decision on undue sympathy, passion, or prejudice.

Oct. 20, 2003 Tr. at 34–40.

■ The government also sought to introduce a memorial video of Rizzo. The video, made for a memorial service, was about twenty-seven minutes in length and featured over 200 still photographs of the victim, in roughly chronological order, from the time he was born until the time just before his death. The pictures were set to evocative contemporary music, including that of the Beatles and James Taylor. On October 30, 2003, the court decided to exclude the videotape because its probative value was outweighed by the danger of unfair prejudice, and created a danger of provoking undue sympathy and a verdict based on passion as opposed to reason.

In making its decision, the court recognized that several courts have allowed some video clips of various kinds to be admitted during a sentencing-phase presentation of evidence. The Court of Appeals of Maryland in *Whittlesey v. State*, 340 Md. 30, 665 A.2d 223, 230 (1995), ruled that a 90–second videotape of the murder victim playing the piano, a skill for which the victim was nationally recognized, was relevant and admissible. In *State v. Gray*, 887 S.W.2d 369, 389 (Mo.1994), the court held that a videotape of the victim's family at Christmas, presented during the sentencing phase of a capital trial, was admissible. The court in *State v. Allen*, 128 N.M. 482, 994 P.2d 728, 751 (1999), found that a three-minute videotape of the victim on a camping trip had probative value, and that the defendant was not unfairly prejudiced by its admission as victim impact evidence. In *State v. Anthony*, 776 So.2d 376, 393–94 (La.2000), during the testimony of one victim's husband, the prosecution introduced a brief videotape depicting portions of her life. The Louisiana Supreme Court found that all evidence was properly admitted and upheld the death sentence.

In each of these cases, the admitted video was brief and found to be probative of some aspect of the victim's life. In other cases, however, trial courts have excluded videotapes where they had the potential to cause unfair prejudice or arouse undue sympathy. For example, in *United States v. McVeigh*, 153 F.3d 1166, 1221 n. 47 (10th Cir.1998), "the district court prohibited the introduction of wedding photographs and home videos".

Notably, *Salazar v. State*, 118 S.W.3d 880 (Tex.App.2003), dealt with a situation almost identical to the instant case. The defendant was convicted by jury of the murder of Jonathon Bishop. During the punishment phase of trial, the judge admitted into evidence a seventeen minute videotape described by the court of criminal appeals as "an extraordinarily moving tribute to Jonathon Bishop's life." *Id.* at 882 (quoting *Salazar v. State*, 90 S.W.3d

330, 333 (Tex.Crim.App.2002) (remanding *Salazar* to Court of Appeals)).

> The exhibit contained approximately 140 still photographs arranged in a chronological montage accompanied by music including "Storms in Africa" and "River" by Enya, and concluded with Celine Dion singing, "My Heart Will Go On," from the movie Titanic. The jury assessed punishment at thirty-five years confinement and a fine of $10,000.

*Id.*

In applying a harmless error analysis to both the visual and audio portions of the videotape, the Court of Appeals looked to the opinion of the Texas Court of Criminal Appeals, where the majority found the character of the videotape to be "very prejudicial" and remanded the case to the Court of Appeals for a harmless error analysis. Quoting the higher court's review of the videotape, the Court of Appeals stated that:

> "[The] prejudicial effect [of the videotape was] enormous because the implicit suggestion is that appellant murdered this angelic infant; he killed this laughing, light-hearted child; he snuffed out the life of a first-grade soccer player and of the young boy hugging his blond puppy dog. The danger of unconsciously misleading the jury [was] high." The majority of the court also stated: "The memorial video ... was very lengthy, highly emotional, and barely probative of the victim's life at the time of his death." When remarking on the background music, the court said: "[T]he Enya and Celine Dion background music greatly amplifie[d] the prejudicial effect of the original error." Even Judge Keller, a staunch proponent of victim-

impact evidence, recognized the photographic montage "was unduly prejudicial," that "the music was unnecessary," and that the videotape "was presented in a manner designed to have an unduly emotional impact." Additionally, regarding the music portion of the videotape, on direct appeal the State conceded that the music was not relevant. On remand, the State again concedes the photographs were "accompanied by highly emotional and moving background music."

*Id.* at 884 (alterations in original; citations omitted). The *Salazar* court ultimately concluded that the error stemming from the erroneous admission of the videotape was not harmless. The trial court's judgment of conviction was affirmed, but the sentence was vacated and the case remanded to the trial court for a new hearing on punishment. *Id.* at 885.

Even longer than the videotape analyzed in *Salazar*, the Rizzo video was close to 30 minutes long and featured many pictures of the victim from birth to college, posing with family, friends and religious figures.[12] In addition, it was set to poignant music. Even without the music, admission of the video would have been unfairly prejudicial in light of the fact that the jury heard powerful, poignant testimony about Jonathan Rizzo's full life and the impact of his loss on his family, and saw photographs of him in conjunction with this testimony. The video, given its length and the number of photos displayed, would have constituted an extended emotional appeal to the jury and would have provided much more than a "quick glimpse" of the victim's life. Together with the evocative accompanying

---

12. By way of comparison, the victim impact testimony that was actually presented to the jury took approximately 120 minutes. As described earlier, the tape was made as a memorial tribute to Jonathan Rizzo rather than produced for the purpose of this case. It was fitting and lovely for its original, intended purpose, but not appropriate for presentation to the jury in this case.

music, the videotape's images would have inflamed the passion and sympathy of the jury.

■ The last issue presented was that of the proffered Whitney victim impact testimony. The government had proposed to offer the testimony of two of Robert Whitney's adult children, in order to allow the jury the opportunity to decide how much weight to give the Whitney murder. The Whitney murder was alleged as an aggravating factor in the government's Notice of Intent.

For several compelling reasons, on October 30, 2003, the court decided to exclude the Whitney victim impact evidence. First, the FDPA makes no express provision for victim impact evidence concerning the victim of a crime for which the defendant is not being sentenced. Section 3593(a) states that aggravating factors "may include factors concerning the effect of *the offense* on the victim and the victim's family." *Id.* (emphasis added). The offenses at issue in this case were the carjackings resulting in the deaths of McCloskey and Rizzo. The murder of Whitney, by contrast, was an aggravating factor in this case rather than a charged offense. An aggravating factor is not an "offense" within the meaning of § 3593(a).

The defendant argued that the government should be precluded from offering this evidence because its Notice of Intent stated that the aggravating factor in question was the murder of Whitney in New Hampshire; there was no reference in the aggravating factor to the presentation of victim impact evidence. This argument was not persuasive because under § 3593(a) the government is required only to give notice of aggravating factors, not all of the evidence it intends to use to prove them. Nevertheless, the court recognized that the proffered Whitney victim impact testimony did not tend to prove that Sampson murdered Whitney, as the

aggravating factor states. That fact was undisputed, and the government was permitted to introduce some evidence to illustrate that fact and allow the jury to consider its proper weight in sentencing.

The impact of Whitney's death on his survivors was also relevant to the weight the jury assigned to the murder as an aggravating factor. As described earlier, however, the Supreme Court and other courts have recognized the risk that victim impact evidence could cause passion to overwhelm reason in sentencing. *Payne,* 501 U.S. at 836, 111 S.Ct. 2597 (Souter, J., concurring); *Hain,* 287 F.3d at 1237 (10th Cir.2002). While the court chose to exercise its discretion liberally in admitting much of the proffered victim impact evidence relating to the Rizzo and McCloskey murders, it found that admitting victim impact evidence regarding Whitney would create too great a risk that the jury would be unduly influenced by sympathy and passion, and the defendant would be denied due process. *See Payne,* 501 U.S. at 825, 111 S.Ct. 2597.

Moreover, it is not clear that the FDPA authorizes victim impact evidence relating to uncharged murders, and no FDPA case seems to have included such evidence. The court found that given the foregoing considerations, it would not be appropriate to admit the victim impact evidence pertaining to Whitney, even assuming, without deciding, that it would be legally permissible to do so under the FDPA.

## VIII. EVIDENCE RELATING TO OTHER CAPITAL PROSECUTIONS

■ One of the mitigating factors Sampson proposed to prove in this case was that "[t]here are numerous other federal defendants convicted of multiple murder who have not been sentenced to death." Essentially, Sampson intended to

argue that it would not be fair to sentence him to death when others who were guilty of equally or more awful crimes had not been executed. The government consistently opposed any reference to other cases.[13]

On October 31, 2003, the court allowed the government's motion in limine to preclude the defendant from presenting evidence of other cases to the jury. Essentially, the court concluded that although the outcomes of other cases were relevant to the determination of the appropriate penalty in this case and the proffered mitigating factor could properly be presented to the jury, the evidence the defendant sought to admit to establish this mitigating factor was not admissible under the FDPA's balancing test. *See* 18 U.S.C. § 3593(c). As there was no evidence presented in support of this mitigating factor, the court did not include it on the verdict forms or instruct the jury on it at the end of the case.

The government first argued that any evidence of the verdicts reached in other cases was irrelevant to the appropriate verdict in this case and, as it was not related to Sampson's "character, record or the circumstances of his offenses," was not properly a mitigating factor. Gov.'s Mot. in Limine—Exs. 20A & 20B at 2–3 (citing 18 U.S.C. § 3592(a)(1)-(8) and cases). However, the FDPA does not limit mitigating factors to those that are related to the defendant or the crime. As Judge Helen Berrigan has persuasively written:

> The penalty phase statute applicable to this case is 18 U.S.C. § 3592. With regard to mitigating factors, it reads as follows:
>
> (a) Mitigating factors.—In determining whether a sentence of death is to be imposed on a defendant, the finder of fact shall consider any mitigating factor, including the following:
>
> . . . .
>
> (8) Other factors.—Other factors in the defendant's background, record, or character or any other circumstance of the offense that mitigate against imposition of the death sentence.
>
> The most notable aspect of the statute is the introductory statement. The finder of fact (1) "shall" consider (2) "any mitigating factor, (3) including the following." First, the jury "shall" or must consider the mitigating factors; it is obligatory, not discretionary. Second, the fact finder must consider "any" mitigating factor. There is no qualification or limitation other than the factor "mitigate" against a sentence of death. Third, "(I)ncluding the following" means the subsequent list is not exclusive, but is instead illustrative. The eight identified factors are examples of specific factors that, if supported by the evidence, mitigate against the death penalty. Most significantly for the issue here, subhead (8) which refers to other factors "in the defendant's background, record, or character or any other circumstance of the offense" is a sub category of "any mitigating factor" rather than being the outer boundaries of what may be considered as mitigating. What 18 U.S.C.A. § 3592 allows is substantially broader than what the Supreme Court has declared to be the minimal requirements under the Constitution. According to the Supreme Court, the Eighth Amendment demands consideration only for those mitigating factors that concern the defendant's "character or record and

---

13. This issue first arose during the jury selection process. The court ordered the parties not to refer to other death penalty cases when questioning potential jurors unless the prospective juror first brought up another case, such as the Oklahoma City bombing, and then to limit any questioning to the particular case or cases mentioned by the prospective juror.

any of the circumstances of the offense ..." *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). Under the statute, on the other hand, the Supreme Court's constitutional minimum is simply subhead(8) of a non-exclusive list. The statute demands the fact finder consider "any mitigating" factor ... period.

*United States v. Davis,* 132 F.Supp.2d 455, 463–64 (E.D.La.2001) (second ellipsis in original); *see also id.* n. 1 ("[I]n light of the overall structure of the statute, it is not necessary to decide whether 18 U.S.C.A. § 3592(a)(8) is broader than the Eighth Amendment minimum."). Thus, the statutory "limitation" asserted by the government is no limitation at all.[14]

The government's argument that the defendant's proposed evidence was not mitigating, even in the broader sense, was also not persuasive. The defendant's proffered evidence was intended to enable the jury to take into account considerations of comparative proportionality in determining the appropriate sentence in this case. Proportionality considerations were recognized as valid mitigating factors by Congress and the President when they enacted the FDPA. *See* 18 U.S.C. § 3592(a)(3)—(4) (listing as mitigating factors relatively minor participation in the offense and lack of death sentences for equally or more culpable co-defendants).

As Judge Leonard Sand wrote in *United States v. Bin Laden,* 156 F.Supp.2d 359, 369 (S.D.N.Y.2001) (footnote omitted):

Congress' deliberate inclusion of this factor [18 U.S.C. § 3592(a)(4) ] in the legislative scheme calls for a more broad interpretation of the range of permissible nonstatutory mitigating factors than

the Government suggests. The circumstance that others who are equally culpable will not be subject to the death penalty is a comparative factor which reflects a determination by Congress that it is appropriate for jurors to consider questions of proportionality and equity when they are evaluating whether a death sentence is appropriate. *See United States v. Beckford,* 962 F.Supp. 804, 811–16 (E.D.Va.1997) (analyzing 21 U.S.C. § 848(m)(8)) (explaining that "proportionality, equity, and fairness" are the goals "which underlie" the mitigating factor regarding equally culpable defendants). By permitting them to engage in such a comparison, Congress provided jurors with a means of improving the likelihood that the death penalty would not be administered in an arbitrary or random manner. *Cf. Pulley v. Harris,* 465 U.S. 37, 45, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984) (noting that general comparative proportionality review provides an "additional safeguard against arbitrary or capricious sentencing").

Judge Sand describes Congress' choice as a deliberate one because "[a] review of competing draft versions of the death penalty legislation makes clear that the decision to include this factor was contested." *Id.* at 369 n. 12.

Proportionality is generally regarded as important to sentencing. It is the foundation of the current regime of sentencing under the United States Sentencing Guidelines. The Guidelines use nationwide statistics to promote proportional sentences throughout the United States. It would be anomalous if the choice between a life sentence and a death sentence were the only

---

**14.** The government urged the court to adopt a construction of the appellate review provision of the FDPA similar to the construction of 18 U.S.C. § 3292(a) presented by the defendant, arguing on June 11, 2003 that when a statute

"has a provision that says, including, and makes a list" the statute does not prohibit a court from considering things not on the list. June 11, 2003 Tr. at 144 (citing 18 U.S.C. § 3595(b)).

sentencing decision in the federal system in which proportionality is not a proper consideration. Unlike many state statutes, the FDPA makes no explicit provision for judicial proportionality review. The various courts of appeals or the Supreme Court may, nevertheless, decide to perform such review. *See Sampson II,* 275 F.Supp.2d at 96. Thus, the government's argument that the sentencer in a capital case is not permitted to consider proportionality was not persuasive in principle.

The state court cases cited by the government were distinguishable. In *State v. Gardner,* 789 P.2d 273, 286 (Utah 1989), the Utah Supreme Court held that it was not error to exclude evidence of other cases. However, unlike the Utah statute at issue in *Gardner,* the FDPA does not limit mitigating evidence to the character of the defendant, his record or the nature of the offense. *Wiggins v. State,* 324 Md. 551, 597 A.2d 1359, 1370–71 (1991) and *State v. Clark,* 128 N.M. 119, 990 P.2d 793, 805 (1999) were also inapposite as they each relied on state statutory schemes that confer the authority to conduct proportionality review on the courts rather than the jury. The FDPA contains no comparable delegation.

▮ Thus, the court decided that proportionality evidence was, as a matter of law, properly a mitigating factor in an FDPA sentencing hearing. Nevertheless, the court found that the probative value of the evidence Sampson proffered was outweighed by the danger of unfair prejudice and confusion of the issues. The defendant made his proffer as follows:

> The defense proposes to present to the jury, via the testimony of Kevin McNally, Esquire, of the Federal Death Penalty Resource Counsel Project, the verdicts reached in every federal death penalty case tried to date. It is anticipated that Mr. McNally would provide brief summaries of the circumstances of each case and the jury's verdict. Where available, the defense will present through Mr. McNally the actual verdict sheets from those cases, illustrating the aggravating and mitigating factors found in each case by the jury. (A CD containing 71 such verdict sheets has been served and filed [as Exhibit 20A]. Efforts top [sic] gather additional verdict sheets are ongoing.)

Def.'s Resp. to Pending Mots. in Limine at 5.

In order to determine which of the many other cases are sufficiently similar to this case to bear on the question of proportionality, the jury would have had to hear a large amount of evidence. In effect, the court would have had to conduct many mini-trials of other FDPA cases, since a jury would be unable to perform meaningful proportionality review based on brief summaries of other cases. Rather, in order to fully appreciate the verdicts reached in those cases, jurors in this case would have had to hear substantial testimony regarding the crime and the defendant in the other cases. The amount of time that would have had to be spent educating jurors regarding all other FDPA cases in a non-prejudicial manner, which could have been measured in weeks or months, as compared to the amount of time spent on the mitigation case as a whole, likely would have diverted the jury's focus from the facts relating to Sampson and his crimes.

In *United States v. Regan,* 221 F.Supp.2d 659, 660–61 (E.D.Va.2002), the court held that proportionality evidence relating to the harm done in other espionage cases could not be used as a mitigating factor because it lacked probative value and there was a significant danger of confusing the issues and misleading the jury.

Section 3592(a)(4) provides that the jury may consider whether "[a]nother

defendant or defendants, equally culpable *in the crime*, will not be punished by death." *Id.* (emphasis added). The plain language of section 3592(a)(4) limits the jury's consideration to co-defendants, co-conspirators, or accomplices of the defendant in the capital crime before the jury, not any *similar* crime. Defendant cites no authority that extends the scope of section 3592(a)(4) to defendants in other crimes.

In fact, the relevant case law stands contrary to Defendant's position. For instance, in *United States v. Beckford*, the court reviewed a similarly worded statutory mitigating factor in 21 U.S.C. § 848(m)(8). 962 F.Supp. 804 (E.D.Va. 1997). In that case, the court refused to expand the phrase "in the crime" to accomplices in the conspiracy that were not involved in the murder in which the defendant was charged. *Beckford*, 962 F.Supp. at 812. The *Beckford* court held that the language "in the crime" referred only to those defendants involved in the capital murder. *See id.* at 814. Relying on this interpretation of the statute, the court denied the defendant's Brady requests for materials relating to all criminal acts of all co-defendants as overbroad. *See id.* at 815.

In this case, Defendant seeks even broader relief than that denied by the *Beckford* court. Defendant seeks discovery concerning defendants who have *no* connection whatsoever to the alleged crime Defendant is accused of committing. Moreover, eight of the ten defendants in the espionage cases identified by the Defendant pled guilty, whereas the Defendant in this case has not. Permitting the submission of evidence of totally unrelated espionage cases would lead to a confusion of the issues or mislead the jury. *See id.* at 826–27. Further, introducing evidence of that sort would inevitably amount to separate mini-trials on whether the Government

should have sought the death penalty in certain cases. In sum, the damage assessments of other espionage defendants are irrelevant to the acts of the Defendant and the jury's determination of Defendant's sentence. Even if this evidence had a modicum of probative value, it would be substantially outweighed by the dangers of confusion of the issues and misleading the jury. Fed.R.Evid. 403.

*Id.*

This court disagreed with the conclusion, reached in *Regan*, that the harm done by other capital defendants was irrelevant to the determination of the appropriate sentence in this case. However, the court concluded that the dangers of misleading the jury and confusing the issues were simply too great in comparison to the probative value that the proffered evidence would have with respect to the proper sentence in this case. *See id.; United States v. Feliciano*, 998 F.Supp. 166, 173 (D.Conn.1998) (concluding that "any possible probative value [of evidence regarding death-eligible offenses of co-conspirators] is outweighed by the danger of misleading and confusing the jury").

On October 31, 2003, the court stated that a narrower proffer might be admissible under the FDPA's balancing test because a more limited presentation could have greater probative value and lesser associated risks. In an effort to conform his evidence to the requirements of 18 U.S.C. § 3593(c), the defendant narrowed his proffer by limiting it "to [47 FDPA] cases where a defendant was found to have committed more than one murder." Def.'s Mem. in Support of a Ltd. Presentation of Penalty–Phase Verdicts Reached in Other Fed. Death Penalty Cases at 1. The government filed a second motion in limine, urging the court to reconsider its earlier decision that proportionality evidence may

be properly presented as a mitigating factor and, in any event, to preclude the narrower proffer under 18 U.S.C. § 3593(c).

On December 1, 2003, the court allowed the government's second motion in limine. The court was not persuaded to revise its earlier decision that proportionality evidence is, at least in theory, admissible in an FDPA case. Although the government was correct that the Guidelines put a relatively greater emphasis on proportionality and the FDPA puts a relatively greater emphasis on consideration of the unique aspects of a defendant and his crime, the government was incorrect when it asserted that proportionality considerations can play no role whatsoever in a jury's determination of whether a death sentence is more appropriate than some other sentence.

However, even when limited to 47 cases, the defendant's proffer did not adequately address the risks of misleading the jury and confusing the issues. Additionally, the government persuasively argued that the defendant's proffer suffered from inaccuracies that greatly diminished its probative value. For example, in the document containing summaries of other cases that the defendant sought to offer as an exhibit, there was a summary of this case. The summary of this case contained several material inaccuracies and omissions. The government pointed out inaccuracies in summaries of other cases as well.

There was a significant danger that allowing even accurate testimony regarding 47 other cases would have confused the jury. To permit inaccurate testimony by a witness relating hearsay accounts of the evidence presented at the other trials would have presented an even more substantial risk that outweighed the probative value of the proffered evidence.

Essentially, the court excluded the limited presentation because it agreed with the government that "the proffered [47] capital case verdicts cannot be compared in any meaningful way unless the [ ] cases are effectively retried to th[e] jury" in this case and the defendant's proposed presentation of the cases through McNally would "only mislead the jury and create prejudicial confusion." Gov.'s Second Mot. in Limine at 27–28.

## IX. THE COURT'S AUTHORITY TO REVIEW THE SUFFICIENCY OF THE GOVERNMENT'S EVIDENCE

■ On November 24, 2003, the court ruled that it had both the power and the responsibility to evaluate the sufficiency of the evidence presented at the penalty phase of a prosecution under the FDPA. While Federal Rule of Criminal Procedure 29 is not directly applicable to the penalty phase of a proceeding under the FDPA, similar procedures and standards for evaluating the evidence are appropriate. A court can, therefore, decide a defendant's challenges to the sufficiency of the government's evidence at the close of the government's case-in-chief or reserve decision and decide at a later time on the basis of the evidence at the end of the government's case-in-chief. As would be the case under Rule 29, a court can make such a decision after the return of a jury verdict.

Federal Rule of Criminal Procedure 29(a) states:

Before Submission to the Jury. After the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction. The court may on its own consider whether the evidence is insufficient to sustain a conviction. If the court denies a motion for a judgment of acquittal at the close of the govern-

ment's evidence, the defendant may offer evidence without having reserved the right to do so.

By its terms, Rule 29 is inapplicable to the penalty phase of a capital case under the FDPA. The Rule refers to evidence sufficient "to sustain a conviction" and to the entry of a "judgment of acquittal." These references indicate that the Rule is not applicable to the penalty phase, where there is no question of evidence sufficient for a "conviction" and no possibility of "acquittal".

This conclusion is not surprising, as the Rules of Criminal Procedure were drafted "long before the FDPA came into existence." *United States v. Lee*, 89 F.Supp.2d 1017, 1021 (E.D.Ark.2000), *rev'd on other grounds*, 274 F.3d 485 (8th Cir. 2001).[15] In *Lee*, the district court dealt with a post-conviction motion for a new trial, ostensibly made pursuant to Rule 33. The court rejected the government's contention that the court had no authority to grant a new trial once the jury had returned a death verdict. *Id.*[16] The court concluded that it had the same authority in the FDPA context as it would have in any other case. *Id.* It noted, further, that there are unique concerns for reliability in capital cases, citing *United States v. Pena–Gonzalez*, 62 F.Supp.2d 358, 360 (D.P.R. 1999), which held:

> [The decision] entails the unique gravity appropriate for capital cases. Capital punishment is qualitatively different from any other form of criminal penalty we may impose. With it, we deny the convict any possibility of rehabilitation and order instead his execution, the most irrevocable of sanctions. Its sever-

ity demands a heightened need for reliability in the determination that death is the appropriate punishment in a specific case. We must be, therefore, particularly sensitive to insure that unique safeguards are in place that comport with the constitutional requirements of the Due Process Clause of the Fourteenth Amendment and the Eighth Amendment.

*Lee*, 89 F.Supp.2d at 1021 (alteration in original; citations omitted). The court in *Lee, id.*, also cited the Supreme Court's statement that:

> In capital proceedings generally, this Court has demanded that factfinding procedures aspire to a heightened standard of reliability. This especial concern is a natural consequence of the knowledge that execution is the most irremediable and unfathomable of penalties; that death is different.

*Ford v. Wainwright*, 477 U.S. 399, 411, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986) (Marshall, J., plurality opinion) (citations omitted).

The same concerns are present in the current case. However, *Lee* is distinguishable as the language of Rule 33 gives the court the power to vacate "any judgment," and does not refer solely, as does Rule 29, to a "conviction". The textual difficulties in applying Rule 29 in the FDPA context are, therefore, not present with respect to Rule 33.

The fact that Rule 29 does not cover the penalty phase of a capital case does not mean that the defendant is left without protection against a judgment based on insufficient evidence. The court has the

---

**15.** The Rules were modified in 2002, but primarily on stylistic grounds.

**16.** Although the Court of Appeals for the Eighth Circuit reversed the district court's order for a new penalty phase trial, it did not

find that the district court lacked authority to enter the order. Instead, the Eighth Circuit decided that the district court had abused its discretion in allowing the motion for a new trial. *Lee*, 274 F.3d at 497.

inherent power to evaluate the sufficiency of the evidence against a defendant. Use of such power by application of the Rule 29 standard is not inconsistent with any of the Federal Rules of Criminal Procedure. *Cf. Carlisle v. United States*, 517 U.S. 416, 425–26, 116 S.Ct. 1460, 134 L.Ed.2d 613 (1996) (noting that "federal courts may, within limits, formulate procedural rules not specifically required by the Constitution or the Congress," but holding that such inherent authority did "not include the power to develop rules that circumvent or conflict with the Federal Rules of Criminal Procedure") (citing *United States v. Hasting*, 461 U.S. 499, 505, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983)). As Rule 29 is not, by its terms, applicable, there is no provision of the Federal Rules of Criminal Procedure that directly or indirectly addresses the issue of a trial court's evaluation of the sufficiency of the evidence at the penalty phase of an FDPA prosecution. In fact, as a whole, the Rules do not explicitly refer to procedures for the penalty phase of a trial. In developing a procedure to govern the situation, the court, therefore, has acted interstitially rather than in conflict with or in circumvention of the Rules.

Courts have acted pursuant to their inherent power in situations analogous to the present case. In *United States v. Weston*, 36 F.Supp.2d 7 (D.D.C.1999), the defendant objected to being forced to undergo multiple competency examinations, relying on *Carlisle* in claiming that Federal Rule of Criminal Procedure 12.2(c) only authorized the court to order "a" single psychological examination. The court rejected this argument, holding that its order was a valid exercise of inherent authority as it "conflict[ed] with neither the [Insanity Defense Reform] Act nor the Federal Rules of Criminal Procedure." *Weston*, 36 F.Supp.2d at 12.

In *United States v. Webster*, 162 F.3d 308 (5th Cir.1998), the defendant in an FDPA case challenged a court-ordered psychiatric examination required as a predicate for introducing his own expert psychiatric testimony.[17] On appeal, the Fifth Circuit upheld the actions of the district court, citing the district court's inherent powers:

> Although Webster correctly asserts that the court lacked statutory authority to order the psychiatric exam, a district court possesses inherent powers "reasonably useful to achieve justice," including certain powers over the administration of civil and criminal discovery. In fact, Fed.R.Crim.P. 57(b) provides that where no law or rule is directly applicable, "[a] judge may regulate practice in any manner consistent with federal law, these rules, and local rules of the district." The existence of the federal rules does not preempt this power, if the rules do not exclude the exercise of the specific putative inherent power.

*Id.* at 339 (alteration in original; citations omitted). The Fifth Circuit went on to say, more broadly, that inherent authority extended to the penalty phase of prosecutions under the FDPA:

> Acknowledging that a district court has such inherent authority furthers the goals of the FDPA. If the federal courts have supervisory authority to "formulate procedural rules not specifically required by the Constitution or the Congress" to "preserve the integrity of the judiciary by ensuring that a conviction rests on appropriate considerations validly before the jury," *United States v.*

---

**17.** *Webster* occurred before the 2002 revision of the Rules, which made Rule 12.2 applicable to the penalty phase of a capital trial. *Cf.* Federal Rule of Criminal Procedure 12.2, Advisory Committee Notes, 2002 Amendments ("Rule 12.2(c)(1)(A) reflects the traditional authority of the court to order competency examinations.").

*Hasting*, 461 U.S. 499, 505, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983), that authority must extend to the sentencing phase of a trial as well.

*Id.* at 339. *see also United States v. Beckford*, 962 F.Supp. 748, 754 (E.D.Va.1997) (stating, in a capital case brought under 21 U.S.C. § 848, "[c]onfronted with situations in which the Federal Rules of Criminal Procedure were not applicable, courts historically have invoked inherent judicial powers to address the general circumstances here presented and to craft appropriate solutions to them.").

Generally, the imposition of the death penalty in the absence of evidence to establish an aggravating factor beyond a reasonable doubt would violate the defendant's right to due process. *See Jackson v. Virginia*, 443 U.S. 307, 318, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (proof beyond reasonable doubt required by due process clause); *Smith v. Armontrout*, 888 F.2d 530, 538 (8th Cir.1989) ("[B]y analogy with *Jackson*, due process would forbid a verdict of death unless the evidence was sufficient to convince a rational trier of fact, beyond a reasonable doubt, of the existence of at least one aggravating circumstance.").

The Court of Appeals, by statute, must review death sentences for the sufficiency of the evidence. 18 U.S.C. § 3595(c)(1). It therefore makes sense for the district court to do so as well. "[A]s a general matter, federal courts of appeals do not rule on issues not decided in the district court." *United States v. Kin–Hong*, 110 F.3d 103, 116 (1st Cir.1997). It is also generally recognized that the District Court is much more familiar with the evidence in the general course of the case than is the Court of Appeals on review. *See United States v. Smith*, 331 U.S. 469, 476, 67 S.Ct. 1330, 91 L.Ed. 1610 (1947) (referring to "the peculiar ability which the trial judge has to pass on the fairness of the trial" due to his or her knowledge of the "incidents and nuances of the trial").

Therefore, to provide the procedural safeguards necessary to vindicate the defendant's due process rights, the court found it appropriate to evaluate the sufficiency of the evidence presented at the penalty phase. In doing so, it adopted the Rule 29 standard applicable to guilt phase determinations. *Cf. Webster*, 162 F.3d at 340 (approving use of inherent authority in establishing penalty phase procedure modeled on similar Rule governing guilt phase procedure). On November 20, 2003, the government acknowledged that the court could evaluate the sufficiency of the evidence with respect to the alleged aggravating factors under the Rule 29 standard.

 In ruling on a motion under Federal Rule of Criminal Procedure 29, and on the sufficiency of the evidence in the penalty phase of an FDPA case, the court must look at the evidence in the light most favorable to the government. *United States v. Duclos*, 214 F.3d 27, 32 (1st Cir. 2000). This evidence includes both direct evidence and circumstantial evidence. *United States v. Olbres*, 61 F.3d 967, 970 (1st Cir.1995). The court must draw reasonable inferences in favor of the government, *United States v. Baldyga*, 233 F.3d 674, 678 (1st Cir.2000), and must resolve all credibility questions and evidentiary conflicts in favor of the government. *Olbres*, 61 F.3d at 970. The court must decide if the evidence is sufficient to permit a rational jury to find each essential fact to have been proven beyond a reasonable doubt. *Id.*

The government is not bound by all of the evidence that it presents. For example, the government was not, in this case, bound by every statement in each of Sampson's confessions, even if it introduced those confessions into evidence. However, if the government introduces ev-

idence contrary to the inferences it wants the jury to draw, it must introduce other direct or circumstantial evidence to relieve itself of the effect flowing from the evidence introduced. *See Rodgers v. United States,* 402 F.2d 830, 833 (9th Cir.1968); *United States v. Canessa,* 534 F.2d 402, 404 (1st Cir.1976) (distinguishing *Rodgers* ); *United States v. Polizzi,* 500 F.2d 856, 905 (9th Cir.1974) ("the government cannot rely on an inference when the only evidence presented by the government is inconsistent with the inference the government wishes drawn").

The evidence must be sufficient to prove the fact at issue beyond a reasonable doubt. However, the government does not have to rule out every hypothesis congenial to a finding of innocence. *United States v. Valle,* 72 F.3d 210, 216 (1st Cir. 1995). The First Circuit discussed the standard for appellate review of the sufficiency of the evidence in *United States v. Spinney,* 65 F.3d 231 (1st Cir.1995). It wrote:

> [A] reviewing court should refrain from second-guessing the ensuing conclusions as long as (1) the inferences derive support from a plausible rendition of the record, and (2) the conclusions flow rationally from those inferences.... [However,] juries do not have *carte blanche.* The appellate function, properly understood, requires the reviewing court to take a hard look at the record and to reject those evidentiary interpretations and illations that are unreasonable, insupportable, or overly speculative.... This function is especially important in criminal cases, given the prosecution's obligation to prove every element of an offense beyond a reasonable doubt.

*Id.* at 234 (citations omitted). The trial court's duty is the same.

## X. ESPECIALLY HEINOUS, CRUEL OR DEPRAVED MANNER OF COMMITTING THE OFFENSE

On November 24, 2003, the court considered the defendant's challenge to the sufficiency of the evidence supporting the alleged statutory aggravating factor that Sampson "committed [each] offense in an especially heinous, cruel or depraved manner in that it involved torture or serious physical abuse to the victim." 18 U.S.C. § 3592(c)(6). This task began, necessarily, by defining the scope of this factor.

In defining the scope of the alleged statutory and non-statutory aggravating factors, the court recognized the constitutional role of aggravating factors. In *Zant v. Stephens,* 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235, the Supreme Court wrote:

> [A]n aggravating circumstance must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder.

*Id.* at 877, 103 S.Ct. 2733. The court, therefore, interpreted the statutory aggravating factors in ways that serve to "genuinely narrow" the class of persons eligible for the death penalty. Further, the statutory aggravating factors create a framework and standard for determining what may be a non-statutory aggravating factor. *See United States v. Davis,* 912 F.Supp. 938, 944 (E.D.La.1996). Statutory aggravating factors generally address circumstances that make the offense clearly more heinous than the typical murder, and the prior criminal history of the defendant. *See United States v. Friend,* 92 F.Supp.2d 534, 541 (E.D.Va.2000); *United States v. Sampson,* 275 F.Supp.2d 49, 100 (D.Mass. 2003).

In *Arave v. Creech,* 507 U.S. 463, 474, 113 S.Ct. 1534, 123 L.Ed.2d 188 (1993), the

Supreme Court held that an aggravating factor cannot apply to every defendant eligible for the death penalty: "If the sentencer fairly could conclude that an aggravating circumstance applies to every defendant eligible for the death penalty, the circumstance is constitutionally infirm." *Id.* The holding of *Arave* indicates that if a class of murderers eligible for the death penalty under a jurisdiction's laws includes all first-degree murders (including premeditated killing), something more is necessary to narrow the class in a constitutionally permissible way. The Tenth Circuit elaborated on this in *Cartwright v. Maynard*, 822 F.2d 1477 (10th Cir.1987). It wrote:

> [I]f an aggravating circumstance is defined and applied so broadly that it conceivably could cover every first degree murder, then it obviously cannot fulfill its constitutional responsibilities to eliminate the consideration of impermissible factors and to provide a recognizable and meaningful standard for choosing the few who are to die.

*Id.* at 1485, *citing* Richard A. Rosen, *The "Especially Heinous" Aggravating Circumstance in Capital Cases—The Standardless Standard*, 64 N.C. L.Rev. 941, 954 (1986).

For the purposes of establishing the statutory aggravating factor that the offense was committed in an especially heinous, cruel, or depraved manner, the literal language of § 3592(c)(6) expressly provides that is sufficient to prove that a crime was especially heinous, especially depraved, *or* especially cruel.[18]

■■■ It is important to recognize that, prior to the enactment of the FDPA, the Supreme Court stated that: "A person of ordinary sensibility could fairly characterize almost every murder as outrageously or wantonly vile, horrible and inhuman." *Godfrey v. Georgia*, 446 U.S. 420, 428–29, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980) (internal quotation marks omitted). This is a point that is not just intuitively hard for lay people to understand; it is also a point on which this court made a mistake early in the proceedings, when it said that it seemed obvious that the offenses charged in this case were heinous, cruel, or depraved. After all, the defendant slit the victims' throats. This analysis is not correct. Something more than a horrible murder is necessary to make that murder especially heinous, cruel, or depraved, as required by the Constitution and the terms of the FDPA.[19] *See id.;* 18 U.S.C. § 3592(c)(6).

**18.** The court instructed the jury that "[t]he government does not have to prove that the killing was done in an especially heinous, especially cruel, and especially depraved manner. If it proves any one of these three to all 12 of you beyond a reasonable doubt, that's sufficient. But you do, all 12, have to agree in order to answer that question yes." Dec. 19, 2003 Tr. at 34.

**19.** *The court explained this concept to the jury when it instructed the jury on this aggravating factor:*

The first statutory aggravating factor you should consider is question 3A, which asks whether it's proven that Mr. Sampson committed the carjacking resulting in the death of Philip McCloskey in an especially heinous, cruel, or depraved manner in that it involved serious physical abuse to Philip McCloskey. This is a question on which the legal definition of the relevant words is particularly important, because in the context of the Federal Death Penalty statute, these words have a precise meaning that may not be obvious to you or, in fact, to me. But this is what they mean. Or I'll tell you in a moment what they mean. But I think you'll understand this instruction and, in fact, all of the instructions, if I explain to you a primary purpose of statutory aggravating factors, what the law is seeking to achieve here.

Statutory aggravating factors are intended to assure that the death penalty is considered in only the most extreme cases and, also, that it is not applied in an arbitrary or inconsistent manner.

## A. SERIOUS PHYSICAL ABUSE

■ The FDPA provides expressly that serious physical abuse can make an offense involving homicide especially heinous, cruel, or depraved. *See* 18 U.S.C. § 3592(c)(6). This is constitutionally permissible. *See Maynard v. Cartwright*, 486 U.S. 356, 364–65, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988).

■ It is, therefore, necessary to determine the legal definition of serious physical abuse. The court defined serious physical abuse as follows:

Serious physical abuse means that

(1) A significant or considerable amount of damage was inflicted to the victim's body.

(2) The defendant specifically intended the abuse in addition to the killing.

Dec. 19, 2003 Tr. at 33; *Manual of Model Criminal Jury Instructions for the District Courts of the Eighth Circuit*, Instruction 12.07F; 1 Leonard B. Sand et al,

As I told you earlier, as a matter of law, premeditated murder alone is not sufficient to make the death penalty a sentencing option. Something more is required. More specifically, one of those "something mores" with regard to murder is that a murder must be committed in an especially heinous, cruel, or depraved manner. However, a person of ordinary sensibility could fairly characterize almost every murder as heinous, cruel, or depraved, the Supreme Court has said. Therefore, something additional must be proven to make this a truly limiting factor and to assure reasonable consistency between cases. In this case, the law provides that the killing can only be especially heinous, cruel, or depraved if it involved serious physical abuse to Mr. McCloskey. In this case, "especially" has its usual meaning of highly or unusually great. Each of the other relevant terms has a defined meaning for the purposes of the Federal Death Penalty statute. I'll now explain those meanings to you.

"Heinous" means shockingly atrocious. In this case, a killing may be found to be especially heinous only as a result of any serious physical abuse that's proven.

*Modern Federal Jury Instructions*, Inst. 9A–11 at 9A–45 to –48. This means that the focus is in large part on the defendant's intent and state of mind. The definition adopted by the court requires that the defendant have intended to inflict harm on the victim's body in addition to the harm that the defendant believed was necessary to kill him. The victim does not, however, have to be conscious at the time the serious physical abuse was inflicted. Nor does the victim have to be alive at the time the serious physical abuse was inflicted. *See United States v. Chanthadara*, 230 F.3d 1237, 1261–62 (10th Cir.2000); *United States v. Jones*, 132 F.3d 232, 250 n. 12 (5th Cir.1998), *aff'd*, 527 U.S. 373, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999); *United States v. Hall*, 152 F.3d 381, 424 (5th Cir.1998). *But see* 1 Leonard B. Sand, et al., *Modern Federal Jury Instructions*, Inst. 9A–11 (victim must be alive) (citing *United States v. Pretlow*, 779 F.Supp. 758, 773 (D.N.J.1991) and *United States v. Pitera*, 795 F.Supp. 546, 558 (E.D.N.Y. 1992)).[20]

"Cruel" means the defendant intended to inflict a high degree of pain. In this case, a killing may be found to be especially cruel only as a result of any serious physical abuse that is proven.

"Depraved" means that the defendant relished the killing or showed indifference to the suffering of the victim. Once again, in this case, a killing may be found to be especially depraved only as a result of any serious physical abuse that is proven.
Dec. 19, 2003 Tr. at 31–33.

20. In its instructions to the jury, the court stated:

"Serious physical abuse" has a particular legal meaning for the purpose of this case. To prove that the killing of Mr. McCloskey involved serious physical abuse, the government must prove that Mr. Sampson intended to inflict significant damage to Mr. McCloskey's body beyond what Mr. Sampson thought was necessary to kill him. In essence, the government must prove that Mr. Sampson intended to do more than kill Mr. McCloskey. It must prove that he also intended to abuse his body above and be-

In essence, the FDPA expresses the judgment that the infliction of serious physical abuse makes a defendant more blameworthy because he intended to do more than kill his victim, and this distinguishes a defendant from other murderers. Or, to put it somewhat differently, the infliction of serious physical abuse is evidence that the defendant was especially depraved because he relished the killing, even if the abuse occurred after the victim was unconscious or dead. If, on the other hand, the victim was conscious, serious physical abuse is evidence that the defendant was especially cruel because he intended to inflict a high degree of pain in addition to killing the victim. Either way, serious physical abuse also makes a killing especially heinous, setting the murder apart from other killings in a particularly shocking way.

■ The government argued that the defendant "bragged" about murdering McCloskey and that this was further evidence that the murder was especially heinous, cruel, and depraved. The court found, however, that any such bragging was not evidence that the offense was especially heinous, cruel, or depraved because the statutory definition given by 18 U.S.C. § 3592(c)(6) requires that the jury's conclusion be rooted in a finding of either serious physical abuse or torture. Evidence other than that of torture or serious physical abuse cannot be considered in determining whether an offense was especially heinous, especially cruel, or especially depraved.[21] Bragging might be evidence of depravity in the colloquial sense, but it is not evidence of depravity within the meaning of the statute. The statutory aggravating factor covers only those offenses that were committed in an especially heinous, cruel or depraved manner *in that* the offense involved torture or serious physical abuse to the victim." 18 U.S.C. § 3592(c)(6). (emphasis added).

■ In addition, the government discussed the "senselessness" of the killings in its filings. There are cases which refer to "senselessness". *See, e.g., United States v. Jones,* 132 F.3d 232, 250 (5th Cir.1998), *aff'd,* 527 U.S. 373, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999). However, a focus on the "senselessness" of a crime is unrelated to whether it was committed in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse. Again, "senselessness" may be evidence of depravity in the colloquial sense, but not in the statutory

---

yond what was necessary to kill him. Serious physical abuse can be inflicted either before or after death. The victim does not have to be alive at the time the serious physical abuse is inflicted.
Dec. 19, 2003 Tr. at 33.

21. The court instructed the jury as follows:

Question 3A requires two steps. First, you must determine whether it has been proven beyond a reasonable doubt that the killing of Mr. McCloskey involved serious physical abuse, as I just defined it for you. If you do not agree unanimously that this has been proven, you must answer question 3A no and proceed to question 3B. If you do agree unanimously that serious physical abuse has been proven, you must continue to the next step. In the second step, you must decide whether that serious physical abuse proves that the crime was committed in an especially heinous, an especially cruel, or especially depraved manner, as I defined those terms for you before.

You may not consider any aspect of the crime other than proven serious physical abuse in determining whether the killing was especially heinous, especially cruel, or especially depraved. However, just because an offense involves serious physical abuse does not necessarily mean that it was committed in an especially heinous, cruel, or depraved manner. Rather, you must decide whether any proven serious physical abuse rendered the killing especially heinous, especially cruel, or especially depraved.
Dec. 19, 2003 Tr. at 33–34.

sense. Further, a focus on "senselessness" would obstruct the constitutionally-required narrowing function of the heinous, cruel, or depraved aggravator. *See* 1 Leonard B. Sand, et al., *Modern Federal Jury Instructions*, Inst. 9A–11 at 9A–47 n. 20 ("Because we find that this factor is difficult to apply in any meaningful manner (arguably, any unlawful killing is 'senseless'), we do not recommend its inclusion in the instruction.").

### B. TORTURE

 The presence of torture is another way of establishing that an offense was committed in an especially heinous, cruel, or depraved manner. 18 U.S.C. § 3592(c)(6). At the outset, it should be recognized that there is an important distinction between what is constitutionally permissible and what has been statutorily prescribed, that is, between what the Supreme Court has approved as an aggravating factor regarding the heinousness, cruelty, and depravity of an offense and what Congress intended as an aggravating factor under the FDPA.

In *Godfrey*, 446 U.S. at 430–33, 100 S.Ct. 1759, the Supreme Court held that torture and aggravated battery were valid aggravating factors, in that they narrowed the class of murderers in a constitutionally permissible way. The Court had previously approved the aggravating factor of an offense being "unnecessarily torturous to the victim." *Proffitt v. Florida*, 428 U.S. 242, 255–56, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); *see also Cartwright v. Maynard*, 822 F.2d 1477, 1487 (10th Cir.1987) (citing *Eddings v. State*, 616 P.2d 1159, 1167–68 (Okla.Crim.App.1980)), *aff'd*, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988).

In *Maynard v. Cartwright*, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988), the Court wrote:

We also do not hold that some kind of torture or serious physical abuse is the only limiting construction of the heinous, atrocious, or cruel aggravating circumstance that would be constitutionally acceptable.

*Id.* at 365, 108 S.Ct. 1853. The FDPA, however, expressly makes these two limiting factors the only two means available in a federal prosecution to prove that an offense was committed in a heinous, cruel, or depraved manner.

In 1990, in *Walton v. Arizona*, 497 U.S. 639, 646, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), the Supreme Court addressed Arizona law, which by judicial construction limited the "heinous, cruel, or depraved" aggravating factor to circumstances when "the perpetrator inflicts mental anguish or physical abuse before the victim's death." *Id.* The Supreme Court noted that *Maynard* did not restrict the "heinous, cruel, or depraved" aggravating factor to only crimes involving torture or physical abuse, as that was not necessarily the only constitutionally acceptable construction of "heinous, cruel, or depraved". *Id.* at 654–55, 110 S.Ct. 3047. The Court went on to say that the construction given by the Arizona Supreme Court, which required the infliction of "mental anguish", was "virtually identical to the construction we approved in *Maynard.*" *Id.* at 655, 110 S.Ct. 3047.

In 1988, Congress passed the Anti–Drug Abuse Act (also known as the Drug Kingpin Act), which included constitutional provisions for imposing a death sentence for a federal crime. 21 U.S.C. § 848. Section 848(n)(12) lists, as one aggravating factor to be considered, that "[t]he defendant committed the offense in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse to the victim." In 1994, the same language was adopted in the FDPA.

In 1988, when the Drug Kingpin Act was passed, the 5th edition of Black's Law Dictionary defined "torture" to mean:

To inflict intense pain to body or mind for the purposes of punishment, to extract a confession or information, or for sadistic pleasure.

*Black's Law Dictionary* 1335 (Spec. Deluxe 5th Ed.1979).[22]

In contrast, the Eighth Circuit Pattern Instruction 12.07F now states in pertinent part:

"Torture" includes mental as well as physical abuse of the victim. In either case, the victim must have been conscious of the abuse at the time it was inflicted, and the defendant must have specifically intended to inflict severe mental or physical pain or suffering upon the victim, in addition to the killing of the victim.

Severe mental pain or suffering means prolonged mental harm caused by or resulting from intentionally inflicting or threatening to inflict severe physical pain or suffering ... [or] the threat of imminent death.

This language is derived from 18 U.S.C. § 2340, a 1994 statute that criminalizes torture committed outside the United States. The 18 U.S.C. § 2340 and Eighth Circuit definitions do not include the requirement that the defendant have the purpose to punish or to achieve sadistic pleasure.[23] It would be plausible to interpret the FDPA in the same way.

However, the rule of lenity applies to this situation. The rule of lenity provides that "ambiguity in the scope of a criminal statute must be resolved in favor of a criminal defendant." *United States v. Luna–Diaz*, 222 F.3d 1, 3 n. 2 (1st Cir. 2000); *see also United States v. Hussein*, 351 F.3d 9, 14 (1st Cir.2003); *Dowling v.*

*United States*, 473 U.S. 207, 213–4, 105 S.Ct. 3127, 87 L.Ed.2d 152 (1985). After *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), a statutory aggravating factor is the functional equivalent of an element of the offense, so the rule of lenity applies to statutory aggravating factors in the same way it does to offense elements. Under the rule of lenity, it is appropriate to adopt the narrower definition given by Black's Law Dictionary, 5th edition, rather than a broader definition which does not require proof of sadistic purpose, intent to punish, or intent to extract information. Therefore, the court held that under the FDPA, an offense can be found to be especially heinous, cruel, or depraved in that it involved torture only if it is found that the defendant inflicted the mental or emotional abuse to the victim for the purpose of sadistic pleasure, for the purpose of punishment, or for the purpose of extracting information or a confession.

## C. SUFFICIENCY OF THE EVIDENCE AS TO SERIOUS PHYSICAL ABUSE

■ The court found that the evidence was sufficient to prove that Sampson committed each of the two offenses, in an especially heinous, cruel, or depraved manner in that it involved serious physical abuse.

Applying the Rule 29 sufficiency standard, and looking at the evidence in the light most favorable to the government, the court found that the following evidence was sufficient to establish that each crime was especially heinous, cruel, or depraved in that it involved serious physical abuse.

---

**22.** The Sixth Edition of Black's Law Dictionary was not published until 1990.

**23.** The court also notes that the aggravating factor focuses on whether the offense—carjacking resulting in death—involved torture,

not whether the killing itself involved torture. Further, the court agrees with the Tenth Circuit's ruling in *United States v. Chanthadara*, 230 F.3d 1237, 1262 (10th Cir.2000), which held that torture under the FDPA need not be "prolonged".

Sampson stabbed McCloskey twenty-four times. Some of these stabs caused shallow, non-fatal wounds. In his confession to Massachusetts State Trooper, the defendant said in part, "It was like I didn't want to stop [stabbing]." Cooke Tr. at 17 (Ex. FF). In the next sentence, the defendant went on to say, "He wouldn't die." *Id.* This latter statement supports Sampson's argument that he kept stabbing McCloskey solely in order to kill him, not because of any intent to inflict additional physical abuse. However, the jury had the discretion to believe some but not all of what the defendant said in his confession. Therefore, for the purposes of the sufficiency of the evidence analysis, the court was required to put aside those statements in the confessions that were favorable to the defendant where, in this case, they were contradicted by any other evidence. *See Rodgers*, 402 F.2d at 833.

In addition, in the second confession to Trooper Cooke, the defendant stated that McCloskey said, "Ah, I'm dying." Second Keefe Tr. at 8 (Ex. CC). After McCloskey said this, Sampson, according to his confession, slit McCloskey's throat, nearly decapitating him. *Id.* The jury could, therefore, have reasonably inferred that Sampson knew that slitting McCloskey's throat was not necessary to kill him, but rather intended to inflict serious physical abuse.

The evidence, viewed from the perspective most favorable to the government, included the following with respect to the Sampson's second victim, Rizzo.

Sampson tied Rizzo to a tree. The defendant knew that he could approach Rizzo from behind, slit his throat, and kill him quickly. Instead, the defendant approached Rizzo from the front. He stabbed Rizzo at least fifteen times. According to his second confession given to Trooper Keefe, the defendant stabbed Rizzo's throat *during* this process of stabbing

him many times, rather than as the first or the last stab wound. Second Keefe Tr. at 17 (Ex. CC). The testimony of the medical examiner indicated that the wounds to the throat would have been fatal. In addition, the defendant stabbed Rizzo five times in the chest, inflicting wounds that the medical examiner testified would have been "rapidly fatal." Nov. 10, 2003 Tr. at 101. This evidence was sufficient to permit, though not require, the jury to find that the defendant intended to inflict serious physical abuse on Rizzo as well as kill him. The jury could have inferred from the defendant's course of action that he specifically intended to inflict abuse beyond what he thought necessary to kill Rizzo.

Again, it should be recognized that evidence of what the defendant did after the murder was not relevant to whether that offense was committed in an especially heinous, cruel, or depraved manner as defined in the FDPA, because what occurred later was not evidence of either serious physical abuse or torture.

### D. SUFFICIENCY OF THE EVIDENCE AS TO TORTURE

■■■ The presence of torture is another way of establishing that an offense was committed in an especially heinous, cruel, or depraved manner. 18 U.S.C. § 3592(c)(6).

Under the definition of torture described earlier, the evidence was insufficient to establish the presence of torture. The government did not contend that Sampson attempted to extract a confession or other information from his victims. The defendant did use his knife to coerce McCloskey and Rizzo into driving him to remote locations. However, there was not sufficient evidence to prove, beyond a reasonable doubt, that the defendant tried to cause them additional apprehension in order to

punish them or because he took sadistic pleasure in their suffering. Rather, in his confessions, he said that he tried to lull both of them by telling them that they would not be harmed if they cooperated. Such comments are inconsistent with torture. However, even if the jury did not believe these statements were made, there was an absence of direct or circumstantial evidence sufficient to prove beyond a reasonable doubt that Sampson had any motive for threatening his victims with his knife other than to convince them to drive him where he wanted to go. *See, e.g., Domingues v. State*, 112 Nev. 683, 917 P.2d 1364, 1377 & n. 6 (1996) (citing Black's Law Dictionary for definition of torture and concluding that "[t]here [wa]s no evidence that the specific intent behind the attempted electrocution or the stabbing was to inflict pain for pain's sake or for punishment or sadistic pleasure").

## XI. SUBSTANTIAL PLANNING AND PREMEDITATION

On November 24, 2003, the court considered the defendant's challenge to the sufficiency of the evidence supporting the substantial planning and premeditation aggravating factor.

### A. DEFINITION

The government alleged as statutory aggravating factors that the defendant committed the offense of carjacking resulting in the death of Philip McCloskey after substantial planning and premeditation to cause the death of Philip McCloskey and the offense of carjacking resulting in the death of Jonathan Rizzo after substantial planning and premeditation to cause the death of Jonathan Rizzo. 18 U.S.C. § 3592(c)(9) states:

> Substantial planning and premeditation.—The defendant committed the offense after substantial planning and premeditation to cause the death of a person or commit an act of terrorism.

The substantial planning and premeditation aggravating factor focuses on the intention to cause death, not on the broader offense, which in this case was carjacking resulting in death. The government must prove both substantial planning and substantial premeditation. *See United States v. Tipton*, 90 F.3d 861, 896 n. 17 (4th Cir.1996).

Substantial planning and premeditation is a statutory aggravating factor. Congress has decided that substantial planning and substantial premeditation distinguish a defendant from other murderers in a way that justifies the death penalty. This statutory aggravating factor expresses a legislative determination that "this [type of] murder is different." *Cartwright v. Maynard*, 822 F.2d 1477, 1485 (10th Cir.1987), *aff'd*, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988). This factor is not unconstitutionally vague. *See Tipton*, 90 F.3d at 895–96. Substantial planning and premeditation is a true aggravating factor, for it narrows the class of murderers in a way that is constitutionally relevant. *See United States v. Frank*, 8 F.Supp.2d 253, 278 (S.D.N.Y.1998).

Generally, the offense of murder does not require premeditation. It requires, rather, "malice aforethought." *See, e.g.*, 18 U.S.C. § 1111(a) ("Murder is the unlawful killing of a human being with malice aforethought"). Premeditation is not synonymous with malice aforethought. However, premeditation is generally an element of first-degree murder, absent certain other circumstances such as those present in felony murder. Consistent with the common law, the Supreme Judicial Court of Massachusetts has described premeditation, stating:

> Deliberate premeditation means that the plan to kill was formed after deliberation and reflection. However, no particular length of time is required in order for deliberate premeditation to be found. It

is not so much a matter of time as of logical sequence. First the deliberation and premeditation, then the resolution to kill, and lastly the killing in pursuance of the resolution; and all this may occur in a few seconds.

*Commonwealth v. Palmariello,* 392 Mass. 126, 466 N.E.2d 805, 816 (1984) (citations omitted). Planning is not an independent statutory element or common law element in any degree of murder. It is, however, part of the definition of premeditation used in Massachusetts.

It would not be constitutionally permissible to make first-degree murder alone an aggravating factor. *Arave,* 507 U.S. at 474, 113 S.Ct. 1534; *Cartwright,* 822 F.2d at 1485. Congress recognized this in enacting the FDPA. The statute requires *substantial* planning and *substantial* premeditation regarding the killing. "Substantial" means more than the minimum amount of planning and premeditation required to commit the murder. *Tipton,* 90 F.3d at 895–96. There remains the issue, however, of how much more is necessary.

The FDPA and the Drug Kingpin Act do not provide that the aggravating factor is established if the defendant engaged in "more than minimal planning and premeditation," as the United States Sentencing Guidelines did in 1988 and 1994 when these statutes were enacted. *See* U.S.S.G. § 1B1.1, Application Note 1(f) (1989) (" 'More than minimal planning' means more planning that is typical for commission of the offense in a simple form.").

The statute states that there must be substantial premeditation and planning. In this context, the court construes "substantial" to mean "large." *See United States v. McCullah,* 76 F.3d 1087, 1110–11 (10th Cir.1996) ("[T]he term ['substantial'] clearly has a commonsense meaning of 'considerable in quantity: significantly large.' "); *cf. Pierce v. Underwood,* 487 U.S. 552, 564, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988) (one meaning of substantial is "large"). Defining "substantial" as "large" is both appropriate and comports with a commonsense understanding of the word.

Finally, while 18 U.S.C. § 3592(c)(9) requires only that there be substantial planning and premeditation "to cause the death of a *person,*" the government in this case, in its Notice of Intent, specifically alleged that there was substantial planning and premeditation "to cause the death of Philip McCloskey" and "to cause the death of Jonathan Rizzo." This narrows the relevant inquiry, as the evidence was required to show that Sampson's planning and premeditation was directed to the specific individual, and not just to any person generally. Therefore, for the purposes of this aggravating factor, the analysis of the evidence could not extend back beyond the point where the defendant first saw McCloskey or Rizzo. Any planning or premeditation Sampson may have done prior to the time that he encountered McCloskey or Rizzo was not relevant to the aggravating factors as they were alleged in the Notice of Intent.[24]

---

**24.** The court instructed the jury:

Question 3B asks whether it has been proven beyond a reasonable doubt to each and every one of you that Gary Sampson committed the offense of carjacking, resulting in death, after substantial planning and premeditation to cause the death of Jonathan Rizzo. This means the government must prove that Mr. Sampson engaged in substantial planning and premeditation to kill Mr. Rizzo. It would not be enough for the government to prove only that Mr. Sampson engaged in substantial

planning and premeditation to commit the carjacking.

In this case, "planning" means mentally formulating a method for doing something or achieving some end.

"Premeditation" means thinking, deliberating about something, and deciding beforehand whether to do it. In this context, "premeditation" means that the plan to kill was formed after deliberation and reflection. Premeditation does not require proof that the

## B. SUFFICIENCY OF THE EVIDENCE

The court found that there was sufficient evidence for a jury to find beyond a reasonable doubt that the murder of Rizzo involved substantial planning and premeditation. There was not sufficient evidence with regard to the murder of McCloskey.

In light of the standard explained earlier, requiring a large amount of both planning and premeditation, the evidence, even when viewed in the light most favorable to the government, was insufficient to support a finding of substantial planning and premeditation beyond a reasonable doubt for the killing of McCloskey. The following discussion, while not exhaustive, emphasizes the differences between the killing of McCloskey and the killing of Rizzo, for which there was sufficient evidence on substantial planning and premeditation.

Sampson did not specifically target McCloskey for the killing. McCloskey had the misfortune of picking up Sampson, but that was not the result of Sampson targeting him in particular. Further, as explained previously, any evidence of planning or premeditation by the defendant prior to encountering McCloskey was irrelevant to the inquiry under the narrowly drafted aggravating factor in the Notice of Intent, which specifies planning and premeditation to "cause the death *of Philip McCloskey*." (emphasis added). At one point during his confession, Sampson does say that both killings were premeditated. At other points in his confession, he says that the killing of McCloskey was not premeditated, but rather the product of an impulsive response when McCloskey resisted and began to fight. Assuming, without finding, that Sampson used the correct legal definition of "premeditated," the jury could have taken his statement that both killings were premeditated as sufficient evidence to find beyond a reasonable doubt that the killing of McCloskey was premeditated. The jury would have been entitled to reject the defendant's subsequent assertions to the contrary and, therefore, the court disregarded the subsequent assertions for the purposes of analyzing the sufficiency of the evidence. Nevertheless, there was not sufficient evidence of *substantial* premeditation or *substantial* planning.

The defendant was carrying a knife, but this was not sufficient to prove beyond a reasonable doubt that he intended to kill anyone. Particularly, it was not sufficient to prove beyond a reasonable doubt that he intended to kill McCloskey. A knife has many functions, including lawful functions and unlawful functions that do not involve killing. It also does not require substantial planning to obtain a knife. A

defendant deliberated about his crimes for any particular period of time. Premeditation does, however, require proof that the defendant had some period of time to become fully aware of what he intended to do and to think it over before he acted. In this case, "substantial" has its common sense meaning of large.

So to find this aggravating factor, you must find that it is proven beyond a reasonable doubt that there was both substantial planning and substantial premeditation. It would not be sufficient if some of you found only substantial planning and some of you found only substantial premeditation.

Similarly, it would not be sufficient if you found there was a substantial amount of planning, but only a small amount of premeditation.

If you agree unanimously that the government has proven beyond a reasonable doubt that Gary Sampson committed the offense of carjacking resulting in death after substantial planning and premeditation to cause the death of Jonathan Rizzo, you will answer question 3B, all say yes. Otherwise, you will answer it, one or more jurors say no. Dec. 19, 2003 Tr. at 79–81.

knife can be bought legally and easily, without the necessity of detailed or complex plans. At the time of the killing, Sampson had nothing with which to tie-up McCloskey. His attempts to use his belt were unsuccessful. The defendant had no planned destination when he was picked up by McCloskey. He was looking for a secluded place, but had not selected a specific location. He did not, as he did with Rizzo, have an elaborate story designed to allay McCloskey's fears. Therefore, the evidence was insufficient to prove beyond a reasonable doubt that there was substantial planning and premeditation that lead to the killing of McCloskey.

■■■ The evidence was, however, sufficient to prove, beyond a reasonable doubt, that Sampson engaged in substantial planning and premeditation to cause the death of Rizzo. The evidence viewed in the light most favorable to the government included the following.

Once the defendant got into the car with Rizzo, he developed a plan to kill him. More specifically, he formulated a new plan, incorporating Rizzo into a previous, provisional plan he had made. If Rizzo had been a more physically imposing person, Sampson might have developed an entirely different plan or decided not to kill him at all. The evidence indicated that this might have happened on other occasions. However, based on his assessment of Rizzo's age and size, Sampson developed and put into action a plan to get Rizzo to a particular spot and to kill him there.

Sampson selected a remote and isolated place that he knew well, and directed Rizzo to drive him to that location. Sampson chose the woods behind the Abington Ale House, where he had been camping just before he carjacked and killed McCloskey. After Rizzo drove Sampson to the parking lot of the Abington Ale House, Sampson directed him to carry one of his bags part of the way out of the woods. The defen-

dant also developed and carried out an elaborate ruse to convince Rizzo that he was not in danger. The defendant told Rizzo that he would spray him with OFF!, an insect repellant, to protect him from insects. This was intended to lull Rizzo into a false sense of security. During the drive to the Abington Ale House, the defendant considered how he could restrain Rizzo, and decided that he could use the sturdy rope he had found at the Bourne Bridge. This would be more effective than using his belt, which had broken when he tried to subdue McCloskey. The defendant decided that it would be preferable to incapacitate Rizzo first, and then to attack him with the knife when he was not able to fight back.

This plan was formulated during the course of the twenty-mile drive to Abington. Once Sampson and Rizzo arrived at the parking lot behind the Abington Ale House, the defendant put this plan into action.

The defendant had substantial opportunity to reconsider his decision. Premeditation can occur in a few seconds, *see Palmariello*, 466 N.E.2d at 816, and the defendant had a much longer time to premeditate and plan during his twenty-mile ride to Abington Ale House and subsequent walk into the woods. He did not do so, but instead proceeded to put his plan to kill Rizzo into action. The jury could, therefore, have concluded that the killing was committed after substantial planning and premeditation to cause the death of Jonathan Rizzo.

## XII. VULNERABLE VICTIM

On November 24, 2003, the court considered Sampson's challenge to the sufficiency of the evidence supporting the government's alleged statutory aggravating factor regarding McCloskey's status as a vulnerable victim. 18 U.S.C. § 3592(c)(11)

provides that it is an aggravating factor if "[t]he [homicide] victim was particularly vulnerable due to old age, youth, or infirmity." The court ruled that the evidence was sufficient to support the allegation that McCloskey was vulnerable due to infirmity, but not sufficient to support the allegation that he was vulnerable due to old age.

## A. DEFINITION

Sampson argued that, in order to be aggravating in a way that is relevant to the decision between life and death, the vulnerable victim aggravator must have: (1) a nexus between the vulnerability and the victim's death; and (2) a knowledge requirement that prevents a defendant from becoming eligible for a death sentence as a result of "circumstances that the defendant was unaware of and which played no role in the capital offense beyond mere happenstance." Def.'s Brief in Support of Pretrial Mots. at 88. The court reserved judgment on this issue before trial, choosing instead to address it in the context of other disputes over jury instructions. *See Sampson II*, 275 F.Supp.2d at 104.

At trial, the court concluded that the vulnerable victim aggravating factor does

have a nexus requirement, but does not have a knowledge requirement. *See United States v. Minerd*, 176 F.Supp.2d 424, 447 (W.D.Pa.2001); *United States v. Johnson*, 136 F.Supp.2d 553, 560 (W.D.Va. 2001); 1 Leonard B. Sand et al, *Modern Federal Jury Instructions*, Inst. 9A–14 (2003). Ultimately, the court adopted a jury instruction based in part on the Eighth Circuit's Pattern Instruction 12.07K and Model Instruction 9A–14 in Sand *et al.*[25]

■ The infirmity which makes a person particularly vulnerable must somehow contribute to the person's death. Vulnerability does not exist in a vacuum; a victim must be vulnerable to someone or something. Thus, in order to give meaning to the word "vulnerable", the court adopted a nexus requirement.

■ Contrary to Sampson's contention, however, there is no requirement that the defendant either knew of the victim's vulnerability or targeted his victim because of that vulnerability. Unlike the nexus requirement, which stems from the definition of the word "vulnerable", there is no statutory language that creates a knowledge requirement.

**25.** The court instructed the jury as follows:

Question 3B asks whether it's been proven to each and every one of you beyond a reasonable doubt that Philip McCloskey was particularly vulnerable due to infirmity. In essence, the Federal Death Penalty statute provides that a defendant is especially blameworthy if he murders someone who is particularly vulnerable to being killed because he has an infirmity which made him less able to escape or resist attack than most people. In this context, to be vulnerable means to be subject to being attacked or injured because of some weakness. To be particularly vulnerable means to be especially or significantly vulnerable or to be vulnerable to a particularly high degree.

An infirmity is a physical or mental weakness or flaw. To prove this aggravating fac-

tor, it must also be proven beyond a reasonable doubt to each and every one of you that there was a connection between Mr. McCloskey's alleged vulnerability and his death. This means that any infirmity which you find made Mr. McCloskey particularly vulnerable must somehow have contributed to his death. However, the requirement of a connection between any proven infirmity and a person's death does not mean that the prosecution must prove that the defendant knew of Mr. McCloskey's alleged vulnerability and targeted him because of it. Rather, it means that the prosecution must prove that, once targeted, Mr. McCloskey was significantly more vulnerable to being killed because he had an infirmity. Dec. 19, 2003 Tr. at 34–36.

As the court explained on August 21, 2003, the Sentencing Guidelines, as a result of legislation that also included the FDPA, require that a defendant knew or should have known of a victim's vulnerability in order to receive a two-level enhancement. *See* Aug. 21, 2003 Tr. at 74–79 (citing U.S.S.G. § 3A1.1(b)(1)). It is anomalous that a lower level of knowledge is required to make death more appropriate and, in some cases, to make death a possible sentence, than is required to permit or require a longer prison sentence. However, for certain other statutory aggravating factors, Congress expressly established a knowledge requirement. *See, e.g.,* 18 U.S.C. § 3592(b)(2) ("defendant . . . knowingly created a grave risk of substantial danger to the national security"); 18 U.S.C. § 3592(c)(5) ("defendant . . . knowingly created a grave risk of death"); 18 U.S.C. § 3592(c)(16) ("defendant intentionally killed or attempted to kill"); 18 U.S.C. § 3592(d)(4) ("defendant . . . knowingly directed, advised, authorized, or assisted another to use a firearm"); 18 U.S.C. § 3592(d)(8) ("defendant was aware of the presence of the adulterant"). In contrast to these provisions, the vulnerable victim aggravating factor focuses only on the victim rather than the defendant.

"[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States,* 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983) (alteration in original), *quoted in Trenkler v. United States,* 268 F.3d 16, 23 (1st Cir.2001). Thus, the court concluded that the statute does not manifest an intent to require the government prove either that the defendant knew of the victim's vulnerability or targeted him because of it.

Nor does the constitution mandate a knowledge requirement. Even absent a knowledge component, the aggravating factor narrows the class of murderers in a way that is relevant to the sentencing decision in a capital case. The factor serves a narrowing function because not all murders involve a particularly vulnerable victim. This distinction is relevant because, even if a defendant did not know of a victim's vulnerability, society may properly consider a murder more outrageous if the victim died as a result of some sort of vulnerability. The defendant's knowledge or moral culpability is not a prerequisite to an enhanced sentence. Rather, the law often provides for varying penalties based on the degree of harm resulting from equally morally culpable acts. For example, 18 U.S.C. § 1111 sets the maximum penalty for first degree murder as death, while 18 U.S.C. § 1113 sets the maximum penalty for attempted murder at twenty years' imprisonment. A person who unsuccessfully attempts to kill someone is as morally culpable as a person who makes the same effort and succeeds. The disparate punishments for attempted murder and murder are not related to the moral blameworthiness of the defendant.

## B. SUFFICIENCY OF THE EVIDENCE

■ Based on this framework, the court ruled that although there was sufficient evidence to establish that McCloskey was 69 years old at the time of his death, there was no evidence to link his age with any vulnerability that contributed to his death. There are some people who are in excellent health at age 69. Consequently, the court did not instruct the jury on vulnerability due to old age.

However, the court found that McCloskey had several conditions that a jury could—and ultimately did—reasonably

conclude contributed to his death. The evidence was sufficient to prove that McCloskey had recently had quintuple bypass surgery, that he was overweight, and that he suffered from shortness of breath after walking short distances. These conditions constituted an infirmity that made McCloskey particularly vulnerable. The vulnerability was connected to his death. Because of these conditions, McCloskey was especially susceptible to being successfully carjacked. He was less able to jump out of the car and run away like Gregory, one of Sampson's other victims. McCloskey was also less able to flee during the walk from his vehicle through the woods to the place where Sampson killed him. In addition, McCloskey was less able to resist when the defendant attempted to tie him up and began to stab him. It was on this evidence permissible to for a jury to find, beyond a reasonable doubt, that all three of these factors contributed to McCloskey's death.

## XIII. OBSTRUCTION OF JUSTICE

On November 25, 2003 and December 1, 2003, the court considered and rejected the defendant's challenge to the sufficiency of the evidence supporting the government's alleged non-statutory aggravating factor entitled "Obstruction of Justice".

### A. DEFINITION

The Notice of Intent alleged with regard to each count that "[t]he defendant, Gary Lee Sampson, murdered [the victim] to seize control of his motor vehicle and to prevent him from reporting the carjacking to authorities."

In an indictment or other charging instrument such as an Notice of Intent, "and" generally means "or". *See United States v. Garcia–Torres*, 341 F.3d 61, 66 (1st Cir.2003), *cert. denied sub nom., Torres v. U.S.,* —— U.S. ——, 124 S.Ct. 1467, 158 L.Ed.2d 121 (2004). However, in this case, murder to seize control of an automobile is not *alone* a proper aggravating factor. If it were, every carjacking resulting in death would involve this aggravating factor. Congress chose to make the commission of certain crimes involving homicide statutory aggravating factors. *See* 18 U.S.C. § 3592(c)(1). Carjacking in violation of 18 U.S.C. § 2119(3) is not among them. Nor is it analogous to the large majority of the crimes which Congress chose to include as statutory aggravating factors such as destruction of an aircraft or the death of a member of Congress. *See* 18 U.S.C. § 3593(c)(1).

In contrast, a murder committed to eliminate a witness to some other crime is an aggravating factor. Several states make this a statutory aggravating factor. *See* Fla. Stat. ch. 921.141(5)(e); *Spann v. State,* 857 So.2d 845, 856–57 (Fla.2003); *Philmore v. State,* 820 So.2d 919, 935 (Fla. 2002); *Menendez v. State,* 368 So.2d 1278, 1282 (Fla.1979); *People v. Bigelow,* 37 Cal.3d 731, 209 Cal.Rptr. 328, 691 P.2d 994, 997–98, 1006 (1984); *Olsen v. State,* 67 P.3d 536, 583 (Wyo.2003).

This court agrees with the legislative judgment embodied in the statutes underlying these cases that a killing committed solely or primarily to eliminate a witness makes a defendant more blameworthy than other murderers and is properly deemed an aggravating factor. However, eliminating a witness to another crime must be the sole or dominant motive for the killing. *See Menendez,* 368 So.2d at 1282; *Olsen,* 67 P.3d at 583. *But see State v. Kleypas,* 272 Kan. 894, 40 P.3d 139, 236 (2001); *State v. Powers,* 101 S.W.3d 383, 399 (Tenn.2003). This is because, as the Wyoming Supreme Court said in *Olsen,* 67 P.3d at 582, "in virtually every homicide there is a witness silenced, and an arrest thus potentially prevented." Unless this aggravating factor is limited to cases in

which witness elimination is the sole or dominant motive for the killing, the factor would not provide a principled way to distinguish murders for which the death penalty is imposed from those for which it is not. *Id.*

In this case, the carjackings resulting in death are distinct federal statutory crimes from carjackings that do not result in death. *See Jones v. United States,* 526 U.S. 227, 251–52, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999). This distinction would not be sufficient to prove the analogous aggravating factor under California law, which limits the aggravating factor to those cases in which "the killing was not committed during the commission, or attempted commission of the crime to which he was a witness." *Bigelow,* 209 Cal.Rptr. at 340 n. 13, 691 P.2d 994 (citing Cal.Penal Code § 190.2(a)(10)). However, this distinction would be sufficient to support the analogous aggravating factor under Florida law, which makes it an aggravating factor if "[t]he capital felony was commit-

ted for the purpose of avoiding or preventing a lawful arrest . . . ." Fla. Stat. ch. 921.141(5)(e). The government in this case, in effect, alleged the Florida aggravating factor, which is constitutionally adequate. Thus, the court ultimately instructed the jury on this factor with the limitation that it could only be found if witness elimination was the sole or dominant motive for the murder.[26]

## B. SUFFICIENCY OF THE EVIDENCE

■ The court ruled that the government had produced sufficient evidence to prove, beyond a reasonable doubt, that witness elimination was the sole or dominant motive for both murders. Courts have focused on various types of evidence in analyzing sufficiency of the evidence challenges to this aggravating factor. These include: (a) whether the defendant confessed that witness elimination was his reason for the killing; (b) whether the victim knew the defendant; (c) whether

---

**26.** The jury was instructed:

> With regard to this alleged aggravating factor, it would not be sufficient for the government to prove only that Mr. Sampson killed Mr. McCloskey, primarily or exclusively to steal his car. Almost every murder has some motive, and killing someone to get his automobile does not make a murder sufficiently extreme to tend to justify the death penalty as a matter of law. Similarly, in virtually every homicide, there's a witness who will be silenced and, therefore, an arrest that is potentially prevented.
>
> Thus, if this was one of the defendant's motives, but not his sole or primary motive for committing a murder, it is not enough to constitute an aggravating factor.
>
> However, killing a person for the sole or dominant purpose of preventing him from reporting another crime to the authorities does make a defendant more blameworthy in a way that's relevant to deciding whether the death penalty is justified.
>
> This alleged aggravating factor focuses on the motivation for the murder. Mere speculation that witness elimination was the primary

purpose of a killing is not sufficient to prove it. Moreover, standing alone, the fact that the victim could identify the murderer does not prove beyond a reasonable doubt that the elimination of a witness was the sole or dominant motive for a killing. However, as I told you before with regard to intent, with certain things, circumstantial evidence may be particularly helpful, and you may consider the circumstantial, as well as the direct evidence, in deciding motive. In addressing this, you may consider both any relevant direct and any circumstantial evidence from which the motive for the murder may be inferred.

> Ultimately, you must decide whether the direct and circumstantial evidence proves to each and every one of you beyond a reasonable doubt that the defendant killed Mr. McCloskey for the sole or primary purpose of preventing Mr. McCloskey from reporting the attempted theft of his automobile to the authorities.

Dec. 19, 2003 Tr. at 41–43.

the defendant disguised himself in any way; (d) whether the victim could easily identify the defendant; (e) whether the defendant took the victim to a remote area before killing him; and (f) whether there was an alternative possible reason for the killing, such as resistance by the victim. *See Philmore,* 820 So.2d at 935; *Olsen,* 67 P.3d at 582. "Standing alone, the fact that the victim could identify the murderer does not prove beyond a reasonable doubt that the elimination of a witness was a dominant motive for the killing." *Bruno v. State,* 574 So.2d 76, 81–82 (Fla.1991) (adopted by *Olsen,* 67 P.3d at 583).

Focusing on these factors, the court concluded that the government had presented sufficient evidence for a jury to find, beyond a reasonable doubt, that Sampson's motive for murdering both of his victims was to prevent them from reporting the theft or attempted theft of their respective vehicles.

With regard to the McCloskey murder, the government introduced evidence including the following. Sampson told Vermont State Trooper Cable that the "murders" were premeditated. Cable Tr. at 3 (Ex. DD). Sampson elaborated, "[b]ecause I had planned on killing whoever picked me up. Premeditated murder." *Id.* Although the defendant later said that he did not intend to murder McCloskey and only did so after McCloskey began to fight, the court disregarded this statement in the context of the defendant's challenge to the sufficiency of the evidence. Second, the defendant was not disguised and McCloskey had a good opportunity to see and remember him. Thus, the jury could have inferred that the defendant had a well-founded fear that McCloskey could identify him. Third, the defendant took McCloskey to a secluded area. The defendant arguably could have just tied McCloskey up and left him there. Fourth, in another context, the defendant stated that

he didn't "like to leave witnesses." Crisp Tr. at 24 (Ex. R). In these circumstances, a rational jury could find, beyond a reasonable doubt, that the defendant's sole or dominant motive for killing McCloskey was to eliminate him as a witness.

With regard to the Rizzo murder, the evidence supporting this aggravating factor was even stronger. The evidence of premeditation was not contradicted by Sampson's confessions. Before he was killed, Rizzo was tied to a tree and gagged. A rational jury could have concluded that the defendant did not need to kill Rizzo to effect the carjacking, but instead chose to kill him because, as Sampson stated during one of his confessions, he needed Rizzo's car for a long time. Crisp Tr. at 48.

## XIV. FUTURE DANGEROUSNESS

As part of its Notice of Intent, the government alleged that "[t]he defendant, Gary Lee Sampson, is likely to commit criminal acts of violence in the future which would be a continuing and serious threat to the lives and safety of prison officials and inmates as demonstrated by his history of prison misconduct including, but not limited to, escapes, attempted escapes, verbal threats to harm prison officials and inmates, and possession of dangerous weapons."

In *Sampson II,* 275 F.Supp.2d at 108–09, the court rejected a vagueness challenge to this aggravating factor, essentially because the Supreme Court had rejected a comparable challenge in *Jurek v. Texas,* 428 U.S. 262, 269, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976). Sampson continued to ask the court to strike this factor on a variety of grounds, but the court consistently rejected these challenges. Ultimately, however, the jury was not unanimously persuaded that the government had proved this aggravating factor.

As explained on October 30, 2003, the court's decision to submit this aggravating factor to the jury was controlled by *Jurek*. In *Jurek*, the Supreme Court held that the Texas death penalty scheme, under which a question virtually identical to the aggravating factor alleged in this case was posed to the jury, was constitutional. *Id.* at 269, 96 S.Ct. 2950. If the Supreme Court has directly decided an issue, the lower courts must reach the same result "unless and until [the] Court reinterpret[s] the binding precedent." *Agostini v. Felton*, 521 U.S. 203, 238, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997), *quoted in Sampson II*, 275 F.Supp.2d at 72.

This court's experience in this case, however, suggests that it may now be appropriate for the Supreme Court to revisit *Jurek*. The reasons for this court's concerns are as follows.

In *Barefoot v. Estelle*, 463 U.S. 880, 896–99, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983), the Supreme Court held that the Constitution does not prohibit the introduction of expert evidence concerning future dangerousness. It reasoned that:

> If the likelihood of a defendant committing further crimes is a constitutionally acceptable criterion for imposing the death penalty, which it is, *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976), and if it is not impossible for even a lay person to sensibly arrive at that conclusion, it makes little sense, if any, to submit that psychiatrists, out of the entire universe of persons who might have an opinion on the issue, would know so little about the subject that they should not be permitted to testify.

*Id.* at 896–97, 103 S.Ct. 3383; *see also id.* at 898–99, 103 S.Ct. 3383 ("If the jury may make up its mind about future dangerousness unaided by psychiatric testimony, jurors should not be barred from hearing the views of the State's psychiatrists along with opposing views of the defendant's doctors.").

In reaching this decision, the Supreme Court recognized and rejected the view of the American Psychiatric Association that expert testimony on future dangerousness was almost entirely unreliable, which the Court had previously considered in *Estelle v. Smith*, 451 U.S. 454, 472, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981). *Id.* at 899, 103 S.Ct. 3383. However, in *Barefoot*, the Supreme Court signaled that the evolution of events might cause it to revise its decision concerning the constitutionality of admitting expert testimony on future dangerousness. It wrote:

> We are unconvinced, *at least as of now*, that the adversary process cannot be trusted to sort out the reliable from the unreliable evidence and opinion about future dangerousness, particularly when the convicted felon has the opportunity to present his own side of the case.

*Id.* at 901, 103 S.Ct. 3383 (emphasis added).

Developments in the law and more recent scientific research suggest that expert testimony on future dangerousness would be inadmissible under the Federal Rules of Evidence and is also too unreliable to be admitted in the penalty phase of a capital case under the balancing test established by 18 U.S.C. § 3593(a). The same considerations suggest that it may be timely for the Supreme Court to reconsider whether jurors can ascertain future dangerousness in a particular case with sufficient certainty to satisfy the heightened "need for reliability in the determination that death is the appropriate punishment in a specific case." *Woodson v. North Carolina*, 428 U.S. 280, 305, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976).

The issue of whether expert opinion on future dangerousness can, as an evidentiary issue or consistent with the require-

ments of due process, be admitted in a capital case was thoroughly and thoughtfully explored by Fifth Circuit Judge Emilio M. Garza in his concurring opinion in *Flores v. Johnson*, 210 F.3d 456 (5th Cir. 2000). As Judge Garza explained, following the Supreme Court's decisions in *Barefoot* in 1983 and *Smith* in 1981, the Court generally placed strict limits on the admissibility of expert testimony in its decisions in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). 210 F.3d at 464.

> To address this particularized need for reliability in expert scientific testimony, the Supreme Court has set out five non-exclusive factors to assist trial courts' determination of whether scientific evidence is reliable, and thus admissible. Those factors are:
>
> > (1) whether the theory has been tested,
> >
> > (2) whether the theory has been subjected to peer review and publication,
> >
> > (3) the known or potential rate of error,
> >
> > (4) the existence of standards controlling the operation of the technique, and
> >
> > (5) the degree to which the theory has been generally accepted by the scientific community.
>
> *Daubert*, 509 U.S. at 593–94, 113 S.Ct. at 2796–97; *see also Moore v. Ashland Chemical Inc.*, 151 F.3d 269, 275 (5th Cir.1998) (en banc), *cert. denied* 526 U.S. 1064, 119 S.Ct. 1454, 143 L.Ed.2d 541 (1999).

*Id.*

As Judge Garza wrote: "On the basis of any evidence thus far presented to a court, it appears that the use of psychiatric evidence to predict a murderer's 'future dangerousness' fails all five *Daubert* factors."

*Id.* "Among other things, the scientific community virtually unanimously agrees that psychiatric testimony is, to put it bluntly, unreliable and unscientific." *Id.* at 463. The literature that this court has reviewed is consistent with Judge Garza's conclusion. One recent survey concluded:

> For nearly twenty years we have known that psychiatrists cannot predict whether a person who has committed a violent act will be violent in the future.... Even the most scientific predictions based on thorough examination, diagnosis of mental symptoms, past patterns of behavior, and probabilistic assessment are wrong nearly as often as they are right. The most common courtroom predictions—frequently based solely on hypotheticals-are wrong twice as often as they are right.

Erica Beecher–Monas & Edgar Garcia–Rill, *Danger at the Edge of Chaos: Predicting Violent Behavior in a Post–Daubert World*, 24 Cardozo L.Rev. 1845, 1845–46 (2003).

One of the authors of that survey has also written:

> [S]tudies show both that clinicians [psychiatrists and psychologists] tend to think that they have more information than they really do and that they are poor at making extreme judgments. Clinical judgments tend to ignore the well-known difficulty in predicting statistically rare events (like violence). Stereotypes and prejudices are just as likely to taint the decisions of clinicians as those of lay people. As a result, clinicians are no better than lay people in making these predictions.

Erica Beecher–Monas, *The Epistemology of Prediction: Future Dangerousness Testimony and Intellectual Due Process*, 60 Wash. & Lee L.Rev. 353, 362–363 (2003) (footnotes omitted). In addition, a recent study, which examined 155 capital cases in

Texas where expert witnesses predicted that the defendant would be a future danger, concluded that the expert witnesses were wrong in 95% of the cases. Texas Defender Service, *Deadly Speculation: Misleading Texas Capital Juries with False Predictions of Future Dangerousness* 34 (2004), available at http://www.texasdefender.org/DEADLYSP.PDF.

Jurors, however, may give great deference to the testimony of a psychiatrist as a supposed expert for purposes of determining future dangerousness. As the American Psychiatric Association stated in its amicus curiae brief in *Barefoot,* "A psychiatrist comes into the courtroom wearing a mantle of expertise that inevitably enhances the credibility, and therefore the impact, of the testimony." *Quoted in* Eugenia T. La Fontaine, Note, *A Dangerous Preoccupation With Future Danger,* 44 B.C. L.Rev. 207, 228 (2002). Therefore, there is good reason to fear that the testimony of a psychiatrist on the issue of future dangerousness will be given more weight than it deserves. *See Flores,* 210 F.3d at 466. As Judge Garza wrote:

> [T]he problem here (as with all expert testimony) is not the introduction of one man's opinion on another's future dangerousness, but the fact that the opinion is introduced by one whose title and education (not to mention designation as an "expert") gives him significant credibility in the eyes of the jury as one whose opinion comes with the imprimatur of scientific fact. As has been previously recognized, when a medical doctor testifies that "future dangerousness" is a scientific inquiry on which they have particular expertise, and testifies that a particular defendant would be a "continuing threat to society," juries are almost always persuaded.

*Id.*

Thus, this court would probably have excluded any expert evidence offered on future dangerousness because its probative value would have been outweighed by the danger of creating unfair prejudice. *See* 18 U.S.C. § 3593(c). Such a decision would not have violated the court's duty to follow the Supreme Court's holding in either *Jurek,* which did not involve expert testimony, or *Barefoot,* which addressed whether the Constitution prohibited expert testimony on future dangerousness in a capital trial. *See Barefoot,* 463 U.S. at 899 n. 6, 103 S.Ct. 3383 ("The question before us is whether the Constitution forbids exposing the jury or judge in a state criminal trial to the opinions of psychiatrists about an issue that Justice Blackmun's dissent concedes the factfinders themselves are constitutionally competent to decide."). In identifying the question presented in *Barefoot,* the majority explicitly distinguished cases cited by the dissent because they were "decisions of federal evidence law" rather than "constitutional decisions." *Id. Barefoot* did not decide, and could not have decided, the admissibility of expert testimony on future dangerousness under federal evidentiary law; in particular, it did not address whether expert testimony would be admissible under the FDPA balancing test established by 18 U.S.C. § 3593(c). *See* Thomas Regnier, *Barefoot in Quicksand: The Future of "Future Dangerousness" Predictions in Death Penalty Sentencing in the World of Daubert and Kumho,* 37 Akron L.Rev. 469, 488 (2004) (noting potential application of Federal Rule of Evidence 403 to expert testimony on future dangerousness).

Although this court was not required to decide whether to admit expert testimony on future dangerousness, exposure to this issue in deciding whether to admit other evidence of future dangerousness raised a serious question as to whether the Supreme Court would now find, as it did in *Jurek,* that a jury may constitutionally decide whether to impose the death penalty

based on its prediction of a defendant's future dangerousness.

The Supreme Court established the foregoing five non-exclusive factors to assist trial courts in determining whether to admit scientific evidence because, it found, there is generally a "particularized need for reliability in expert scientific testimony." *Flores,* 210 F.3d at 463 (Garza, J., concurring); *Daubert,* 509 U.S. at 592–94, 113 S.Ct. 2786. There is also a similar, heightened need for reliability in the determination that the death penalty is justified. As indicated earlier, in 1986 the Supreme Court wrote:

> In capital proceedings generally, this Court has demanded that factfinding procedures aspire to a heightened standard of reliability. This especial concern is a natural consequence of the knowledge that execution is the most irremediable and unfathomable of penalties; that death is different.

*Ford v. Wainwright,* 477 U.S. 399, 411, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986) (Marshall, J., plurality opinion) (citations omitted); *See also Woodson v. North Carolina,* 428 U.S. at 305, 96 S.Ct. 2978.

As described earlier, in *Barefoot,* 463 U.S. at 896–97, 103 S.Ct. 3383, the Supreme Court reasoned that if jurors could with constitutionally sufficient reliability predict future dangerousness, experts should not be prohibited from testifying on this issue. However, the fact that there now seems to be increasing reason to be concerned that experts cannot reliably predict future dangerousness also generates, for this court at least, increased concern that jurors cannot do so.

In *Jurek,* Justice John Paul Stevens addressed this issue by stating that:

> It is, of course, not easy to predict future behavior. The fact that such a determination is difficult, however, does not mean that it cannot be made. Indeed, prediction of future criminal conduct is an essential element in many of the decisions rendered throughout our criminal justice system. The decision whether to admit a defendant to bail, for instance, must often turn on a judge's prediction of the defendant's future conduct. And any sentencing authority must predict a convicted person's probable future conduct when it engages in the process of determining what punishment to impose. For those sentenced to prison, these same predictions must be made by parole authorities. The task that a Texas jury must perform in answering the statutory question in issue is thus basically no different from the task performed countless times each day throughout the American system of criminal justice. What is essential is that the jury have before it all possible relevant information about the individual defendant whose fate it must determine. Texas law clearly assures that all such evidence will be adduced.

*Jurek,* 428 U.S. at 275–76, 96 S.Ct. 2950; *see also Barefoot,* 463 U.S. at 897, 103 S.Ct. 3383 (quoting *Jurek* ).

However, once again, the Court has also recognized and written that:

> Death, in its finality, differs more from life imprisonment than a 100–year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.

*Woodson,* 428 U.S. at 305, 96 S.Ct. 2978 (opinion of Stewart, Powell, and Stevens, JJ.). *See also Ford,* 477 U.S. at 411, 106 S.Ct. 2595 (Marshall, J., plurality opinion).

It remains true that decisions on bail, sentencing, and possible revocation of supervised release are frequently influenced by judges' predictions of future dangerousness. However, none of these decisions is as consequential or irreversible as the de-

cision to sentence a defendant to death. Therefore, the degree of reliability required to make those decisions in a manner that satisfies the requirements of due process may be considerably less than the certainty that should be required to establish a fact that may determine whether a person will live or die.

There are relatively recent studies that suggest that it is not just difficult for jurors to predict reliably whether a murderer is likely to commit violent crimes again, but that it is impossible. For example, it has been written that:

> Recent research on jury deliberations has shown that jurors' assessments of future dangerousness is highly subjective. Influenced by stereotypical images of the violent recidivist—the psychopathic [27] serial killer disproportionately portrayed in the media and the new crime "true crime" genre of television shows—jurors seldom realize research has consistently found the true incidence of recidivism among murderers released from prison to be much lower than for other types of parolees.

Jonathan R. Sorenson, Rocky L. Pilgrim, *An Actuarial Risk Assessment of Violence Posed by Capital Murder Defendants*, 90 J.Crim. & Criminology, 1251, 1254 (2000) (citing William J. Bowers, Benjamin D. Steinor, *Death by Default: An Empirical Demonstration of False and Forced Choices in Capital Sentencing*, 77 Tex. L.Rev. 605, 645–65 (1999)).

Arguably, the instant case demonstrates that gate-keeping by the court and the operation of the adversary process are adequate to assure that consideration of future dangerousness does not deprive a defendant of due process. As explained, *infra*, the court carefully considered and limited the government's proffered evidence on future dangerousness. The court also allowed much, but not all, of the evidence that Sampson sought to introduce on future dangerousness. Ultimately, the jury found that the government had not proven that aggravating factor.

Nevertheless, the court's experience in the case causes it to wonder whether it is impossible for lay jurors, as well as for trained experts, to predict future dangerousness with the level of reliability necessary to ensure that the death penalty is not being "wantonly and ... freakishly imposed." *Furman v. Georgia*, 408 U.S. 238, 310, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (Stewart, J., concurring).

It may be challenging for courts to confront this issue. Future dangerousness is certainly relevant to the decision of whether the death penalty is justified in a particular case. There is arguably no more compelling justification for a death sentence than a reliable conclusion that a convicted murderer is likely to kill again if he is not executed. However, the evolution of the law, and of scientific research,

---

27. Dr. Michael Welner was engaged by the government to examine Sampson pursuant to Federal Rules of Criminal Procedure 12.2. The information that he obtained in that process could only be used in connection with his testimony on Sampson's mental condition. *See* Fed.R.Civ.P. 12.2(c)(4) ("[n]o statement made by a defendant in the course of any examination conducted under this rule ... and no other fruits of the statement may be admitted into evidence against the defendant in any criminal proceeding except on an issue regarding mental condition..."). It could not be used on the issue of future dangerousness. The fact that characterizing Sampson as a "psychopath" would have entailed a high risk that, despite any limiting instruction, the jury would have considered Dr. Welner's testimony as tending to show that Sampson would be dangerous in the future contributed to the court's decision not to allow Dr. Welner to use this term in his testimony. There were, however, other reasons for this decision as well.

presents the question of whether it can now be said that future dangerousness can generally be predicted with sufficient reliability to assure that the death penalty is not being imposed arbitrarily and capriciously. Therefore, if this issue is, in an appropriate case, fully-developed factually and well-briefed, it may be appropriate for the Supreme Court to consider again its ruling in *Jurek*.

## A. JURY INSTRUCTIONS

Once the court decided that it was required to permit the government to present the future dangerousness aggravating factor to the jury, the court addressed the scope of this aggravating factor and what facts the government would need to establish in order to satisfy its burden of proof. By the terms of the Notice of Intent, this factor was limited to Sampson's alleged

future dangerousness in a prison setting. Even if the Notice of Intent had not explicitly included this limitation, the court would have instructed the jury that it could not consider Sampson's future dangerousness outside of the prison context because the only alternative to a death sentence in this case was a sentence of life imprisonment. *See Simmons v. South Carolina*, 512 U.S. 154, 156, 165–66 & n. 5, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994).[28]

The terms of the Notice of Intent also required the government to prove that Sampson was "likely" to commit criminal acts of violence. The court construed "likely" to mean "more probable than not". This is consistent with the Texas statute upheld in *Jurek*, which required the state to prove a "probability" of future dangerousness.[29] *Jurek*, 428 U.S. at 269, 96 S.Ct. 2950.

---

**28.** The court instructed the jury as follows:

In deciding whether this alleged aggravating factor has been proven, you must understand and accept that if he is not executed, Mr. Sampson will spend the rest of his life in federal prison. It is not alleged that he'll escape and, therefore, be a threat to the public. There is no evidence to prove that this could or would occur. Therefore, you must consider only the possible danger that Mr. Sampson might present to other inmates and prison officials.

 \* \* \* \* \* \*

In deciding whether Mr. Sampson is likely to commit more than one violent act in prison and to be a continuing and serious threat to others, you should consider the evidence you have received regarding the resources and policies ... that the Federal Bureau of Prisons has to protect prison officials and inmates from prisoners who are perceived to present such a threat.
Dec. 19, 2003 Tr. at 48–49.

**29.** The court instructed the jury as follows:

To prove that something is likely means to prove that it is probable that it will occur. This requirement that the government ... prove that Mr. Sampson is likely to commit

criminal acts of violence while in prison and be a continuing and serious threat to the lives and safety of others in prison is important. There may be some risk of violent crime associated with keeping any defendant in prison for the rest of his life. However, for many defendants, the level of ·risk would not be great enough to reasonably tend to justify a sentence of death.

In this case, there's a particular degree of risk that the prosecution must prove before you can consider the future danger that Mr. Sampson might present in determining the appropriate sentence for his crime. The law requires that for you to consider Mr. Sampson's alleged future dangerousness, the prosecution must prove beyond a reasonable doubt to each and every one of you that it is more probable than not that Mr. Sampson will commit criminal acts of violence in the future, which would be a continuing and serious threat to the lives and safety of prison officials.

 \* \* \* \* \* \*

This alleged aggravating factor requires you to make a prediction based on the evidence that several things are likely to occur in the future. This does not, however, reduce the prosecution's burden of proving those things ....

The terms of the Notice of Intent required the government to prove that it was likely that Sampson would commit "criminal acts of violence in the future which would be a continuing and serious threat to the lives and safety of prison officials and inmates." This phrase placed several burdens on the government. First, the government was required to prove that more than one act of violence was likely because the government chose to use the plural "acts" rather than the singular "one or more acts".[30]

Second, the government was required to prove that the acts of violence would be criminal. The evidence in this case included threats that the defendant made against others in prison. However, some of these threats were conditional; Sampson was describing what he would do if someone did something to him. Thus, the court instructed the jury on the general law of self defense.[31] If the jury were convinced that it was likely that the defendant would commit acts of violence in prison, but that those acts would be limited to instances where the defendant was acting in self-defense, the government would not have met its burden of proof.

Third, the government was required to prove that the criminal acts of violence would be sufficiently serious to pose "a continuing and serious threat to the lives and safety of prison officials and inmates". The court incorporated this standard into its definition of future dangerousness by instructing the jury that "a criminal act of violence is a physical assault on another person with intent to cause death or seri-

ous bodily injury to that person." This instruction was used in *United States v. O'Driscoll,* Instruction 70; Def.'s July 30, 2003 Appendix at A–71.

## B. EVIDENTIARY RULINGS RELATING TO GOVERNMENT'S PROFFER

Before trial, the court ordered the government to submit a proffer of the evidence it sought to use to prove future dangerousness. After reviewing the proffer, the court excluded several pieces of evidence under 18 U.S.C. § 3593(c). Certain incidents of prison misconduct could not have been established by reliable evidence, such as live testimony. Permitting these incidents to be presented to the jury without information about the context in which they allegedly occurred presented an unacceptably high risk of unfair prejudice to the defendant as compared to the probative value of the incidents. They were, therefore, excluded. Other incidents were so remote in time that their probative value was outweighed by the danger of unfair prejudice.

 The court also excluded evidence of the defendant's past membership in a prison gang because the government proffered no evidence to prove: (1) that the defendant was still a member of the gang; (2) that the gang of which the defendant was allegedly once a member operated in federal penitentiaries; or (3) that, if it did, the chapters in the federal prisons engaged in the same sort of misconduct as the chapter of which the defendant was

---

Dec. 19, 2003 Tr. at 47–49.

**30.** The court instructed the jury that "the prosecution must prove that it's more probable than not that Mr. Sampson will commit more than one act of violence in prison." Dec. 19, 2003 Tr. at 48.

**31.** The court instructed the jury:

A person who acts in self-defense has not committed a criminal act of violence. Use of force is justified if a person reasonably believes it is necessary to defend himself against the immediate use of unlawful force. However, a person must use no more force than appears reasonably necessary in the circumstances.
Dec. 19, 2003 Tr. at 48.

once allegedly a member. Thus, the court concluded that the evidence of gang membership should be excluded under 18 U.S.C. § 3593(c)'s balancing test. *See Dawson v. Delaware,* 503 U.S. 159, 166, 112 S.Ct. 1093, 117 L.Ed.2d 309 (1992).

## C. SUFFICIENCY OF THE EVIDENCE

■ On December 1, 2003, the court concluded that the remaining evidence that the government presented was sufficient to withstand the defendant's sufficiency of the evidence challenge.

Some state courts have held that the circumstances of the offense alone can be sufficient evidentiary support for a finding of future dangerousness. *See, e.g., Lovitt v. Commonwealth,* 260 Va. 497, 537 S.E.2d 866, 878 (2000); *Martinez v. State,* 924 S.W.2d 693, 706 (Tex.Crim.App.1996) (Maloney, J., concurring and dissenting). However, this court had serious doubts whether relying on the circumstances of the offense alone would be constitutionally adequate to prove future dangerousness in most cases. Just as "[a] person of ordinary sensibility could fairly characterize almost every murder as 'outrageously or wantonly vile, horrible and inhuman,'" *Godfrey,* 446 U.S. at 428–29, 100 S.Ct. 1759, such a person might find that any person who commits one murder represents an unacceptable risk of future danger. Permitting a jury to find future dangerousness based solely on the facts of the crime risks an arbitrary and uneven imposition of the death penalty.[32] However, the Notice of Intent in this case eliminated this issue by limiting the sort of evidence the government proposed to rely on in proving this factor. More specifically, the Notice of Intent alleged that Sampson's future dangerousness would be "demonstrated by his history of prison misconduct including, but not limited to, escapes, attempted escapes, verbal threats to harm prison officials and inmates, and possession of dangerous weapons."[33]

Past violence by a defendant in prison is relevant evidence that a prosecutor could use to prove future dangerousness. However, no such evidence was presented concerning Sampson. Past prison misconduct of a potentially violent nature is also relevant. In this case, the government introduced evidence that the defendant had, on more than one occasion, possessed "shanks" (sharpened instruments) in prison. Other courts have considered this sort of evidence in evaluating the sufficiency of the evidence concerning to future dangerousness. *See Witter v. State,* 112 Nev. 908, 921 P.2d 886, 899 (1996); *Braun v. State,* 909 P.2d 783, 798 (Okla.Crim.App. 1995).

---

**32.** The court does not exclude the possibility that a case could arise in which the circumstances of the crime are sufficient to demonstrate that the defendant has a special ability to engage in violence in a prison setting—for example if he killed or seriously injured someone in prison. This would adequately distinguish that defendant from other murderers.

**33.** Accordingly, the court instructed the jury not to consider other facts that otherwise might be relevant to the future dangerousness inquiry such as the bank robberies the defendant committed. The court instructed the jury:

[D]o not consider the evidence of the bank robberies or other crimes Mr. Sampson previously committed in deciding this. The bank robberies are separate aggravating factors. They should not, in effect, be double counted. Rather, you must decide whether it is proven that Mr. Sampson is likely to commit criminal acts of violence in the future, which would be a continuing and serious threat to the lives and safety of prison officials and inmates, based solely on any proven attempted escape, threats to harm others, or possession of dangerous weapons by Mr. Sampson while in custody.
Dec. 19, 2003 Tr. at 46–47.

Past escapes and escape attempts are also relevant because they show a willingness and ability to break the rules of a prison. The government introduced evidence that Sampson attempted to escape from a state prison in New Hampshire.

Threats to harm prison guards and other officials are also relevant to future dangerousness. *See Sallahdin v. Gibson,* 275 F.3d 1211, 1231–32 (10th Cir.2002) (reviewing death sentence under Oklahoma law); *Gilbert v. Mullin,* 302 F.3d 1166, 1182 (10th Cir.2002) (same), *cert. denied,* 538 U.S. 1004, 123 S.Ct. 1911, 155 L.Ed.2d 835 (2003). The government introduced evidence of several threats Sampson made to correctional officers and others after he was charged in this case.

Although a close question, the evidence of possession of a "shank" both before and after the murders, an attempted escape from prison, and threats to correctional officers and others, examined in the light most favorable to the government, was sufficient to permit a rational jury to conclude, beyond a reasonable doubt, that Sampson was likely to commit criminal acts of violence in the future which would be a continuing and serious threat to the lives and safety of prison officials and inmates. *See Swisher v. True,* 325 F.3d 225, 232 (4th Cir.) (holding that shank possession combined with threats was sufficient to show future dangerousness under Virginia law and, therefore, petitioner did not demonstrate prejudice for *Strickland* purposes), *cert. denied,* 539 U.S. 971, 123 S.Ct. 2668, 156 L.Ed.2d 679 (2003). Thus, the court denied the defendant's motion to strike this aggravating factor for insufficient evidence.

As indicated earlier, however, the jury did not find that this aggravating factor was proven.

## D. EVIDENTIARY RULINGS RELATING TO DR. MARK CUNNINGHAM

To rebut the government's allegation of future dangerousness, Sampson offered the testimony of an expert witness, Dr. Mark Cunningham. On October 30, 2003 and December 1, 2003, the court made several rulings regarding Dr. Cunningham's testimony.

██ As a threshold matter, the court indicated that neither Dr. Cunningham nor any other witness would be permitted to offer an opinion as to whether Sampson presented a future danger. The court suggested that any such testimony was inadmissible under 18 U.S.C. § 3593(c) because its probative value would be outweighed by the danger of unfair prejudice. Once again, this question is not controlled by *Barefoot,* 463 U.S. at 905–906, 103 S.Ct. 3383, because that case held that it was not unconstitutional to permit expert evidence on future dangerousness. It did not address questions of federal evidence law generally or the FDPA's balancing test specifically. *Id.* at 899 n. 6, 103 S.Ct. 3383.

The government filed a motion in limine seeking to preclude Dr. Cunningham from testifying. The government argued that Dr. Cunningham "is not qualified to testify concerning prison administration and safety or the assignment and classification of the defendant by the Bureau of Prisons" and that the court should exclude his testimony under 18 U.S.C. § 3593(c). Gov.'s Mot. in Limine to Preclude Cunningham Testimony at 4. As explained on October 30, 2003, this court disagreed.

The government correctly argued that Dr. Cunningham was not testifying based on his training and experience as a forensic psychologist. Rather, the court viewed Dr. Cunningham's proffered testimony as expert testimony based on his specialized knowledge about the Bureau of Prisons' ("BOP") policies,[34] procedures and facili-

---

34. Some of the Bureau of Prisons policies to which Dr. Cunningham referred while testify-

ties. Therefore, the court limited the extent to which the defendant could inquire into Dr. Cunningham's qualifications as a forensic psychiatrist on direct examination.

The government was incorrect, however, when it argued that Dr. Cunningham lacked the specialized knowledge to testify regarding the conditions Sampson would face if confined for life in a BOP facility. As Dr. Cunningham's testimony in this trial and at least one other case [35] has illustrated, he has spent a significant amount of time gathering information regarding the BOP and its capabilities, and he possesses the sort of specialized knowledge that would assist the jury in evaluating the government's allegations regarding future dangerousness. Dr. Cunningham's specialized knowledge is based on information that he obtained in a reliable manner. More specifically, much of Dr. Cunningham's knowledge regarding the BOP comes directly from the BOP in the form of its publications, web site, and responses to discovery requests in cases such as this one.

Testimony such as that presented by Dr. Cunningham is valuable to a jury asked to consider whether a defendant is likely to present a danger in a prison setting if incarcerated for life. The danger any individual presents is a function not only of that individual, but also of his environment. A person who is dangerous in a halfway house may be significantly less dangerous in a medium security prison, even less dangerous in a maximum security prison, and less dangerous still in a more secure environment.

■ In addition to information about the general success that the BOP has had in controlling violent and dangerous inmates, the defendant sought to introduce testimony from Dr. Cunningham regarding specific inmates in the Bureau of Prisons. The court permitted only general testimony about the ability of the BOP to control inmates, including gross statistics regarding assaults and other misconduct, but did not permit testimony regarding specific other prisoners. Each person in the custody of the BOP is unique, and the court found that the probative value of information about the BOP's ability or inability to control a particular other prisoner was outweighed by the danger of misleading the jury into thinking that the BOP would have a similar experience with Sampson.

■ The government also objected to a slide in Dr. Cunningham's PowerPoint presentation that contained three statements regarding the relationship between offense history and prison misconduct.[36] The government argued that the court had ruled that the information on this slide was

---

ing are codified in the Code of Federal Regulations. It is court's duty to inform the jury what the law is. *See United States v. Johnson*, 223 F.3d 665, 671 (7th Cir.2000); *Marx & Co., Inc. v. Diners' Club Inc.*, 550 F.2d 505, 508 (2d Cir.1977). Consequently, the court explained CFR provisions to the jury, but permitted Dr. Cunningham to testify as to BOP program statements that do not have the force of law.

**35.** The parties provided the court with a transcript of parts of Dr. Cunningham's testimony in *United States v. Bin Laden*. *See* Mot. in Limine to Preclude Cunningham Testimony, Ex. 2.

**36.** The slide was titled "The Relationship of Offense History to Prison Adjustment". It contained three bullet points: "Past violence in the community is not strongly or consistently associated with prison violence."; "Current offense, prior convictions and escape history are only weakly associated with prison misconduct."; and "Severity of offense is not a good predictor of prison adjustment." At the bottom of the slide, in small print, were the names of two studies sponsored by the Department of Justice which support these statements.

inadmissible when it indicated that no witness would be permitted to give an opinion as to whether Sampson presented a future danger in prison. This contention was incorrect. The court permitted Dr. Cunningham to present this slide to the jury. This slide did not express an opinion about the level of danger presented by Sampson. Rather, it exposed the jury to facts not generally known that might have caused one or more jurors to question the strength of the government's evidence. More specifically, it informed jurors that, contrary to what they might have assumed, past violence outside of prison is not strongly or consistently associated with prison violence and the severity of Sampson's offenses is not a good indicator of whether he would commit violent acts in prison. It was appropriate for the defendant to present testimony tending to show that the government had failed to meet its burden of proof because the facts it presented did not establish the likelihood that Sampson would commit criminal acts of violence in prison.

## XV. MITIGATING FACTORS AS QUESTIONS OF LAW OR FACT

 The parties disputed whether jurors could properly refuse to treat a non-statutory mitigating factor as mitigating. Drawing a distinction between whether an alleged mitigating factor has been found to exist and whether that factor is truly mitigating, the defendant argued that the existence of a mitigating factor is a question for the jury, but it is the duty of the court to determine, as a matter of law, whether a factor is mitigating. The government argued that although jurors must treat statutory mitigating factors as mitigating, jurors are free to find that a non-statutory mitigating factor, even if proven to exist, is not mitigating and, therefore, deserves no weight in the juror's ultimate decision.

The Eighth Circuit Model Jury Instructions identify this issue and recommend resolving it as follows:

Many factors, both aggravating and mitigating, may be factually true, and yet not be perceived by a juror as aggravating or mitigating. For instance, in *United States v. Paul*, 217 F.3d 989, 1000 (8th Cir.2000), one of the mitigating factors submitted to the jury was the fact that defendant was eighteen when he committed the offense. The court found no error in the failure of six jurors to find his age as mitigating, concluding that a juror is not required to give mitigating effect to any factor. *Accord United States v. Bernard*, 299 F.3d 467, 485–86 (5th Cir.2002). To prevent confusion, the Committee suggests that nonstatutory aggravating and mitigating factors include some version of the phrase "and that fact tends to [support] [mitigate] imposition of the death penalty." *See* Note 4, Instruction 12.08, *supra*.

Eighth Circuit Model Jury Instruction 12.10 cmt. In this case, the government acknowledged that whatever treatment the court gave to non-statutory mitigating factors should be given to non-statutory aggravating factors as well.

This court respectfully disagrees with the conclusion reached in *Paul* and *Bernard* that a juror is free to reject the court's determination that a factor is mitigating or aggravating. Instead, on December 16, 2003, the court decided that whether a factor is aggravating or mitigating is a question of law for the court to decide. Jurors, however, are free to assign a particular factor whatever weight they see fit. A juror can properly determine that a particular factor is so insignificant compared to the other factors found that its presence or absence has no impact on the juror's decision. It would be im-

proper, however, for a juror to refuse to even consider a particular factor because he or she disagrees with the court's determination that the factor is aggravating or mitigating.

In *Eddings v. Oklahoma*, 455 U.S. 104, 113–15, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), the Supreme Court wrote that:

> Just as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, *as a matter of law*, any relevant mitigating evidence. In this instance, it was as if the trial judge had instructed a jury to disregard the mitigating evidence Eddings proffered on his behalf. The sentencer ... may determine the weight to be given relevant mitigating evidence. But they may not give it no weight by excluding such evidence from their consideration.

Thus, *Eddings* recognizes a distinction between considering a relevant factor but assigning it so little weight so as to make it of no practical significance in a sentencer's ultimate decision and refusing to consider a relevant factor, effectively giving it no weight because a sentencer does not consider the factor to be relevant at all. *See also Buchanan v. Angelone*, 522 U.S. 269, 276, 118 S.Ct. 757, 139 L.Ed.2d 702 (1998) ("In the selection phase, our cases have established that the sentencer may not be precluded from considering, *and may not refuse to consider*, any constitutionally relevant mitigating evidence.") (emphasis added).

Neither party disputed the proposition that the court must serve a gate-keeping function with respect to non-statutory aggravating factors. This court described its gate-keeping role as follows:

Once the government gives notice of what it proposes to prove and argue as justification for a death sentence, the judge serves as a gatekeeper. Before admitting evidence of a non-statutory aggravating factor, the judge must find that it is sufficiently relevant, that the evidence supporting it is sufficiently reliable, and that the probative value of the evidence is not "outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." 18 U.S.C. § 3593(c); *see also United States v. Jones*, 132 F.3d 232, 239–40 (5th Cir.1998), *aff'd*, 527 U.S. 373, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999). After the judge performs this gate-keeping function, the jury considers any proven non-statutory aggravating and mitigating factors along with any proven statutory aggravating and mitigating factors in deciding whether the death sentence is justified. *See* 18 U.S.C. § 3593(e). *Sampson II*, 275 F.Supp.2d at 101. The parties agreed that the court serves an analogous gate-keeping role with respect to non-statutory mitigating factors.[37] Accordingly, on December 16, 2003, the court exercised its gate-keeping role by ensuring that the defendant did not present any mitigating factors to the jury that were irrelevant to the decision between life and death, duplicative, or unsupported by reliable evidence.

In exercising its gate-keeping role and permitting a party to present a particular non-statutory factor to the jury, a court is, in effect, deciding that the jurors must assign that factor some weight, however small, in favor of or against a death sentence if the factor is proven. The Tenth Circuit implicitly recognized this necessary consequence to the decision to permit ju-

---

**37.** However, as the court acknowledged on December 16, 2003, the court may have a duty to define relevance more broadly for mitigating factors than for aggravating factors to ensure that the jury is able to consider all constitutionally relevant mitigating factors.

rors to consider a factor in *United States v. McCullah*, 76 F.3d 1087, 1111–12 (10th Cir.1996). As part of its discussion of the harm resulting from permitting duplicative aggravating factors, the Tenth Circuit stated that "[w]hile the federal statute at issue is a weighing statute which allows the jury to accord as much or as little weight to any particular aggravating factor, *the mere finding of an aggravating factor cannot but imply a qualitative value to that factor.*" *Id.* at 1112 (emphasis added).

The distinction urged by the government between statutory factors and non-statutory factors is ultimately unpersuasive. Permitting jurors to reject the court's ruling that a particular non-statutory factor is aggravating or mitigating is inconsistent with requiring jurors to treat statutory factors as aggravating or mitigating because Congress has so designated them. Once jurors have determined that a defendant is eligible for the death penalty and enter the selection stage, aggravating and mitigating factors enumerated in the FDPA play the same role as non-statutory aggravating and mitigating factors. That a particular factor was identified by Congress rather than by the parties, subject to the gate-keeping function of the court, is a distinction that should make no difference.

In the ordinary case, a jury is not informed of the source of the law underlying the jury instructions. Whether a particular instruction is grounded in a statute or the common law, a court instructs a jury as to what the law is and the jury is required to follow the law. The ordinary considerations which underlie the division of responsibilities between the court, which determines the legal framework, and the jury, which applies the legal framework it is given, are equally important in the sentencing phase of a capital case. One of the core concepts underlying modern capital jurisprudence is that juror discretion in a capital sentencing proceeding must be sufficiently guided so as to prevent the arbitrary imposition of death sentences. *See Gregg v. Georgia*, 428 U.S. 153, 189, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.). Congress understood this requirement when it crafted the FDPA and chose to enact a statute that greatly focuses the jurors' discretion. Committing the determination of whether a factor is mitigating or aggravating to the court rather than the jury provides increased guidance to the jury and diminishes the risk that the death penalty will be imposed arbitrarily.

The court recognized that it has been held that instructing the jury that it must consider mitigating factors as mitigating is not constitutionally required so long as there is no reasonable likelihood that the jury will apply the instructions as a whole in a way that prevents them from considering constitutionally relevant mitigating evidence. *See Buchanan*, 522 U.S. at 276–77, 118 S.Ct. 757. However, when reviewing a capital case prosecuted under state law, as the federal courts in *Buchanan* were, the role of the federal courts is limited. In contrast, when instructing a jury in a capital case brought under the FDPA, the court need not give an instruction that merely complies with the constitutionally prescribed minimum. Provided the choice between two instructions, this court chose the one that was more likely to result in consistency in imposition of the death penalty.

Treating the status of non-statutory factors as a question of law is also likely to improve the jury's deliberative process. Adopting the Eighth Circuit's recommendation of adding the phrase "and that fact tends to [support] [mitigate] imposition of the death penalty" to each non-statutory aggravating and mitigating factor risks juror confusion over their function. By

clearly dividing the inquiry into whether a factor has been proven from the inquiry into what weight a factor deserves, a court guides jurors' discretion by focusing them on the distinct roles they must play as finders of fact and sentencing authority. This separation of functions is consistent with the structure of the FDPA. Section 3593 indicates that Congress intended that juries first determine whether aggravating and mitigating factors are proven and only later decide what weight to give them.

In order to clarify the distinct tasks facing the jury for certain mitigating factors which the parties agreed had been established, the court directed jurors that all twelve of them were required to find certain mitigating factors proven, but that the question of how much weight to assign those factors was up to the jurors individually.[38] The court gave this instruction only for those mitigating factors that the parties agreed the defendant had established.

There is a constitutional requirement that a jury not be precluded from considering any constitutionally relevant mitigating evidence, *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). Thus, the court instructed the jurors that a mitigating factor need not be alleged by the defendant in order for the jurors to consider it.[39] The court recognized that this potentially permitted jurors to circumvent the court's gate-keeping function by considering mitigating factors that were not constitutionally relevant as a matter of law, but were considered relevant by jurors. However, as the parties agreed, this instruction was necessary to comply with the rule of *Lockett*, 438 U.S. at 604, 98 S.Ct. 2954 ("the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that

**38.** For example, with respect to one of the mitigating factors, the court instructed the jury:

Question 5H, which is on page 9, addresses the alleged mitigating factor that Mr. Sampson called 911 and surrendered himself to the Vermont State Police after the offenses charged in this case occurred. Once again, the parties have stipulated that this occurred, and you must accept that it did. So this is another one where you will answer, number of jurors who say yes, 12, but then you will each have to decide for yourself what weight to give that fact in any ultimate decision that you have to make.

Dec. 19, 2003 Tr. at 60.

**39.** The jurors were instructed:

In addition to the mitigating factors specifically raised by the defendant and listed on the verdict form, the law permits each of you to consider anything about the circumstances of the offense or anything about Mr. Sampson's background, record, or character, or anything else relevant that you individually believe weighs against the imposition of the death penalty.

The law does not limit your consideration of mitigating factors to those that have been articulated in advance of your deliberations. Therefore, if there is any mitigating factor that was not argued by the attorneys for the defendant which any juror on his or her own or with others finds to be established by a preponderance of the evidence, that juror is free to consider it in his or her sentencing determination.

So after question 5Q, you are asked to identify any such additional mitigating factors that one or more of you independently finds to exist by a preponderance of the evidence and indicate how many of you find that mitigating factor to be proven. However, it is not necessary for you to list a mitigating factor in order to consider it. But if you're able to articulate it, discuss it with each other, and if you think of something that is a mitigating factor that reasonably weighs in favor of a life sentence, you should write it in ..., one of these spaces, and write down the number of jurors who find that mitigating factor to be proven by a preponderance of the.evidence.

Dec. 19, 2003 Tr. at 64–65.

the defendant proffers as a basis for a sentence less than death.") (footnote omitted).

## XVI. JURY INSTRUCTIONS RELATING TO MITIGATING FACTORS

### A. STATUTORY MITIGATING FACTORS RELATING TO MENTAL CONDITION

██ Sampson argued that he had established two statutory mitigating factors relating to his mental condition at the time of the offenses. First, he argued that his "capacity . . . to conform conduct to the requirements of law was significantly impaired, regardless of whether the capacity was so impaired as to constitute a defense to the charge." 18 U.S.C. § 3592(a)(1). Second, he argued that he "committed [each] offense under severe mental or emotional disturbance." 18 U.S.C. § 3592(a)(6). Sampson also presented the jury with other non-statutory mitigating factors relating to his mental condition.

The statutory mitigating factors appear to have their roots in the Model Penal Code. *See* Model Penal Code § 210.6 (1962 Official Draft and Revised Comments). Therefore, the court adopted some of the ideas reflected in the Model Penal Code's commentary in developing the jury instructions for these factors. With respect to significant impairment, the court instructed the jury that:

> In this case, it is not argued that Mr. Sampson was completely unable to conform his conduct to the requirements of the law. If that were true, he would have been legally insane and, therefore, not guilty of the crime in question.
>
> The Federal Death Penalty statute provides, however, that if a person's ability to conform his conduct to the requirements of the law was not so completely impaired as to render him not guilty, but was nevertheless significantly impaired, he is less blameworthy than a person

who does not have a comparable impairment. Therefore, if proven, such as a significant impairment is a mitigating factor.

*See* Dec. 19, 2003 Tr. at 56–57; Model Penal Code § 210.6 cmt. 5(b), at 138.

The court also defined two key concepts embodied in the statute for the jury. The first is "impairment." The court instructed the jury that "[b]y 'impaired,' I mean damaged, weakened, or distorted." *Id.* at 56. The second is "significantly". The court instructed the jury that "[i]f an impairment is proven, it also must be proven that the impairment was significant. A significant impairment is a meaningfully large impairment, although not one so great as to completely impair Mr. Sampson's ability to do what the law requires." *Id.* at 58.

The court then explained the links among significant impairment and mental illness and other potential causes of an impairment in the context of the evidence in the case. The court instructed the jury that:

> The impairment could be caused by a mental illness. A mental illness is a disease or defect affecting the brain or mind that influences the way a person thinks, feels, behaves, and/or relates to others and to his surroundings.
>
> You have in this case heard evidence concerning mental illness. You should consider whether any form of mental illness has been proven and, if so, whether it caused or contributed to a significant impairment to Mr. Sampson's ability to conform his conduct to the requirements of the law.
>
> The impairment could also result from a brain dysfunction. A person has a brain dysfunction if his brain does not work as well as a normal person's brain. He, therefore, has problems with performing certain functions. These problems may involve, but not be limited to, difficulty

in controlling his impulses. The impairment could also be caused by the withdrawal from a drug addiction or from the consumption of a large amount of alcohol. In addition, the impairment could result from the interaction of a mental illness, a brain dysfunction, alcohol abuse, and/or withdrawal from the use of drugs.

*Id.* at 57–58.

With respect to severe mental and emotional disturbance, the court instructed the jury as follows:

The next mitigating factor is addressed in question 5C, which asks whether it's proven, at the time he committed the carjacking resulting in the death of Philip McCloskey, Gary Sampson was under a severe mental or emotional disturbance.

Once again, the Federal Death Penalty statute treats a person who kills in a state of severe mental or emotional disturbance as less blameworthy than one who murders while in complete control of his faculties. In contrast to a significantly impaired ability to obey the law, a severe mental or emotional disturbance may not be subject to a reasonable explanation but, nevertheless, be real. Therefore, if it is established that, for whatever reason, Mr. Sampson was not in normal control of his faculties because he was under a severe, meaning intense or great, mental or emotional disturbance, this alleged mitigating factor is proven.

*Id.* at 58–59.

The Model Penal Code indicates that the analogous mitigating factor of "extreme mental or emotional disturbance" relates to the concept of "imperfect provocation."

Section 210.3(1)(b) reduces murder to manslaughter where the homicide is committed "under the influence of extreme mental or emotional disturbance for which there is a reasonable explanation or excuse." ... [T]he Code recognizes that, even where extreme emotional distress is not subject to reasonable explanation or excuse, it may be weighed against imposition of the capital sanction. Generally speaking, one who kills in a state of extreme emotional disturbance is not as blameworthy as one who murders while in normal control of his faculties.

Model Penal Code § 210.6 cmt. 5(b), at 138. By using the word "severe" rather than "extreme", the FDPA provides for a mitigating factor that may be broader than the one described in the Model Penal Code because it has within its scope disturbances that, while severe, are not extreme.

### B. NON–STATUTORY MITIGATING FACTORS RELATING TO MENTAL CONDITION

In addition to the statutory mitigating factors relating to mental condition, the defendant also argued that several non-statutory mitigating factors relating to mental condition militated against a sentence of death. These non-statutory mitigating factors were: (1) Sampson is mentally ill; (2) Sampson has a brain dysfunction; and (3) Sampson was mentally ill at the time of each offense. The court instructed the jury to apply the definitions of mental illness and brain dysfunction that the court gave as part of the significant impairment instruction.

The court considered each of these non-statutory mitigating factors to be distinct from each other and the statutory mitigating factors relating to mental condition. Unlike the statutory mitigating factors, the first two non-statutory mitigating factors focused on the defendant as he was at the time of the sentencing trial rather than as he was at the time of the offenses.[40] Rath-

**40.** In this case involving multiple offenses taking place at different times, it was important

er than calling on the jury to consider mental illness or brain dysfunction as making the defendant less blameworthy for the crime, these mitigating factors focus the jury on the defendant's suitability for the death penalty and what sort of sentence life imprisonment would be for this defendant as opposed to another, mentally healthy defendant.

■ The final non-statutory mitigating factor, mental illness at the time of the offense, was arguably not a proper mitigating factor under the FDPA. One could plausibly read the FDPA as expressing judgment that mental illness at the time of an offense can be considered mitigating only if that mental illness contributes to a significant impairment or severe mental or emotional disturbance. However, the court did not adopt this interpretation. Rather, it concluded that mental illness at the time of an offense—even if that mental illness does not contribute to the offense—is a personal characteristic of the defendant that is properly characterized as mitigating. As the court explained to the jury: "This mitigating factor does not allege that any mental illness that Mr. Sampson had when he killed Mr. McCloskey caused or contributed to that crime being committed. Rather, it is based on the view that a more merciful punishment may be appropriate for a person who is suffering from a mental illness when he committed a crime as compared to a mentally healthy person." Dec. 19, 2003 Tr. at 59.

## C. OTHER MITIGATING FACTORS

■ Most of the other mitigating factors presented by Sampson were relatively straightforward factual allegations and did not require any elaboration by the court in

its jury instructions. The court did, however, provide jurors with some explanation regarding the mitigating factor that alleged Sampson was remorseful for his conduct. The court instructed the jury that "[r]emorse is a feeling of distress, arising from a sense of guilt for harm done to others. This mitigating factor focuses on whether Mr. Sampson is remorseful now. While his state of mind following his crimes may be relevant, it is his feelings now that are at issue." Dec. 19, 2003 Tr. at 63. Thus, the court instructed the jury that if the defendant was not initially remorseful, but later developed remorse for his conduct, that is a fact that mitigates against the imposition of the death penalty.[41] Conversely, if the defendant was initially remorseful, but later decided that he was glad that he committed his crimes, that is not a fact that mitigates against the imposition of the death penalty.

At the defendant's request, the court also instructed the jury that "[i]f it is proven that Mr. Sampson is remorseful, his remorse is a mitigating factor. If, however, you find that Mr. Sampson is not remorseful, you may not consider that to be an aggravating factor in this case." Dec. 19, 2003 Tr. at 64.

## XVII. INSTRUCTIONS RELATING TO THE WEIGHING PROCESS

■ The FDPA provides that:

the jury, or if there is no jury, the court, shall consider whether all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death, or, in the absence of a mitigating factor, whether the aggrava-

---

to focus the jury on the defendant's mental state at the time of each offense for purposes of the statutory mitigating factors. It was possible that the defendant was significantly impaired for one offense, but not the other.

**41.** The fact that remorse developed later rather than sooner may properly influence the weight a juror assigns to this mitigating factor.

ting factor or factors alone are sufficient to justify a sentence of death. Based upon this consideration, the jury by unanimous vote, or if there is no jury, the court, shall recommend whether the defendant should be sentenced to death, to life imprisonment without possibility of release or some other lesser sentence. 18 U.S.C. § 3593(e). Congress and the President provided no further guidance as to how much outweighing is "sufficient[ ] . . . to justify a sentence of death" or what other rules should govern the weighing process. Consequently, the parties presented the court with several disputes regarding the appropriate jury instructions on the weighing process required by the FDPA. In his requests for jury instructions, the defendant requested that the court instruct the jury that it should vote for a death sentence only if it finds that "death is the only proper and justified sentence." Def.'s Supp. Submission of Requested Penalty–Phase Instructions at 1, 6, 8, 11. The defendant elaborated on this concept, asking the court to further instruct the jury that "[i]f, after fair and impartial consideration of all the evidence in this case, each and every one of the twelve of you is *not* completely convinced that Gary Sampson's execution, and *only* his execution, is the justified and proper sentence, and that no other penalty will adequately serve the end of justice, then you *cannot* impose the death penalty here." *Id.* at 12.

The defendant also requested that the court instruct the jury that it could not vote for a death sentence unless the government proved, beyond a reasonable doubt, that the aggravating factors sufficiently outweighed the mitigating factors. In addition to this request, the defendant took the position that he had the right to argue that the jury should not impose a death sentence unless it was absolutely certain that it was appropriate. In essence, the defendant's position was that

"beyond a reasonable doubt" was the floor below which a jury could not go, but that he could properly ask the jurors to impose a higher burden on the government because of the severity and irrevocability of a death sentence.

The government strenuously opposed these requested instructions, arguing that the FDPA does not place such a heavy burden on the government and the jury should be instructed by simply reading the statutory language. With regard to the defendant's request for a "beyond a reasonable doubt" instruction, the government initially argued that when Congress meant to require a burden of proof in the FDPA, it expressly did so, and the absence of any burden of proof in the statute meant that the court should not adopt one. *See United States v. Chandler,* 996 F.2d 1073, 1091–93 (11th Cir.1993); *United States v. Hammer,* 25 F.Supp.2d 518, 530–31 (M.D.Pa.1998). *Compare* 18 U.S.C. § 3593(c) *with* 18 U.S.C. § 3593(e). The government acknowledged that it was subject to some undefined burden of proof, but argued that assigning any particular measure was inappropriate.

At first glance, the dispute over whether the court should instruct jurors that they must find that death is "the only appropriate penalty" and the dispute over a reasonable doubt instruction may appear to be different ways of framing the same argument. However, the court determined that this dispute involved two distinct, but related concepts: sufficiency and certainty.

The question of what is sufficient to justify the death penalty is conceptually distinct from the question of how *certain* a juror or judge needs to be in order to properly choose a death sentence. The Connecticut Supreme Court explained this distinction in *State v. Rizzo,* 266 Conn. 171, 833 A.2d 363 (2003). Unlike the FDPA, the Connecticut statute at issue in *Rizzo*

does not ask jurors whether the aggravating factors "sufficiently" outweigh the mitigating factors to justify the death penalty. Rather, it directs the jurors to determine simply whether the aggravating factors outweigh the mitigating factors. *Compare id.* at 377 *with* 18 U.S.C. § 3593(e). The defendant challenged the jury instructions relating to the weighing process because they did not instruct that the aggravating factors had to outweigh the mitigating factors "beyond a reasonable doubt". The court wrote:

> Before considering the defendant's claim, we must first identify it, because it is subject to two different interpretations: one interpretation focuses on *measuring the balance* between the aggravating factors and the mitigating factors; and the other interpretation focuses on the *level of certitude* required of the jury in determining that the aggravating factors outweigh the mitigating factors. In other words, we first must clarify whether the defendant claims that: (1) in performing the weighing process, the jury must be persuaded that the aggravating factors outweigh the mitigating factors by some quantum or amount measured by the "beyond a reasonable doubt" standard; or (2) in performing the weighing process, the jury must be persuaded beyond a reasonable doubt that the aggravating factors outweigh the mitigating factors by any degree or amount. Under the first interpretation, the jury must be persuaded that the balance of the aggravating factors against the mitigating factors must tip greatly—in the words of the defendant's request to charge, "substantially"; see footnote 8 of this opinion;—in favor of the aggravating factor such that the quantitative difference between the two factors would be aptly described as "beyond a reasonable doubt." Under the second interpretation, the jury need only determine that

the aggravating factor is greater in some degree or amount than the mitigating factor, but, in arriving at that determination, it must be persuaded by a level of certitude of beyond a reasonable doubt.

*Rizzo*, 833 A.2d at 377–78.

What the Connecticut Supreme Court refers to as "measuring the balance" is addressed by the FDPA's requirement that the jury find that the aggravating factors *sufficiently* outweigh the mitigating factors to justify the death penalty. This court rejected the defendant's argument that the FDPA's sufficiency requirement is satisfied only if jurors find that death is the only appropriate penalty. Instead, the court told jurors that they would be called on to decide whether death, as opposed to life imprisonment, was "the appropriate penalty" in this case. The defendant's proposed instruction would have precluded a death sentence unless the jury viewed death as an appropriate sentence and life imprisonment as an inappropriate sentence. However, given the severity of both sentences, it seemed quite possible that the jury would view either one as an appropriate sentence, but view one as more appropriate than the other. Although a jury in a FDPA case is certainly entitled to be merciful and choose the less severe sentence, the FDPA does not express the intent to require that the jury always choose the least severe appropriate sentence.

With respect to certainty, the court first decided that if the law imposes a particular burden of proof on the government, neither party may ask the jury to disregard the law by urging it to apply a higher or lower standard. Thus, the court rejected the defendant's request to forbid the government from arguing for a burden lower than "beyond a reasonable doubt" while

permitting the defendant to argue for a higher burden.

The text of the FDPA does not indicate that Congress intended to impose a reasonable doubt requirement on the weighing process. *See Chandler*, 996 F.2d at 1091–93. Indeed, the absence of an explicit burden of proof requirement in § 3593(e), given the explicit burden of proof requirements established in § 3593(c), suggests that Congress did not intend that the government be required to prove that death is appropriate to any particular degree of certainty. "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *See Russello v. United States*, 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983), *as quoted in Trenkler v. United States*, 268 F.3d 16, 23 (1st Cir.2001).

The lower courts are split on whether to instruct that the government must prove beyond a reasonable doubt that the death penalty is justified. The defendant cited cases in which the instruction was given and the government cited cases in which it was not. Judge Sand's model jury instructions contain "beyond a reasonable doubt" language while the Eighth Circuit's model jury instructions do not. *See* 1 Leonard B. Sand et al., *Modern Federal Jury Instructions,* Inst. 9A–19 at 9A–78 to –79; *Manual of Model Criminal Jury Instructions for the District Courts of the Eighth Circuit,* Instruction 12.11.

The defendant argued that even if the FDPA does not require a reasonable doubt standard, the constitution requires proof beyond a reasonable doubt for all facts of importance in a criminal trial. *See In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). The government responded that this argument is foreclosed by various Supreme Court decisions. In *Rizzo*, the Connecticut Supreme Court reached a similar conclusion, writing that "[i]t is settled law that, under the federal constitution, 'specific standards for balancing aggravating against mitigating circumstances are not constitutionally required.'" 833 A.2d at 378 (quoting *Zant v. Stephens*, 462 U.S. 862, 875–76 & n. 13, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983)).

This court concluded that the United States Supreme Court has never directly addressed the question of whether a sentencing body must be certain, beyond a reasonable doubt, that a death sentence is appropriate before deciding to impose it. In *Zant, supra,* the Court was presented with the question of whether the constitution requires a weighing statute. The "Respondent argue[d] that the mandate of *Furman* is violated by a scheme that permits the jury to exercise unbridled discretion in determining whether the death penalty should be imposed after it has found that the defendant is a member of the class made eligible for that penalty by statute." *Zant,* 462 U.S. at 875, 103 S.Ct. 2733. The Court rejected this argument and held that a weighing process was not an indispensable element of a constitutional death penalty statute. *Id.* The Court was not presented with the question of whether jurors must be certain beyond a reasonable doubt that they are exercising their discretion appropriately.

Although this court concluded that the defendant's argument was not foreclosed by binding precedent, the court did not find it persuasive. It is true, as the defendant argued, that the decision between the death penalty and a lesser sanction is in some ways similar to the other questions put to a jury in a criminal trial for which the constitution demands proof beyond a reasonable doubt. As with questions of guilt and innocence, the defendant in a

capital sentencing proceeding has "at stake interest[s] of immense importance." *Winship*, 397 U.S. at 363. As with questions of guilt and innocence, "[i]t is critical that the moral force of the criminal law not be diluted by a standard of proof that leaves people in doubt whether" those who do not deserve the death penalty are being condemned to die. *Id.* at 364, 90 S.Ct. 1068.

However, the defendant's analogy to proof of facts, which is the subject of *In re Winship*, is not apt. Although important to the defendant and society, the sentencing decision in a capital case is, in its most important respects, fundamentally different than any other task that a jury is called upon to perform in our criminal justice system. The jury is not acting as a finder of fact. Rather, it is exercising discretion in sentencing that is ordinarily exercised by judges. Whether a jury's sentencing decision is right or wrong is not something that is capable of proof in the traditional sense. As the Supreme Court of Alabama explained, "the weighing process is not a factual determination. In fact, the relative 'weight' of aggravating circumstances and mitigating circumstances is not susceptible to any quantum of proof." *Ex parte Waldrop*, 859 So.2d 1181, 1189 (Ala.2002), *cert. denied sub nom., Waldrop v. Alabama,* — U.S. —, 124 S.Ct. 430, 157 L.Ed.2d 314 (2003); *accord Harris v. Pulley,* 692 F.2d 1189, 1195 (9th Cir.1982) ("[W]e are not aware of any instance where a state must carry such a burden of proof when attempting to convince a sentencing authority of the appropriate criminal sentence. If the Supreme Court had intended for the burden in death-penalty cases to vary from the standard burden in all other criminal sentencing, it would have said so in one of the many modern cases dealing with the death penalty."), *rev'd on other grounds,* 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984).

When a court chooses among the various sentences that the law permits in a typical criminal case, it need not be persuaded beyond a reasonable doubt that the harsher sentence is the most appropriate sentence in order to impose it. The FDPA appears to confer comparable discretions on the jury in a federal capital case.

Thus, this court initially concluded that it was appropriate to not only leave the determination of what is sufficient to justify a death sentence to the jurors, but also to permit the jurors to decide how certain they must be to impose a death sentence.

However, on December 16, 2003, the government changed its position and stated that it had no objection to a reasonable doubt instruction so long as it provided both a "floor" and a "ceiling". That is, the government withdrew its objection to jurors being instructed that the weighing process carries a reasonable doubt burden provided that the court did not permit the defendant to argue that the jurors should impose a stricter burden on the government. The defendant maintained his position that "beyond a reasonable doubt" was the proper floor, but that he should be entitled to argue that absolute certainty was required.

Relying on the government's revised position and viewing it as prudent, the court incorporated a reasonable doubt standard in the instructions relating to the weighing process. However, the court also instructed jurors that they had the discretion to decide what was "sufficient" for themselves. The court rejected the government's initial suggestion that the court should simply read the jurors the applicable part of § 3593(e) without any further explanation. Instead, the court explained to the jurors the scope of their responsibility to determine what was sufficient to justify the death penalty and the impact

that this determination would have on their ultimate decision.[42]

■ A final dispute regarding the weighing process concerned what the defendant referred to as a "mercy instruction" and the government referred to as a "nullification instruction." The defendant requested that the court instruct the jury that it was never required to impose the death penalty. The government objected to this instruction, arguing that it would encourage jury nullification. Unlike the Drug Kingpin Act on which it was modeled, the FDPA does not explicitly require such an instruction. *Compare* 21 U.S.C. § 848(k) ("The jury ... regardless of its findings with respect to aggravating and mitigating factors, is never required to impose a death sentence and the jury shall be so instructed.") *with* 18 U.S.C. § 3593.

To the extent there are no circumstances in which the law mandates that a juror find that the aggravating factors sufficiently outweigh the mitigating factors to justify a sentence of death, the defendant was correct that a juror is, as a practical matter, never required to impose the death penalty. However, the defendant failed to identify a situation in which it would be appropriate for a juror to be persuaded beyond a reasonable doubt that the aggravating factors sufficiently outweigh the mitigating factors to justify a sentence of death yet still refuse to vote for a death sentence. The statute directs the jury to make a unanimous recommendation "[b]ased upon this consideration" of aggravating and mitigating factors. 18 U.S.C. § 3593(e). The statute does not identify any other permissible considerations. To permit the jury to consider matters other than the relative weight of aggravating and mitigating factors found during jury deliberations risks the arbitrary and capricious imposition of death sentences based on unspecified criteria.

Accordingly, the court instructed the jury that:

> the law never requires that any or all of you find that the death sentence is justified. Any one of you may decline to impose the death penalty. If you decide that the prosecution has not proven beyond a reasonable doubt that the death penalty is justified, you do not have to give a reason for that decision. The law does require that you follow the process

---

**42.** On December 19, 2003, the court instructed the jury that:

> The law does not define what is sufficient to make death the appropriate penalty. Here, the law relies on each of you as a representative of our community to consult your conscience and determine what is sufficient to justify Mr. Sampson's execution. Thus, your decision as to what the appropriate sentence is will depend in part on what is sufficient for you. If you find that the government has proven that the aggravating factors slightly outweigh the mitigating factors and that is sufficient for you to find that death is the appropriate penalty, you may properly vote for death.

> On the other hand, even if the government has proven to you that the aggravating factors greatly outweigh the mitigating factors, you may properly decide that this is not sufficient to justify a sentence of death because, for you,

even more is required for you to find that a man should die.

> However you personally define sufficiency, the prosecution must convince you beyond a reasonable doubt that the aggravating factor or factors sufficiently outweigh the mitigating factors to make death the appropriate penalty in this case.

> As I told you earlier, this is a heavy burden. More than a strong probability is required. You must be certain beyond any reasonable doubt that a death sentence should be imposed before voting for it.

> Death is, of course, the ultimate irreversible punishment. You must not sentence Gary Sampson to die unless you are convinced beyond a reasonable doubt that death is the appropriate punishment.
> December 19, 2003 Tr. at 69–71.

that I've explained and then make a reasoned moral judgment.

Dec. 19, 2003 Tr. at 71. This instruction informed jurors that if they reached the selection stage, the decision whether to impose a death sentence was entirely for each of them to make because the law never compels a death sentence.

However, the court also instructed the jurors that:

If each and every one of you find that the prosecution has proven beyond a reasonable doubt that the aggravating factors found to exist sufficiently outweigh the mitigating factors found to exist to make death the appropriate penalty for Mr. Sampson for the carjacking resulting in the death of Philip McCloskey, you will check "All 12 jurors say Yes." You will have thus decided that Mr. Sampson will be executed for that crime, and that is the sentence that I will impose.

*Id.* at 73. Therefore, the jurors were informed that if they unanimously decided that the government had proven beyond a reasonable doubt that the government had satisfied the statutory standard, they were obliged to say so and the death penalty would be imposed.

Accordingly, rather then treating the weighing process as a prerequisite to imposing the death penalty based on some additional undefined criteria, the court, in essence, instructed the jurors that the weighing process was the criteria by which they were to determine if death was the appropriate sentence.

## XVIII. INSTRUCTIONS RELATING TO FAILURE OF THE JURY TO REACH A UNANIMOUS VERDICT

The court told the jury what would occur if it failed to reach a unanimous verdict in favor of the death penalty. In Part Six of the verdict forms, the court

gave the jury three options. The first was a unanimous vote that the government had met its burden of proving that death was the appropriate sentence. The second was a unanimous vote that the government had failed to meet its burden of proving that death was the appropriate sentence. The third was that "[a]fter making all reasonable efforts, the jury is unable to reach a unanimous decision on whether the government" met its burden of proof.

The court recognized that the Eighth Amendment does not require that the jury be told the consequences of their failure to agree and that the government has a strong interest in a unanimous verdict—one way or the other—in a death penalty prosecution. *See Jones v. United States,* 527 U.S. 373, 381–82, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999). However, the Supreme Court in *Jones* did not forbid this sort of instruction. Instead, it held that the constitution does not require it and that the Court would not exercise its supervisory powers to require that it be given in every case.

This court chose to inform the jury of the consequences of deadlock for several reasons. First, viewing this instruction as part of the overall instructions regarding deliberations, the court believed that the government's interest in a unanimous verdict was adequately protected. Second, informing the jurors of the consequences of deadlock emphasized the individual responsibility of each juror. Ensuring that jurors were cognizant of this responsibility was also an important government interest. Third, the instruction also ensured that jurors undertook their deliberations accurately understanding the consequences of their actions. Declining to instruct the jury on the consequences of a deadlock could result in jurors deliberating based on a misunderstanding of the law

rooted in speculation and incorrect assumptions.[43]

## XIX. ISSUES RELATING TO FEDERAL RULE OF CRIMINAL PROCEDURE 12.2

 Prior to trial, a number of issues arose when Sampson gave notice, pursuant to the recently revised Federal Rule of Criminal Procedure 12.2(b), that he intended to introduce expert evidence relating to his mental condition at the penalty phase in this case. The former version of Rule 12.2 applied only when a defendant intended to offer mental condition evidence at the guilt phase. Prior to the Rule's amendment on December 1, 2002, several courts fashioned their own procedures in capital cases where a defendant's mental health might be an issue at sentencing. *See, e.g., United States v. Allen,* 247 F.3d 741 (8th Cir.2001), *vacated on other grounds,* 536 U.S. 953, 122 S.Ct. 2653, 153 L.Ed.2d 830 (2002); *United States v. Minerd,* 197 F.Supp.2d 272 (W.D.Pa.2002); *United States v. Edelin,* 134 F.Supp.2d 45 (D.D.C.2001); *United States v. Beckford,* 962 F.Supp. 748 (E.D.Va.1997); *United States v. Haworth,* 942 F.Supp. 1406 (D.N.M.1996); *United States v. Vest,* 905 F.Supp. 651 (W.D.Mo.1995).

As discussed below, some of the procedures employed by those courts are no longer permissible because the new Rule limits the court's discretion in certain areas. However, the new Rule does not resolve all of the procedural issues that may arise in a capital case.

## A. SUFFICIENCY OF SAMPSON'S RULE 12.2 NOTICE

Pursuant to Rule 12.2(b), a defendant "must" give notice before trial if he "intends to introduce expert evidence relating to a mental disease or defect or any other mental condition of the defendant bearing on ... the issue of punishment in a capital case ...." Fed.R.Crim.P. 12.2(b). If the defendant provides such notice, "the court may, upon the government's motion, order the defendant to be examined under procedures ordered by the court." Fed.R.Crim.P. 12.2(c)(1)(B).

On May 5, 2003, Sampson filed a Notice Pursuant to Fed.R.Crim.P. 12(b) (the "Notice"), which stated that "he may introduce, at the penalty phase of this capital case, expert evidence relating to a mental disease or defect or any other mental condition bearing on the issue of punishment." Sampson also filed a Motion to Seal the Notice based on counsel's "concern[ ] that the public filing of the notice will yield media speculation that Mr. Sampson is somehow going to 'plead insanity' or argue that he was 'crazy' at the time of the offense." The court was not persuaded that the potential for prejudicial pretrial publicity could overcome the presumption that criminal proceedings should be open to public scrutiny. *See United States v. Salemme,* 985 F.Supp. 193, 195 (D.Mass. 1997). Thus, on May 22, 2003, the court unsealed the documents relating to Sampson's Rule 12.2 Notice.

The government filed a Motion to Strike the Notice. The motion was based on the

**43.** The court instructed the jury as follows:

If, after making all reasonable efforts, at the conclusion of your deliberations on a particular count, you have not reached unanimous agreement on whether the prosecution has proven that the death penalty is justified, you will not be a hung jury. And in contrast to the conventional criminal case, this case will not have to be tried again because the jury did

not reach a unanimous verdict. Rather, if you are unable to reach a unanimous verdict on whether the government has proven the death penalty is justified on a particular count, the law provides that I must sentence Mr. Sampson to life in prison without possibility of release on that count, and I will do so.
Dec. 19, 2003 Tr. at 72.

fact that Sampson's Notice and the related motion to seal expressed uncertainty about whether he would introduce expert evidence at any penalty phase of this case and a concern that, because of this equivocation, the government would be deprived of its right to request an examination of the defendant.

On May 9, 2003, the court ruled that the Notice was sufficient to preserve Sampson's right to present mental condition evidence as well as to trigger the government's right to request an examination of Sampson. If the defendant had expressed a clear intention to offer expert evidence of his mental condition, he would have been free to change his mind and withdraw the Notice. See Fed.R.Crim.P. 12.2(e) (evidence of a withdrawn intention is not admissible against person who gave notice). Moreover, the defendant himself acknowledged that his Notice had triggered the government's right to request an examination of Sampson. See Def.'s Motion to Seal ("Where such a notice is filed, the court may, upon motion from the government, order the examination of the defendant 'under procedures ordered by the court.'"). Therefore, it was not necessary or appropriate to strike the Notice.

### B. CONTENT OF SAMPSON'S RULE 12.2 NOTICE

 The government moved for a mental health examination of the defendant. See Fed.R.Crim.P. 12.2(c)(1)(B). The government, however, contended that Sampson's terse notice failed to provide the information the government's experts needed to conduct meaningful testing of the defendant. The government asked the court to order Sampson to supplement his Rule 12.2 notice to include (1) the nature of the proffered mental condition(s); (2) the

identity and qualifications of the expert who would testify or whose opinions would be relied upon; (3) a brief, general summary of the topics to be addressed that was sufficient to permit the government to determine the area(s) in which its expert(s) must be versed; and (4) all medical records and test results relating to mental health that would be the subject of the anticipated expert testimony. The defendant objected to providing more information than Rule 12.2 explicitly required.

Following a hearing and further discussion between the parties, the court adopted the parties' agreement that defense counsel would supplement the defendant's Rule 12.2 Notice to include "the kinds of mental health professionals who have evaluated Mr. Sampson (e.g., forensic psychiatrist, neuropsychologist, clinical psychologist) as well as the specific nature of any testing that these experts have performed (e.g., MMPI–2, WAIS–2, etc.) in the course of their evaluations of Mr. Sampson."[44]

The revised Rule 12.2 resolved only some of the pertinent issues. First, the new Rule "extends" the previously existing notice requirement for mental condition evidence at the guilt phase "to a defendant who intends to offer expert evidence, testimonial or otherwise, on his or her mental condition during a capital sentencing proceeding." Fed.R.Civ.P. 12.2, 2002 Advisory Committee Notes. The Advisory Committee cited approvingly to Beckford and Haworth, both of which grounded the need for pretrial notice in the government's right to develop rebuttal evidence fairly and efficiently. See Haworth, 942 F.Supp. at 1407–08; Beckford, 962 F.Supp. at 759–60. This comports with Congress' rationale for enacting the prior version of Rule

---

**44.** The parties also agreed that: (1) the government must preserve all notes taken during its experts' examinations; and (2) use and disclosure of the reports will be governed by Rule 12.2(c)(2)-(4) and (e).

12.2(b): namely, without notice of the defendant's mental capacity claim, "the government would not have [ ] an opportunity to conduct the kind of investigation needed to acquire rebuttal testimony." Fed.R.Civ.P. 12.2, 2002 Advisory Committee Notes; *see United States v. Buchbinder,* 796 F.2d 910, 915 (7th Cir.1986) (citing Conference Committee Notes, H.R. 94–414, 1983 amendment to Rule 12.2(b)). Thus, "notice" in Rule 12.2 must be read, as it was before the 2002 revision, to require meaningful notice, serving the overall purpose of the Rule.

However, the need for meaningful notice must be balanced against the special considerations present when a capital defendant intends to use his mental condition at the sentencing phase only. To allow the government to use the results of a defendant's mental examination, or any information derived from it, for a purpose other than rebuttal at sentencing would violate the defendant's Fifth Amendment right against self-incrimination. *See Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981). Moreover, the defendant's Sixth Amendment right to the effective assistance of counsel could be compromised if defense counsel was required to reveal his strategy or to disclose materials he provided to his experts. *See Beckford,* 962 F.Supp. at 764 n. 16; *United States v. Edelin,* 134 F.Supp.2d 45, 52 (D.D.C.2001). The new Rule 12.2 partially addresses these concerns by providing that:

> The results and reports of any examination conducted [by government experts] solely under Rule 12.2(c)(1) after [defendant's] notice under Rule 12.2(b)(2) must be sealed and must not be disclosed to any attorney for the government or the defendant unless the defendant is found guilty of one or more capital crimes and the defendant confirms an intent to offer

during sentencing proceedings expert evidence on mental condition.

Fed.R.Crim.P. 12.2(c)(2).

This procedure, while not constitutionally required, is designed to avoid litigation over whether the government has improperly made derivative use of the evidence. *See* 2002 Advisory Committee Notes (citing *Beckford* and *United States v. Hall,* 152 F.3d 381, 398 (5th Cir.1998)).

Before the enactment of the new Rule 12.2, the courts were split on the propriety of the government's first request, for "the nature of the proffered mental conditions(s)." *Compare Beckford,* 962 F.Supp. at 764 n. 15 (denying similar request) and *Edelin,* 134 F.Supp.2d at 55–56 (denying similar request) *with Haworth,* 942 F.Supp. at 1409 (requiring notice to include "brief summary of each expert's conclusions") and *United States v. Vest,* 905 F.Supp. 651, 654 (W.D.Mo.1995) (requiring notice to include "brief description of the professional's diagnostic conclusions"). Under the new Rule, however, requiring the defendant to provide such information is no longer permissible because "the nature of the proffered mental condition(s)" is essentially the same as the "results and reports" for which early disclosure is barred. *See* Fed.R.Crim.P. 12.2(c)(2). As reflected in the parties' agreement, however, the government's other requests sought the type of information that was necessary to enable the government to hire the right type of rebuttal experts and conduct the proper tests. *See Beckford,* 962 F.Supp. at 764; *Minerd,* 197 F.Supp.2d at 277; *Edelin,* 134 F.Supp.2d at 58. The government's requests were, therefore, meritorious.

## C. DESIGNATION OF FIRE-WALLED ASSISTANT UNITED STATES ATTORNEYS

On June 17, 2003, the court, with agreement of the parties, designated two Assis-

tant United States Attorneys ("AUSAs") from the District of New Jersey to serve as the "fire-walled" AUSAs in this case. The fire-walled AUSAs were responsible for all issues relating to the Rule 12.2 mental health testing of Sampson, including any legal or logistical issues that had to be resolved or brought to the court's attention. All further issues relating to mental health examinations of Sampson for possible use at any penalty phase were shielded from the prosecution team by a June 17, 2003 Protective Order.[45]

The new Rule 12.2 does not resolve how, as a practical matter, the government experts are to conduct their mental health examinations while adhering to the prohibition against early disclosure to the prosecutors of the "results and reports" of those examinations. *See* Fed.R.Crim.P. 12.2(c)(2). It was foreseeable that issues would arise during the course of the examinations—such as non-cooperation by the defendant or the unexpected need to do additional testing—that would have to be communicated to a government attorney, to defense counsel, and to the court. However, if the government's experts had raised potential problems with the prosecution team the "results" of the government's testing could be prematurely revealed and, at a minimum, there would have been a risk of disputes over whether the government impermissibly used the information for purposes other than rebuttal at sentencing.

Before the amendment to the Rule, at least one court had designated a "fire-walled" Assistant United States Attorney who alone would have pre-penalty phase access to the government's experts' reports. *See United States v. Allen,* 247 F.3d 741, 773–74 (8th Cir.2001), *vacated on other grounds,* 536 U.S. 953, 122 S.Ct. 2653, 153 L.Ed.2d 830 (2002). Under the literal language of the new Rule 12.2, how-

---

**45.** The June 17, 2003 Protective Order stated:

For the Reasons described at the lobby conference on June 16, 2003, it is hereby ORDERED that:

1. Marc Agnifilo and Kevin Walsh, Assistant United States Attorneys from the District of New Jersey, will serve as the "fire-walled Assistant United States Attorneys" in this case.

2. All documents, records, and information disclosed by the defendant to the fire-walled Assistant United States Attorneys and all documents, records, and information obtained or developed by any expert working with them are subject to the following restrictions. *See* Fed. R.Crim. Pro. 12.2, 16(d).
a) The documents, records, and information shall be disclosed only to: (i) Mr. Agnifilo; (ii) Mr. Walsh; (iii) the individuals in the District of New Jersey and in the Department of Justice in Washington, D.C. necessary to assist them in this case; and (iv) any expert(s) working with them. Each of the foregoing is an "Authorized Individual" for the purpose of this Order.
b) The foregoing documents, records, and information shall not be disclosed, directly or indirectly, to United States Attorney Michael Sullivan, to Assistant United States Attorneys Frank Gaziano, George Vien or John Wortmann, Jr., or to any other attorney, staff member, agent, expert or consultant working for or with the United States Attorney for the District of Massachusetts.
c) The foregoing documents, records, and information shall be used by each Authorized Individual solely for the purpose of this case. Each Authorized Individual shall not divulge the documents, records or information to anyone who is not an Authorized Individual.
d) Submissions to the court referring to the foregoing documents, records, or information shall be filed (i) at least temporarily under seal, and (ii) be served only on defense counsel and the fire-walled Assistant United States Attorneys.
e) Each Authorized Individual shall file, under seal, a statement under oath representing that he or she has read this Order and recognizes that a willful violation of it may be deemed a civil and/or criminal contempt.
f) If an Authorized Individual learns of a possible violation of this Order, he or she shall inform the court promptly.

ever, the reports and results cannot be revealed to "*any* attorney for the government" unless and until the defendant's guilt is established and he confirms an intent to offer expert evidence on his mental condition during the penalty phase. Fed.R.Civ.P. 12.2(c)(2) (emphasis added). Moreover, the 2002 Advisory Committee Notes, citing *Beckford*, state that the Rule "adopts the procedure by some courts to seal or otherwise insulate" the results. Fed.R.Civ.P. 12.2, 2002 Advisory Committee Notes; *see also Beckford*, 962 F.Supp. at 764 (report of government examination filed under seal and not disclosed to any government attorney until defendant confirmed an intent to offer mental condition evidence in mitigation). Arguably, the Committee implicitly rejected other possible procedures that were in use in the district courts before the Rule was amended, including the fire-wall procedure. *See Allen*, 247 F.3d at 773–74; *Minerd*, 197 F.Supp.2d at 276 (contrasting *Beckford* and *Allen* and choosing *Beckford* procedure because it better protected the defendant's constitutional rights).

Nevertheless, this court found that it was reasonable and consistent with the goals of the new Rule 12.2 to interpret "any attorney for the government" to mean any attorney for the government in a particular prosecution except those attorneys representing the government's interests solely in connection with its experts' testing. To avoid premature disclosure of the "reports and results" to the prosecution team, the court ruled that the fire-walled AUSAs in this case could not be members of the prosecution team and would not be allowed to join the prosecution team after any penalty phase had begun.[46] This contrasted with procedure

in *Allen*, where the district court allowed one assistant prosecutor to begin evaluating the results of the examinations prior to the sentencing phase. This prosecutor was not allowed to divulge the results of the examinations to the other prosecutors until after the completion of the guilt phase, but was then allowed to join the prosecution team. *Allen*, 247 F.3d at 772.

Rule 12.2's goal of avoiding delays in capital sentencing proceedings would not be served if any problems with the government testing were not revealed until after the guilt phase. The defendant could suffer no prejudice from the fire-wall procedure. Indeed, the procedure might provide the defendant with an even greater sense of security that his defense strategy—including the types of mental health experts he had hired—would remain hidden from the prosecution team.

On June 27, 2003, the court, with agreement of the parties, ordered that the fire-walled AUSAs read the mental health reports prepared by the government expert(s) before filing the reports with the court.

### D. ADVANCE NOTICE TO THE DEFENDANT OF GOVERNMENT TESTING

On June 27, 2003, as agreed by defense counsel and the fire-walled AUSAs, the court ordered the fire-walled AUSAs to provide defense counsel with at least five days' advance notice of the professions of the government expert(s) who would examine Sampson with respect to his mental condition and of the tests that the expert(s) planned to perform. The defendant had requested this procedure for two reasons: so that defense counsel could

---

**46.** Although it is, in theory, possible that a fire-walled AUSA could work in the same office as the prosecutors, in this case the government wisely chose to use fire-walled AUSAs from a different district to minimize the possibility of any inadvertent breach of the fire-wall.

make a challenge under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), to any proposed test of "dubious scientific validity" and so that defense counsel could advise Sampson of the "scope and nature of the proceeding." Def.'s Mem. re: Conditions of Mental-Health Evaluation at 6–7 (quoting *Buchanan v. Kentucky*, 483 U.S. 402, 424, 107 S.Ct. 2906, 97 L.Ed.2d 336 (1987)).

The court was not persuaded by the defendant's *Daubert* argument. Because any dispute surrounding a test's admissibility could become moot if neither party attempted to admit the test results, conducting a *Daubert* analysis before the test was administered would have wasted judicial resources and frustrated Rule 12.2's goal of avoiding delay in capital cases.

Arguably, the Sixth Amendment right to counsel recognized in *Estelle*, 451 U.S. at 470–71, 101 S.Ct. 1866, would be satisfied without five days' advance notice, because defense counsel had undoubtedly already told Sampson that he would have to retake, with government experts, any tests he had already taken with his own experts. *See Buchanan*, 483 U.S. at 423–25, 107 S.Ct. 2906 (requiring only general awareness of the types of test to be performed and how they could conceivably be used against defendant). A defendant might nevertheless benefit from legal advice. For example, if defense counsel were given notice of the government's experts and the tests they intended to conduct, a defendant could decide to withdraw his notice rather than proceed with the possibility of presenting evidence concerning his mental condition. In addition, a defendant, with or without his lawyer's advice, might refuse to participate in certain tests or to answer certain questions. Such conduct would subject him to the risk of forfeiting his right to present evidence of his mental health. *See* Fed.R.Crim.P. 12.2(d) ("If the defendant fails to give notice under Rule 12.2(b) or does not submit to an examination when ordered under Rule 12.2(c), the court may exclude any expert evidence from the defendant on the issue of the defendant's mental disease, mental defect, or any other mental condition."). However, that is the defendant's decision to make, and he must have his lawyer available to help him. *See Estelle* at 470, 103 S.Ct. 3383 ("[A]ccused is guaranteed that he need not stand alone against the State at any stage of the prosecution, formal or informal, in court or out, where counsel's absence might derogate from the accused's right to a fair trial.") (quoting *United States v. Wade*, 388 U.S. 218, 226–27, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967)).

There were also practical reasons to give defense counsel notice of the proposed exams, such as to better coordinate access to Sampson between the government's experts and the defendant's experts. *See Minerd*, 197 F.Supp.2d at 278 (establishing procedures to address possibility that dueling tests could be incompatible with each other or would need to be scheduled far enough apart in order to obtain reliable results).

Finally, there was a certain symmetry to requiring the government to give the defendant notice of the types of experts it would employ and the testing to be done, because that is the information Sampson had to give to the government. The overarching purpose of Rule 12.2 is to place the parties on a level playing field regarding the development of mental health evidence.

### E. TAPE–RECORDING OF GOVERNMENT'S TESTING

As also agreed by defense counsel and the fire-walled AUSAs, the court ordered that the mental health examinations of the defendant conducted by government expert(s) be tape-recorded, subject to recon-

sideration if the fire-walled AUSAs moved to prohibit such a procedure. Originally, the defendant had contended that the Sixth Amendment right to counsel and the Fifth Amendment privilege against self-incrimination required that the court allow a defense representative, including a defense expert, to be present during any clinical interviews or testing of Sampson. The defendant later indicated that having the interviews tape-recorded and the recordings provided immediately to defense counsel would be a satisfactory alternative. *See United States v. Byers,* 740 F.2d 1104, 1172 (D.C.Cir.1984) (Bazelon, J., dissenting) ("[A] taped record would facilitate constitutional aims without impairing the interview process itself.") (footnotes omitted).

The defendant could not present expert testimony on his mental condition and yet refuse, on Fifth Amendment grounds, to answer questions put to him by the government's experts. *See* Fed.R.Crim.P. 12.2(d); *cf. United States v. Bartelho,* 129 F.3d 663, 673–74 (1st Cir.1997) (striking defendant's direct testimony because he refused to answer related questions on cross-examination). Defense counsel's presence at the testing would not have been necessary to protect Sampson's Fifth Amendment rights because Rule 12.2 provides that "[n]o statement made by a defendant in the course of any examination conducted under this rule ... and no other fruits of the statement may be admitted into evidence against the defendant in *any criminal proceeding* except on an issue regarding mental condition" on which the defendant has introduced expert evidence pursuant to Rule 12.2. Fed.R.Crim.P. 12.2(c)(4) (emphasis added); *see* 1983 Advisory Committee Notes (stating that Rule 12.2(c) was written to "reflect the Fifth Amendment considerations" addressed in *Estelle*); *State v. Martin,* 950 S.W.2d 20, 25 (Tenn.1997) (concluding that Tennessee's version of Rule 12.2 "achieve[s] the

balancing of interests stressed" in *Estelle* and thus defendant had no Fifth Amendment right to have defense counsel and experts present at government's examination).

Rule 12.2 does not shed much, if any, light on Sampson's Sixth Amendment claim. While "a substantial majority of state and federal jurisdictions have held that a defendant does not have the right to counsel during a psychiatric examination," *see Martin,* 950 S.W.2d at 26 (collecting cases), there is no controlling Supreme Court or First Circuit precedent, and there are compelling arguments on both sides. *See U.S. v. Byers,* 740 F.2d 1104 (D.C.Cir.1984) (*en banc*) (five judges found no right to counsel, four judges dissented and three judges would have refused to consider the appeal on procedural grounds.)

However, regardless of whether a defendant has a constitutional right to have counsel present at the government's examinations, the court has the discretion to order that a defense representative be allowed to attend or that the testing be recorded. *See* Fed.R.Civ.P. 12.2(c)(1)(B) ("court may ... order the defendant to be examined under procedures ordered by the court"); *United States v. Kaczynski,* 1997 WL 668395, at *3 (E.D.Cal. Oct. 22, 1997) (denying government request to videotape government experts' examinations, but allowing examinations to be audio-taped and permitting defense counsel to monitor examinations via live audio or video feed); *Commonwealth v. Baldwin,* 426 Mass. 105, 686 N.E.2d 1001, 1005 (1997) (holding that while Sixth Amendment does not categorically demand that defense counsel be allowed to attend or videotape government testing, court has discretion to allow either procedure). The court's exercise of its discretion may be influenced by factors such as the nature of the test, the

potential harm to the test's reliability if a defense representative were to attend, and the reason defense counsel wants to be present (e.g., to interrupt the testing if necessary or simply to observe to gather information for cross-examination). In the circumstances of this case, the tape-recording of the examinations was a reasonable exercise of the court's discretion.

## XX. ORDER

It is hereby ORDERED that this Memorandum shall be served on the parties and made part of the public record in this case.